SILLS CUMMIS & GROSS P.C.
101 Park Avenue
New York, NY 10178
(212) 643-7000
*Attorneys for Defendants Sahara Plaza, LLC and*
*Fairmont Hotels & Resorts (Maryland) LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TINA MICHELLE BRAUNSTEIN,<br><br>                    Plaintiff,<br><br>-against-<br><br>SAHARA PLAZA, LLC and THE PLAZA HOTEL, a FAIRMONT MANAGED HOTEL,<br><br>                    Defendants. | Civil Case No. 1:16-cv-08879 (VSB)<br><br>(Electronically Filed Document)<br><br>**DEFENDANTS' L. CIV. R. 56.1**<br>**STATEMENT OF UNDISPUTED**<br>**MATERIAL FACTS** |

      Defendants Sahara Plaza, LLC ("Sahara") and Fairmont Hotels & Resorts (Maryland) LLC (incorrectly identified in the Complaint as "The Plaza Hotel, a Fairmont Managed Hotel") (collectively, the "Defendants") respectfully submit this statement of the material facts as to which the Defendants contend there is no genuine issue to be tried:

      1.    Plaintiff Tina Michelle Braunstein ("Plaintiff" or "Ms. Braunstein") was employed by Defendant Sahara as a Bartender in The Palm Court (the "Restaurant"), a dining venue located at The Plaza Hotel (the "Hotel"), from October 27, 2014 to March 13, 2015. (Affidavit of Karen Wenger dated March 13, 2018 ("Wenger Aff."), ¶ 2).

      2.    Per the job description for the Bartender position Plaintiff held, under the "Requirements" section, a Bartender must have, among other things, "[e]xcellent communication . . . skills," "[s]trong interpersonal . . . abilities," and the "[a]bility to work cohesively with fellow colleagues as part of a team." (Wenger Aff., ¶ 3, Ex. A). At her deposition, Plaintiff

acknowledged that the foregoing qualifications were the "same requirements in place when [she] was in the position." (Declaration of David I. Rosen dated March 14, 2018 ("Rosen Decl."), Ex. 1, 139:14-20; 145:1-14; 146:14-20).

3.  Plaintiff's position was covered under the terms and conditions of a collective bargaining agreement ("CBA") between the Hotel & Motel Trades Council (the "Union"), a labor organization, and the Hotel Association of New York City, a multi-employer bargaining agent representing numerous hotels, including the Hotel. (Wenger Aff., ¶ 4).

4.  The Hotel and the Union also were parties to a separate agreement which modified the CBA with respect to the operation of the Restaurant (the "Palm Court Agreement"). (*Id.*, ¶ 5, Ex. B).

5.  Plaintiff was hired during the Restaurant's first year of operation. Pursuant to Section 2, paragraph h., of the Palm Court Agreement, "For the first one (1) year of operation, the probationary period for new hires shall be one hundred fifty (150) days." The Hotel had the authority under the CBA to terminate Plaintiff's probationary period employment without affording her the right to contest her termination under the grievance and arbitration provisions of the CBA. (*Id.*, ¶ 5, Ex. B).

6.  Plaintiff signed an offer of employment letter from Sahara on October 21, 2014. (*Id.*, ¶ 6, Ex. C). The first page of said letter states: "The work you will do is covered by an existing collective bargaining agreement between the Plaza and the New York Hotel and Motel Trades Council, AFL-CIO." (*Id.*).

7.  On October 23, 2014, four days prior to her official employment commencement date, Plaintiff signed a Form of Acknowledgment (*id.*, Ex. D) confirming that she had received

and reviewed the Hotel's Discrimination & Harassment Prevention Policy (the "Policy"). (*Id.*, ¶ 7, Ex. D).

8. During the period of Plaintiff's employment, Johann Widnersson ("Mr. Widnersson"), who was then the Beverage Manager, was her direct supervisor. Amin Deroui ("Mr. Deroui"), the Food and Beverage Manager, also supervised Plaintiff from time-to-time. (*Id.*, ¶ 9).

9. Martin Mariano ("Mr. Mariano"), then the Hotel's Director of Food and Beverage, oversaw the Restaurant's operation. (*Id.*, ¶ 10).

10. On approximately the same day as Plaintiff's hire, three other evening Bartenders were also hired: James Menite ("Mr. Menite"), Edwin Marini ("Mr. Marini"), and Roberto Rosa (Mr. Rosa"). (*Id.*, ¶ 11).

11. The Hotel ranked all four bartenders in terms of seniority (length of service) based on their actual hire dates, in accordance with the terms of the CBA. Mr. Menite was first in seniority, Plaintiff was second, Mr. Marini was third, and Mr. Rosa was fourth. (*Id.*, ¶ 12).

12. On November 9, 2014, less than three weeks after commencing employment, Plaintiff sent an email to Suzanne Paradi ("Ms. Paradi") in the Hotel's Human Resources Department to inform Ms. Paradi of "inappropriate comments made to [her] by the tailor as he was having [her] try on the sample uniform jacket on Friday November 7th. (*Id.*, ¶ 13, Ex. F). The email also stated, "All I ask is that I not be subject to being alone with him again." (*Id.*, Ex. F). By responsive email dated November 10, 2014, Ms. Paradi wrote, "I am sorry to hear this happened to you. We will certainly follow up with the tailor and ensure he understands that those remarks and comments are unwelcome and inappropriate. Please let me know if there's anything else I can assist you with." (*Id.*). Plaintiff admitted at her deposition that she

considered Ms. Paradi's response to be an appropriate response by someone from human resources, and that the response reflected that Ms. Paradi had sensitivity to what Plaintiff had complained about.  (Rosen Decl., Ex. 1, at 172:18-173:6).  Plaintiff also admitted at her deposition that the tailor whom she alleged had made the inappropriate comments did not repeat them to her on another occasion following the foregoing email exchange.  (*Id.* at 173:7-10).

13. On December 8, 2014, Ms. Braunstein sent an email to Mr. Mariano, in which she complained that Edmund McSloy ("Mr. McSloy"), a morning bartender, did not allow her to start setting up for her evening shift at the bar during the transition between the two shifts.  (*Id.* at Ex. G).  She complained that Mr. McSloy "did all he could to get in my way physically, as well as constantly raising his voice to me about being in his way."  (*Id.*).  Mr. Mariano responded to her that same day, apologized, and stated that he was in the process of getting witness statements.  (*Id.*).  Mr. Mariano explained that the morning bartenders, including Mr. McSloy, expressed concern to the Union that their shift was being cut short, but that the team would need to work together to resolve scheduling obstacles.  (*Id.*).  Mr. Mariano stated to Plaintiff that "it is unacceptable that any colleague would treat another with disrespect" and told her to "feel free to call [him] at any time to discuss this further."  (*Id.*).

14. Evan Hunt ("Mr. Hunt"), then Assistant Director of Human Resources, testified that he and Kristin Stabile, the interim Director of Human Resources, assisted in the investigation.  (Rosen Decl., Ex. 3, at 37:21-39:23).  Plaintiff, Mr. McSloy, and additional witnesses were interviewed.  (*Id.* at 40:4-14).  Mr. Marini, one of the witnesses, revealed that Plaintiff "was actually [verbally] bullying [Mr. McSloy] beforehand."  (*Id.* at 39:24-40:3).

15. On December 10, 2014, Mr. McSloy reported that Ms. Braunstein was very hostile and aggressive.  (Wenger Aff., ¶ 15, Ex. H).  When Mr. McSloy asked Ms. Braunstein to

take the order of two guests, Mr. McSloy stated that Ms. Braunstein threatened him and said words to the effect, "You don't know who you are messing with, go fuck yourself" and that she "has an uncle who is an attorney." (*Id.*, Ex. H).

16. Mr. Marini, an evening bartender, complained that Ms. Braunstein was "aggressive, bossy and used foul language." (*Id.*).

17. On December 13, 2014, Mr. Widnersson sent an email to Mr. Hunt and Mr. Mariano reporting an incident involving an argument with Plaintiff at 1:30 AM at the bar in The Palm Terrace. (*Id.*, ¶ 16, Ex. I). After detailing the incident, Mr. Widnersson wrote in that email: "It was a bizarre argue [sic] and her aggressiveness occurred from nowhere. There are many challenges in our current operation and all bartenders are working their hardest to solve our operational challenges. Tina keeps repeating complaints of what's wrong and blames other bartenders constantly of their performance. I don't consider Tina a good team player, and her negative attitude effects [sic] the entire team. It feels like she is looking for trouble. I do also believe that her colleagues find it hard to work with her due to the above mentioned." (*Id.*, Ex. I).

18. On December 18, 2014, Plaintiff met, together with her Union delegate, with Mr. Widnersson, Mr. Mariano, and Trevor Sherman, after Mr. Widnersson sent his December 13, 2014 email. (*Id.*, ¶ 17, Ex. J).

19. On December 30, 2014, Plaintiff sent Ms. Paradi an email, in which she stated she wished to bring to Ms. Paradi's attention that Mr. Deroui had "made a couple of unprofessional and in appropriate [sic] comments to me." (*Id.*, Ex. K). She added, "I am sure you will agree as another professional woman that no manager, especially a male saying to a female should tell her (me) 'To grow up and stop being such a baby'". (*Id.*). At her deposition, Plaintiff characterized

5

the remark she attributed to Mr. Deroui as "misogynistic." (Rosen Decl., Ex. 1, at 198:10-199:9).

20. That same day, Ms. Paradi sent Plaintiff an email thanking her for her email, and stating: "We will visit this situation tomorrow once Amin [Deroui] in [sic] the office and I will follow up with you." (Wenger Aff., Ex. K). At her deposition, Plaintiff testified that she thought Ms. Paradi's response was appropriate. (Rosen Decl., Ex. 1, at 199:10-18).

21. Plaintiff received a written performance appraisal dated January 9, 2014, completed by Mr. Widnersson. (*Id.*, ¶ 19, Ex. L). The question at the beginning the performance appraisal reads, "Does the colleague demonstrate such behavior?" (*Id.*, Ex. L). Mr. Widnersson checked the "NO" box with respect to each of the following listed behaviors: Respect for others, professionalism, quality of work, productivity, positive attitude, cooperative, accepts responsibility, reliability, attendance and punctuality, team player, and leadership. (*Id.*). Mr. Widnersson rated her overall performance on that appraisal as "Below." Plaintiff handwrote in the "Comments" box on the appraisal, "I do not agree with my review," and then signed it. (*Id.*).

22. On January 9, 2015, Plaintiff sent an email to Mr. Widnersson expressing her disagreement with Mr. Widnersson's "NO" assessments. (*Id.*, ¶ 20, Ex. M). In that email, Plaintiff wrote: "I not only disagree with your assessment of me, but, I do not recognize your assessment of me to be either true or accurate of my high level of professionalism." (*Id.*, Ex. M). Plaintiff also wrote in that email, "I expect to have a more accurate (bullet points) assessment from you by the end of this week, so that I may assess this troubling situation and figure out how we can move forward from here." (*Id.*).

23. On January 10, 2015, Mr. Mariano sent Mr. Hunt an email, copied to others, in which he advised Mr. Hunt that "Roberto" [i.e., Mr. Rosa] had come to see Mr. Mariano that

evening, and that Mr. Rosa "was upset about the treatment he has been getting from Tina as recently as last evening. This is the second time he came to see me about her." (*Id.*, ¶ 21, Ex. N). The email also stated that Mr. Rosa felt "very unsupported by Tina as a co-worker." (*Id.*, Ex. N). "He came to ask 'if she is his boss' because she has been presenting herself to him as if she had 'some kind of authority' over him." (*Id.*). Mr. Mariano's email further stated that Plaintiff was "bossy and aggressive. She is 'all talk' and never helps him out when he is on service bar. She stands arouns [sic] and entertains one group of guests while the rest of the team is struggling to put out drinks." (*Id.*).

24.     On January 12, 2015, Plaintiff sent an email to Mr. Widnersson, Mr. Martin, and Ms. Paradi on the subject "follow up from 1/9 with Tina Braunstein." (*Id.*, ¶ 22, Ex. O). Plaintiff wrote in that email:

> I find your attitude towards my review to be extremely unprofessional, in that you refuse to explain your assessment of my performance with valid points or examples. A manager that had the best interest of their staff as well as their employer would make sure that all parties understood what you meant, because if my performance were truly as bad as you claim, than [sic] you would need to protect the Plaza from my behavior. You did say that my service towards our guests was great, so your review makes no sense, it does not line up, It appears to me Johan, that your motives are self serving.

(*Id.*, Ex. O).

25.     Plaintiff also wrote the following in that email:

> You stated during the review, that I had not given any ideas or contributed to the bars operation. Yet, again Johan that is a **blatant lie,** as I have been sharing my vast knowledge trying to help the success of The Palm Court from day one, as I was encouraged to do by Brian, regarding the fact that I have helped open a dozen bars in New York City . . . .

(*Id.*) (emphasis in original).

26.     Plaintiff also wrote the following in that email:

> [F]rom the beginning I suggested you to stop putting back in spirits in 3 different locations (cabinet off of the bar, kitchen cabinet & kitchen below cabinet) It is

> ***highly irresponsible*** of you to have product come out of storage, and prior to going onto the bar, end up in one of three random locations – it is anyones [sic] guess, making our required nightly rec a nightmare to do, and having booze all over the place . . . .see attached photos taken 1/9.

(*Id.*) (emphasis in original).

27. Plaintiff did not state in that email that she felt the performance review she received discriminated against her based on any of her protected characteristics. (*See id.*).

28. When Plaintiff was asked at her deposition whether she considered what she wrote in the foregoing email to be inappropriate, unprofessional and insubordinate towards her manager, Plaintiff responded, "No – I don't think." (Rosen Aff, Ex. 1, 205:15-23).

29. Mr. Mariano responded to Plaintiff's January 12, 2015 email that same day. (Wenger Aff., Ex. O). In his email, Mr. Mariano wrote:

> Tina
> As I wrote to you earlier today, I am available to speak with you in person to discuss your review at your convenience. After receiving this email, I am compelled to tell you that I find this type of email unnecessary and disrespectful in tone. I do not appreciate the manner in which you are addressing your Manager and I ask you to refrain from doing so. We have always treated you with respect and I ask that you afford us the same courtesy.
>
> Please note that Suzanne Paradis [sic] is not the Human Resources professional that should be involved in this type of matter. You should address these concerns to my attention and that of Evan Hunt who is the Assistant Director of Human Resources.

(*Id.*).

30. Mr. Mariano met with Plaintiff on January 15, 2015 regarding her performance review. (*See id.*, ¶23, Ex. P).

31. On January 25, 2015, Mr. Mariano sent Mr. Hunt an email, which stated, in relevant part:

> Evan
> I met with Tina Braunstein, Palm Court bartender a week ago (Friday, January 15) and I had a very candid conversation with her regarding her performance

8

review and other feedback I had been receiving from the team which supported the review issued by her Manager.

I reminded her that her review was a 'snapshot' of the first 60 days and that she had time to improve on her performance. All bartenders received some negative comments noted as 'does Not Meet" and that we expected improvements from everyone on the team.

I acknowledged that she was doing a fine job with guest service and beverage knowledge but that she needed to improve her overall relationships with her colleagues. Specifically noted:
- She appears 'difficult' and 'uncooperative' to the team and must work on her communication
- Speaking and acting with respect as she expects to be treated
- Having a positive attitude and watching her overall tone and manner which comes across too strong and negative.
- Stop complaining.
- Be more aware of what's happening at the service bar and support her co-bartender when they are overwhelmed. Be proactive and have a sense of urgency to assist.
- Balance your time between bar patrons and the service bar. Being a team player.
- Understand and assist when the servers are stressed so they know they can depend on her
- Communicate when stepping off the bar
- Improve reliability and completing tasks. Not leaving before the work is done.

Tina admits that she is a 'strong personality' having 'being from New York' and having many years of professional experience. She is no nonsense. She believes that much of the negative commentary or feeling about her is because of the innate makeup of who she is. She claims that she doesn't mean to come on negative or strong. She believes allowing the bartender to 'struggle' and 'get out of the weeds' lead to growth, speed and development into a stronger bartender. She feels the servers are demanding, whiney and unprofessional and that she will pull back rather than jump in and assist when they are disrespectful. She sees things in a personal way.

I've asked her to re-evaluate her strategy because it is not working for the team. The [sic] don't believe she is a team player. She must develop and [sic] new way of relating to the team that works and appear to be supportive. Tina was very responsive to the feedback and since then I have not gotten any poor feedback. I will check in with the team this week.

I plan to hold a meeting with all the bartenders and another with the servers to see how things are going overall so I can help the team improve their communication.

x

(Wenger Aff., ¶ 24, Ex. Q).

32. Without Mr. Mariano's knowledge and consent, Plaintiff clandestinely recorded her meeting with Mr. Mariano on January 15, 2015 on her iPhone. (Rosen Decl., ¶ 7, Ex. 1, at 158:23-25). During discovery, Plaintiff produced this recording, which revealed that Mr. Mariano spelled out the word "bitch" in the context of working with Plaintiff to help her overcome her performance deficiencies and facilitate better relationships with her colleagues, including her female colleagues; the transcript clarifies that Mr. Mariano was not spelling out the term in a derogatory manner. (*See* Rosen Decl., ¶ 7, Ex. 5). The transcript also reveals that Plaintiff even *complained* that management treated certain female employees *favorably*. (*See id.*, Ex. 5). The following is an excerpt of the relevant portion of the uncertified transcript of the recording:

> Plaintiff: ". . . That said, I've pointed out that the girls are very rude and snappish. . . . I've brought it up and again, with [Mr. Widnersson], the girls, they could, they walk on water. . . . And I'm a strong woman, and yeah when people say stuff to me, I'm going to be always professional. But you better believe that there's going to be an edge in my voice. And I know that. I own that. I'm 20 years in this industry. I'm a native New Yorker . . . But in this situation, in this house here, I'm not respected, I'm not valued for it . . . ."
>
> Mr. Mariano: "So how do we change that? Do you think we should all have a meeting and we should all be candid with each other . . . . We're a team, we need to work together. . . . Maybe we need to have a department meeting where we workshop with each other and really get to know each other. *There's going to be days where you're going to be a B-I-T-C-H and there's going to be days where they're [referring to the female servers] going to be anxious and flip out and you need to be able to calm them down and get them what they need and not taking things personally so that they don't reflect of an image of you that may not be fully accurate.*"
>
> Plaintiff: "Yeah and my only thing is, and this may sound a little obnoxious, but I'm just going to own it, this image has worked my whole career for 20 years."

(Rosen Decl., Ex. 5) (emphasis added).

33. At her deposition, Plaintiff admitted that when Mr. Mariano spoke with her on January 15, 2015, he never raised his voice to her and listened to what she had to say. (Rosen Decl., Ex. 1, 170:1-7).

34. At her deposition, Plaintiff admitted that she (i) has a strong personality, (ii) has a personality that others occasionally find offensive, (iii) has "absolutely" had disagreements with co-workers, (iv) was sure that arguments between her and her co-workers have happened, (iv) is a person who at times has an "edge" in her voice, (v) told Mr. Mariano during one of their conversations that she was "someone with an edge," and that she was referring to her "personality," and (vi) "absolutely," she has a strong personality because she is from New York. (Rosen Decl., Ex. 1, at 86:2-8; 86:12-24; 87:3-14; *see also* Rosen Decl., Ex. 5).

35. On February 7, 2015, Plaintiff sent an email to Mr. Mariano complaining about the behavior of three female servers towards a guest in The Palm Terrace. (Wenger Aff., ¶ 25, Ex. R). Mr. Mariano sent a responsive email to Plaintiff on February 19, 2015, thanking her for bringing that matter to his attention and sharing with her what he had learned about the incident after meeting with the staff. (*Id.*). In that email, Mr. Mariano wrote:

> The servers mentioned that you had made derogatory remarks about them to the manager in a loud enough voice that they could hear you. They were very hurt about that. Please use caution when discussing your co-workers with the management. I am always happy to facilitate a meeting regarding professional behavior. . . . .

36. On February 19, 2015, Mr. Rosa sent an email to Mr. Deroui, on the subject "Unacceptable Working Environment." (*Id.*, ¶ 26, Ex. S). The email states, in relevant part:

> I'm writing to make a formal complaint against Tina Braunstein. I've already spoken before to management about how her treatment of me and her behavior at the work place is unacceptable. I do not believe that having to put up with someone being condescending or outright insulting, and getting picked on and bossed around by a co-worker should be part of my daily routine at work. It is impossible to give the service hotel guest [sic[ deserve and stay positive when she is belittling you in front of them.

11

. . .

[Ms. Braunstein] used the fact that I was working the service station to demean me in front of guest. She stated that the reason I was always stuck on service bar was because I was not good enough for anything else. Since I ignored her, when she was turning the corner, she called me a "schmuck". . . .

37. On February 21, 2015, Mr. Rosa sent another email to Mr. Deroui on the subject "Continued Harassment." (*Id.*, ¶ 27, Ex. T). The email states as follows:

I'm writing again to inform that the continued harassment by Mrs. Braunstein [sic] is only getting worse. This situation needs to be resolved as soon as possible for it is no longer just causing me stress and anxiety, last night it started affecting my ability to perform my job. After you proposed a reasonable solution to our situation, she once again insulted me saying that I wasn't worthy to work the bar. After that every time I tried to greet guest [sic] she would butt in and say she had them, so I just retreated to the back of the bar to avoid any escalation in front of the guests. I kept myself busy by stocking glassware and serving the occasional guest that sat in the corner of the bar where I was. I feel this has gone on long enough, almost 5 months, and needs to stop. I'm really tired of her putting me and others down . . . .I'm really at my wits end and cannot deal with this any longer. Please address this situation as soon as possible.

38. Plaintiff was terminated effective March 13, 2015, and was told that she had not successfully completed her 150 day probationary period. (*Id.*, ¶ 28). At the time of her termination, Plaintiff had been employed by the Hotel for only 138 days. (*Id.*).

39. On February 8, 2016, Plaintiff filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"). (Rosen Decl., ¶ 8, Ex. 6). With respect to the basis of the Charge, Plaintiff checked two boxes: "sex" and "retaliation." She did not check the "age," "religion," or "national origin" boxes. (*Id.*, Ex. 6).

40. Attached to the Charge was a typewritten Statement of Charging Party ("Statement"), which Plaintiff signed on February 8, 2016 and affirmed that the Statement was "true to the best of [her] knowledge, information and belief." (*Id.*). In the opening paragraph of the Statement, Plaintiff wrote, "I believe I have been discriminated against *based on my gender*, and retaliated against for complaining about my treatment, by my former employer, The Plaza

12

Hotel. . . . I believe I was subjected to disparate treatment *in comparison to my male co-workers.*" (*Id.*) (emphasis added).

41. In the Statement, Plaintiff acknowledged that upon her hiring, she and the other newly-hired bartenders had been told that they "had to complete a five month probation period" and that she was terminated on March 13, 2015, "two weeks short of completing probation." (*Id.*). Plaintiff also wrote in her Statement that she believed she had been subject "to disparate treatment due to [her] gender." (*Id.*). Nowhere in the Statement did Plaintiff state that she believed she had been discriminated against on account of her religion, national origin or age. (*Id.*).

42. By letter dated August 15, 2016, the EEOC, in advising Plaintiff that it was dismissing the Charge, expressed in the second paragraph thereof its understanding as to what Plaintiff was alleging in terms of the basis for her discrimination claim:

> . . . You allege you were subject to employment discrimination by Sahara Plaza LLC/FRHI Hotels & Resorts/Plaza Hotel, hereinafter referred to as Respondent, violated Title VII of the Civil Rights Act of 1964, as amended, *in that because of your sex (female)* and in retaliation for protesting discriminatory acts, you were involuntarily terminated from your position.

(*Id.*, ¶¶ 8-9, Exs. 9-10) (emphasis added).

43. Between 2003 and 2015, Plaintiff was involuntarily terminated by six different employers (inclusive of the Hotel). (Rosen Decl. Ex. 1, 40:20-25). Prior to commencing employment with the Hotel, Plaintiff was involuntarily terminated by Blue Hill at Stone Barns, Telepan Restaurant, City Winery, and Acker, Merral & Condit. (*Id.* at 26:5-13; 33:25-34:2; 35:1-3; 62:9-24). After her termination by the Hotel, Plaintiff was involuntarily terminated by Jams Restaurant in Hotel 1. (*Id.* at 39:12-17). After her termination by Blue Hill at Stone Barns, Plaintiff filed a charge with the EEOC alleging that she was discriminated against because of her gender and retaliated against. *See Braunstein v. Blue Hill at Stone Barns, LLC*, 06-cv-5978, ECF

Doc. No. 30-2. The EEOC dismissed the charge, noting, among other things in its letter of April 3, 2006, that the information provided by the restaurant to the EEOC indicated that it had disciplined her at work and eventually terminated her employment because of a series of complaints that were made from her supervisor, customers and co-workers about her attitude and behavior. (*Id.*).

44.     Since 2006, Plaintiff has filed, or been a co-Plaintiff, in three other civil actions filed in this Court, in which she raised employment claims. The first action she filed was *Braunstein v. Blue Hill at Stone Barns LLC,* 06-cv-5978, in which she alleged gender-based discrimination, harassment and statutory retaliation. The second action she filed was *Braunstein v. Barber,* 07-cv-3391, in which she raised similar discrimination and retaliation allegations. The third action she filed was *Alleyne v. 72 W. 69th Street, LLC*, 07-cv-09367-DAB, a collective action that Plaintiff filed with three other plaintiffs, in which the plaintiffs alleged that the restaurant had failed to pay them minimum hourly wages and statutory overtime.

                                              Respectfully Submitted,

                                              /s/ David I. Rosen
                                              David I. Rosen, Esq.
                                              SILLS CUMMIS & GROSS P.C.
                                              101 Park Avenue, 28th Floor
                                              New York, NY  10178
                                              Attorneys for Defendants
                                              *Sahara Plaza, LLC and Fairmont Hotels & Resorts (Maryland) LLC*

Dated:  March 14, 2018