# EXHIBIT
# 1

Page 1

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
2

3

4    - - - - - - - - - - - - - - - - X
     TINA MICHELLE BRAUNSTEIN,          : Case Action No:
5                                       : 1:16-cv-08879-VSB
                          Plaintiff,    :
6                                       :
                                        :
7        - against -                    : EXAMINATION BEFORE
                                        : TRIAL OF:
8                                       : TINA BRAUNSTEIN
     SAHARA PLAZA, LLC, and THE         :
9    PLAZA HOTEL, a FAIRMONT MANAGED    :
     HOTEL,                             :
10                                      :
                          Defendants.   :
11   - - - - - - - - - - - - - - - - X
12

13

14       Transcript of the stenographic notes of the
15   proceedings in the above-mentioned matter, as taken by
16   and before TONIANN ACQUARO, a professional court
17   reporter and notary public within and for the State of
18   New York, held at the offices of Sills Cummins & Gross,
19   101 Park Avenue, New York, New York, on Thursday,
20   May 18, 2017, commencing at 10:18 in the morning.
21

22

23

24

25   Job No. NJ2602765

**Page 2**

```
 1  A P P E A R A N C E S:
 2
    RAISER & KENNIFF
 3
      Counsel for Plaintiff
 4
        87 Walker Street
 5      2nd Floor
        New York, New York 10013
 6
      BY:  E. GORDON HAESLOOP, ESQ.
 7      (888) 504-5558
        gordon@raiserkenniff.com
 8
 9  SILLS CUMMIS & GROSS, P.C.
10    Counsel for Defendants
11    One Riverview Plaza
      Newark, New Jersey 07102
12
      BY:  DAVID ROSEN, ESQ.
13      (973) 643-7000
        drosen@sillscummis.com
14
15
    ALSO PRESENT:
16
      Gregg Holderman, Videographer,
17        Veritext Legal Solutions
18    Karen Wenger, Corporate Representative,
        The Plaza
19
20
21
22
23
24
25
```

**Page 4**

```
 1      E X H I B I T S   C O N T I N U E D
 2  Exhibit 11   Three-page e-mail chain, Bates   8
               stamped P000134 to 135 and
 3             P000143
 4  Exhibit 12   The Plaza 30 & 60 day            8
               introductory review
 5
    Exhibit 13   E-mail from Tina Braunstein       8
 6             dated January 9, 2015, Bates
               stamped P000039
 7
    Exhibit 14   Two-page e-mail chain, Bates      8
 8             stamped P000147
 9  Exhibit 15   Two-pages of e-mails from         8
               Martin Mariano, dated
10             January 12, 2015 and
               January 25, 2015
11
    Exhibit 16   Two-page e-mail chain, Bates      8
12             stamped P000170 to 171
13  Exhibit 17   Two e-mail chain from Roberto     9
               Rosa dated February 19, 2015,
14             forwarded to Evan Hunt
15  Exhibit 18   E-mail from Martin Mariano        9
               dated February 20, 2015
16
    Exhibit 19   E-mail chain from Roberto Rosa    9
17             dated February 21, 2015
18  Exhibit 20   Letter from Tina Braunstein       9
               dated March 17, 2015
19
    Exhibit 21   Marked but not used               9
20
    Exhibit 22   Marked but not used               9
21
    Exhibit 23   E-mail from Martin Mariano,     206
22             dated January 12, 2015
23             (Exhibits retained by Mr. Rosen.)
24
25
```

**Page 3**

```
 1          I N D E X
 2  WITNESS       EXAMINATION BY      PAGE
 3  TINA BRAUNSTEIN    MR. ROSEN      11
 4
 5
          E X H I B I T S
 6
    DEFENDANT'S  DESCRIPTION          PAGE
 7
    Exhibit 1    Complaint, United States      7
 8             District Court, Case No.
               06-CV-5978-CS
 9
    Exhibit 2    United States District Court,  7
10             Case No. 07-CV-3391
11  Exhibit 3    Offer letter from The Plaza    7
               dated October 21, 2014, Bates
12             stamped P00003 to P00007
13  Exhibit 4    Job description, Palm Court    7
               Bartender, Bates stamped
14             P000027 to 28
15  Exhibit 5    Handwritten journal, Bates     7
               stamped P000193 to 279
16
    Exhibit 6    E-mail chain, November 10,     7
17             2014, Bates stamped P000159
18  Exhibit 7    E-mail chain, December 8,      7
               2014, Bates stamped P000140 to
19             P000141
20  Exhibit 8    One-page document entitled     7
               Meeting with Edmund,
21             December 10, 2014
22  Exhibit 9    Two-page e-mail chain from     8
               Johan Widnersson,
23             December 13, 2014
24  Exhibit 10   Document entitled Meeting with 8
               Tina Braunstein and delegate,
25             December 18, 2014
```

**Page 5**

```
 1   R E Q U E S T E D   I N F O R M A T I O N
 2  INFORMATION REQUESTED            PAGE
 3  Any social medical postings of information  25
    related to the lawsuit
 4
    E-mail from City Winery regarding being fired 36
 5
    Settlement agreement              47, 60
 6
    E-mail to store manager Cliff regarding    67
 7  groping
 8  Work-related photos on Instagram          83
 9  Screen shots of text messages related to  84
    employment at The Plaza Hotel
10
    Text messages post-date your employment at 85
11  The Plaza
12  Start and end date for James Restaurant   253
13  2015 dated worked for Bespoke Libations   254
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Veritext Legal Solutions

800-227-8440                                           973-410-4040

Page 26

1    A.   Correct.
2    Q.   In fact, there were at least two other
3  employers who terminated you; am I right?
4    A.   Yes.
5    Q.   You were previously employed by a company
6  by the name of Blue Hill At Stone Barns; am I right?
7    A.   Yes.
8    Q.   Do you remember what years you worked
9  there?
10   A.   2003 to 2004.
11   Q.   And you were fired by Blue Hill at Stone
12  Barns; is that correct?
13   A.   Yes.
14   Q.   What reasons were given to you for your
15  dismissal?
16   A.   That went to trial and I am under --
17       MR. HAESLOOP:  That's not the
18       question.
19   A.   I'm sorry, can you repeat the question?
20   Q.   Of course.  What reasons were you given
21  for your dismissal by Blue Hill at Stone Barns?
22   A.   The general manager Philippe Gouze called
23  me a bitch.
24   Q.   And did you find that offensive?
25   A.   Absolutely.

Page 27

1    Q.   Did you find the comment to be
2  misogynistic?
3    A.   Absolutely.
4    Q.   When you use the word misogynistic, what
5  do you mean by that word?
6    A.   Something that a man would use
7  specifically towards a woman to put her down that he
8  would not use towards another man.
9    Q.   So when you are using it are you referring
10  to a comment made or is it broader than that?
11   A.   It can be broader than that.
12   Q.   Okay.  And I'm asking you in terms of how
13  you use it when you describe a person as being
14  misogynistic, have you described a person as being
15  misogynistic based on something other than comments
16  made?
17   A.   Actions.
18   Q.   Okay.  Such as?
19   A.   How they treat someone.
20   Q.   Can you be more persist -- precise?
21   A.   To treat a male different than a female.
22   Q.   Has that occurred in your professional
23  life?
24   A.   Absolutely.
25   Q.   Okay.  Can you give me an example of such

Page 28

1  an action that occurred to you?
2    A.   First of all, being called a bitch.
3    Q.   I know you have given that answer.  Are
4  there others?
5        MR. HAESLOOP:  Throughout her
6        career or --
7        MR. ROSEN:  Counsel.
8        MR. HAESLOOP:  -- with
9        respect to this?
10       MR. ROSEN:  Okay, so --
11       MR. HAESLOOP:  Please give it
12       a time, because it's very broad.
13       MR. ROSEN:  I am going to
14       again ask you not to give speaking
15       objections because it violates the
16       court rules.
17           I will remind the witness, if
18       at any time you don't understand the
19       question, you should tell me that
20       and I will rephrase it, fair?
21   A.   Yes.
22   Q.   Okay.  So let's try this again.  The
23  question concerned your -- and I am not going to use
24  your professional -- your business history.  My
25  question was can you give me any other examples of

Page 29

1  actions taken by men towards you that you regarded as
2  being misogynistic?
3    A.   Speaking over me.
4    Q.   What does that mean?
5    A.   Interrupting.
6    Q.   Can you explain how doing so is
7  misogynistic in your mind?
8    A.   They don't do that to other men.
9    Q.   Who doesn't do that to other men, when you
10  say they?
11   A.   Whomever we are referring to.
12   Q.   Okay.  So a -- just so I understand how
13  you use the expression, if a male speaks over you or
14  interrupts you, it's misogynistic in your mind if that
15  person would not have done so towards another man?
16   A.   It could be.
17   Q.   Any other actions that you can give
18  examples of that have occurred to you that you consider
19  to be misogynistic?
20   A.   Having my schedule changed without reason.
21   Q.   Can you explain how that is misogynistic?
22   A.   Specifically speaking about The Plaza,
23  they changed my schedule.  They wanted to accommodate
24  James, midnights.
25   Q.   Just so I understand, they changed your

Page 30

1 schedule to accommodate another employee and that
2 employee happens to be male. In your mind that is
3 misogynistic?
4     A.   With everything else that was going on,
5 it's cumulative, yes.
6     Q.   Can you give me any other examples of
7 actions against you? You don't have to limit yourself
8 to The Plaza.
9     A.   Well --
10     Q.   I am just trying to get a better
11 understanding. I said this because I believe, and
12 correct me if I am mistaken, that the word
13 "misogynistic" is one that you use with a reasonable
14 amount of frequency; is that so?
15     A.   No.
16     Q.   We'll circle back to that. But can you
17 think of any other examples of --
18     A.   I was.
19     Q.   -- conduct by or actions taken by a male
20 during the course of your career --
21     A.   Well, I --
22     Q.   -- that you regarded as being
23 misogynistic?
24     A.   Absolutely. When I was at The Plaza, a
25 great example was when he left me out of the final

Page 31

1 tip-out meeting. The three male bartenders were
2 invited to it, Marty, the head of food and beverage
3 called this meeting. Marty called Harry Riker, the
4 union representative for the hotel at Union 6, Trevor
5 Sherman was called in for this, Amin was called in for
6 it. And Yohan was called in for it. Every one of
7 them, men, made it to that meeting and they forget to
8 invite me.
9     Q.   And you consider that misogynistic?
10     A.   Absolutely.
11     Q.   Any other examples you can give us?
12 Things that occurred to you that you regarded as
13 misogynistic?
14     A.   Male managers in this industry have a
15 habit of going to male bartenders when there is an
16 issue and they will leave out the women behind the bar
17 to these conversations.
18     Q.   When you say "this industry," what do you
19 consider to be this industry?
20     A.   My industry, the restaurant industry.
21         MR. ROSEN: Would you kindly
22     read back the question and answer
23     for us?
24     (The last question and answer were read
25     back.)

Page 32

1     Q.   So is it your testimony that this, in your
2 experience, is a problem in this industry, what you
3 just described?
4     A.   Yes.
5     Q.   And can you give me some other examples of
6 where men engaged in this type of action?
7     A.   At numerous employments that I had.
8     Q.   Understood. So can you give me some
9 examples and where that occurred? Any that you can
10 recall.
11     A.   At Manzanilla Restaurant, Rick Pitcher was
12 the general manager/sommelier, he often ran to the male
13 bartenders with issues.
14     Q.   When did you work at that restaurant?
15     A.   I would have to look at my resume to
16 refresh my memory.
17     Q.   Was it before or after your employment at
18 The Plaza?
19     A.   Before.
20     Q.   When this occurred to you, what, if
21 anything, did you do about it?
22     A.   Well, I tried speaking to Rick about it.
23     Q.   Did you do so?
24     A.   Absolutely.
25     Q.   And what did you say and what did he say?

Page 33

1     A.   I don't remember the exact words.
2     Q.   I understand you don't remember the exact
3 words, but maybe you can share with us as best you can
4 the substance of what the conversation was?
5     A.   To let him know that I felt left out and
6 if there was anything going on in my performance that
7 would make him do that.
8     Q.   And do you recall how he responded?
9     A.   He felt he didn't mean to do that. He
10 recognized that he was going to the men and leaving me
11 out when I pointed it. And he apologized and he said
12 he would try to do better. And he thought I was doing
13 a fantastic job.
14     Q.   You previously were you employed by a
15 restaurant by the name of Telepan; am I correct?
16     A.   Correct.
17     Q.   That's T-e-l-e-p-a-n.
18     A.   Yes.
19     Q.   And when did you work for Telepan
20 restaurant?
21     A.   I don't remember the dates.
22     Q.   Was it before or after you worked for Blue
23 Hill at Stone Barns?
24     A.   After.
25     Q.   And you were terminated by Telepan

9 (Pages 30 - 33)

Page 34

1 Restaurant were you not?
2    A.  Correct.
3    Q.  And what reasons were you given for your
4 termination by Telepan?
5    A.  That my former chef Dan Barber came into
6 the restaurant to dine with Bill Nyman.  He is a
7 purveyor of high-end beef.  And after they dined at the
8 restaurant, they realized I was working at the bar.
9 Nyman wrote a letter to Bill, um, trashing me.
10   Q.  And was that the reason you were told you
11 were fired or was that the reason you believe you were
12 fired?
13   A.  No, that's what Bill Telepan told me, he
14 received an e-mail.
15   Q.  Did you see the e-mail?
16   A.  No.
17   Q.  And did you consider that dismissal
18 unfair?
19   A.  Absolutely.
20   Q.  Did you consider that action misogynistic?
21   A.  No.
22   Q.  Did you consider anything that occurred to
23 you while you were at the Telepan Restaurant to be
24 misogynistic?
25   A.  No.

Page 35

1    Q.  Have you been terminated by any other
2 employer other than the two that I've just mentioned?
3    A.  I was fired from City Winery.
4    Q.  When?
5    A.  I don't remember when I worked there.
6    Q.  Were you fired by City Winery before or
7 after your employment at The Plaza?
8    A.  Before.
9    Q.  Were you fired by City Winery before or
10 after your employment at Telepan?
11   A.  After.
12   Q.  So if I understand then, understanding the
13 best of your recollection in terms of your dismissal,
14 employment engagement that resulted in your dismissal,
15 you first worked at Blue Hill at Stone Barns.  Your
16 employment with Telepan was after that employment, your
17 employment at City Winery was after your employment at
18 Telepan, your employment at The Plaza was after your
19 employment with City Winery; am I correct?
20   A.  Correct.
21   Q.  And what reasons were you given for your
22 dismissal by City Winery?
23   A.  I wasn't given a reason.  I was sent an
24 e-mail that I was fired, if I remember correctly.
25   Q.  How long did you work there?

Page 36

1    A.  I believe four to five months.
2    Q.  Do you still have that e-mail?
3    A.  Possibly.
4    Q.  Okay.  I'm going to ask you at the return
5 of this examination to make a search for that e-mail
6 and if you find it, to please provide it to your
7 counsel so that he can provide it to me.  Will you do
8 so?
9    A.  Absolutely.
10   Q.  Why do you believe you were fired by City
11 Winery?
12   A.  I was one of three fired in maybe a
13 month's time.  The three of us were all much older than
14 the rest of the staff and much more experienced.  We
15 were all over the age of forty.  The restaurant was
16 brand new, we helped set it up.  And then in a very
17 fast sequence we were all fired.
18   Q.  So at the risk of putting words in your
19 mouth which is not my intent, you believe that you were
20 discriminated against on a account of your age, that
21 that was the reason why you were dismissed?
22   A.  The three of us believed so.
23   Q.  Did you file a charge of discrimination
24 against City Winery?
25   A.  I don't believe so.

Page 37

1    Q.  Did you bring a lawsuit against City
2 Winery related to your loss of your employment?
3    A.  No.
4    Q.  Can you tell why you didn't sue them if
5 you felt that your age was a factor in the job loss?
6    A.  Myself, Vincent and Chris, Chris is a
7 male, the three of us went to see my former attorney,
8 Maimon Kirschenbaum, who represented me in Blue Hill at
9 Stone Barns I remember we had a meeting with him asking
10 him questions about the age issue.  And then the three
11 of us went out to lunch after and I don't remember why
12 it went any further.
13   Q.  Have you been terminated by any other
14 employer other than Blue Hill at Stone Barns,
15 Telepan --
16      THE COURT REPORTER:  Sorry.
17   Q.  -- City Winery and The Plaza?
18   A.  Not to my recollection at this time.
19   Q.  If during the course of this depisation --
20 deposition, I'm sorry, you recall the names of other
21 employers that you worked for that subsequently
22 terminated your employment, would you kindly let us
23 know?
24   A.  Absolutely.
25   Q.  Is it possible that there may be more than

10 (Pages 34 - 37)

Page 38

1 four and that you simply don't recall them at this
2 time?
3 A. Possibly, but I'm not sure.
4 Q. Would they have occurred to the best of
5 your memory before or after your employment at Blue
6 Stone?
7 A. Blue Hill at Stone Barns.
8 Q. Thank you. Blue Hill at Stone Barns.
9 A. Very long time before.
10 Q. Would you have also been working in a
11 bartender capacity or some other capacity -- that's a
12 compound question.
13 Would you have also been working at that
14 time in the capacity of a bartender?
15 A. I don't remember.
16 Q. And just so that I can be certain that
17 this is clear, when you worked at Blue Hill at Stone
18 Barns were you, in fact, employed as a bartender?
19 A. Yes.
20 Q. And when you were employed at Telepan,
21 were you, in fact, employed as a bartender?
22 A. Yes.
23 Q. When you were employed at City Winery,
24 were you employed as a bartender?
25 A. Yes.

Page 39

1 Q. And when you were employed at The Plaza in
2 the Palm Terrace, were you also employed as a
3 bartender?
4 A. In the Palm Court, yes.
5 Q. So am I correct that to the best of your
6 memory as you are sitting here today, between
7 approximately 2003 and 2015, the span of approximately
8 12 years, you were terminated four different times?
9 A. No, because I just remembered one.
10 Q. Which one was that?
11 A. After The Plaza.
12 Q. And which -- where did you work after The
13 Plaza? This is another one that you got terminated by?
14 A. Yes.
15 Q. Okay. And what was the name of that
16 employer?
17 A. Jams Restaurant in Hotel 1.
18 Q. Do you remember when you worked there?
19 A. It was during the training period. I
20 don't remember.
21 Q. Would it have been the same year you were
22 terminated at The Plaza?
23 A. Yes.
24 Q. So that would have been 2015; am I
25 correct?

Page 40

1 A. I believe so, yes.
2 Q. And can you tell me what reason you were
3 given for being terminated by Jams Restaurant?
4 A. During the training period, the general
5 manager Carolyn, I believe her name was, she said that
6 we had to be there at 5:00 in the morning, that was a
7 start time. And they didn't tell us this during the
8 hiring period or during the beginning of training but
9 all of a sudden they made that a requirement.
10 So I spoke to Carolyn and I asked her,
11 well, what if you close at night, by the time I get
12 home on a train, I'm going to have an hour to sleep
13 before getting up to shower to come back. And I asked
14 her are they going to not put us back-to-back schedules
15 like that. And she said she couldn't guarantee it.
16 And I said just because there is a chance that I have
17 to close the bar and turn around and reopen it at 5
18 a.m., I said, this wasn't what I signed up for. So
19 because of that she said I couldn't work there.
20 Q. So during the period of 2003 to 2015, you
21 were actually terminated five times, correct?
22 A. I'm sorry, could you say that again?
23 Q. Of course. Between 2003 and 2015, you
24 were actual terminated by five different employers?
25 A. That sounds correct.

Page 41

1 Q. Is there a possibility that there might be
2 one or more others that you just can't recall right
3 now?
4 A. I don't believe so.
5 Q. Same instructions I give you before, if
6 you recall any other names, would you let me know and I
7 will ask you some questions about that, okay?
8 A. Absolutely.
9 Q. Now, I'd like to show you a document that
10 we've premarked for identification as Defendant's
11 Exhibit 1.
12 I'm going to ask you to take a moment to
13 look at it and when you are done doing so, I have some
14 questions for you.
15 MR. ROSEN: Here is an extra
16 copy.
17 MR. HAESLOOP: Oh, you are so
18 kind.
19 Have you read it?
20 Q. Are you finished doing so?
21 A. Yes.
22 Q. Are you ready for a question?
23 A. Yes.
24 Q. So this is the lawsuit, is it not, that
25 you filed again Blue Hill at Stone Barns after your

Page 62

1    charge?
2       A.   Acker, Merral & Condit, I believe.
3       Q.   That's --
4       A.   A-c-k-e-r; Merral, M-e-r-r-e-l and Condit,
5    C-o-n-d-i-t, I believe.
6       Q.   Is Acker, Merral & Condit a former
7    employer of yours?
8       A.   Yes.
9       Q.   And when did you work on the Acker, Merral
10   and Condit?
11      A.   For the holiday season I did wine and
12   spirit sales I believe three years ago.
13      Q.   Was this before or after your employment
14   at The Plaza?
15      A.   Before.
16      Q.   Was it before or after your employment
17   with City Winery?
18      A.   After.
19      Q.   And were you terminated by that employer?
20      A.   I was let go because it was post-holiday
21   season.
22      Q.   But your employment was ended
23   involuntarily; is that a fair statement?
24      A.   That's fair.
25      Q.   And what was the nature of your

Page 63

1    retaliation charge?
2       A.   I went to the EEOC because I was sexually
3    groped by a male employee. He grabbed my breast.
4       Q.   Do you still have a copy of your EEOC
5    papers in that case?
6       A.   I don't believe so.
7       Q.   Do you know who would have it -- have
8    them?
9       A.   The EEOC.
10      Q.   Were you represented by an attorney at
11   that time?
12      A.   No.
13      Q.   Can you tell me which office of the EEOC
14   you filed the charge with?
15      A.   The one in Manhattan.
16      Q.   And what was the nature of the retaliation
17   that you complained about in that case?
18      A.   How the establishment and their attorneys
19   who were on premises, how they handled it.
20      Q.   Can you explain what that means?
21      A.   They kept the male employee and they cut
22   my hours to keep us separate so we wouldn't have to
23   work together.
24      Q.   Okay. And what did you claim that was
25   what had caused that?

Page 64

1          Let me be more precise for you. You
2    stated you were retaliated against?
3       A.   Uh-hmm.
4       Q.   You were retaliated against for having
5    done what?
6       A.   First of all, for being a victim in that
7    case. And besides cutting my hours, they eventually
8    did let me go, although they were talking to me about
9    keeping me on. And even The Plaza, in my paperwork
10   with them, you will see a stellar recommendation from
11   a manager there. So I did a phenomenal job.
12      Q.   I appreciate your sharing that with us,
13   except I hadn't asked for that.   And I want to
14   commend you so far for sticking to the questions that
15   I've asked, and I will ask you on a going-forward basis
16   to continue to do your best to answer the questions
17   that I ask.
18          So what I am going to ask you to do is
19   please read back the question I asked followed by the
20   answer.
21          (The last question and answer were read
22          back.)
23      Q.   So let me try asking the question again.
24   Maybe you didn't understand the question.
25          Usually when you accuse an employer of

Page 65

1    retaliation, it's because you have complained about
2    something and as a result of that, you may allege that
3    somehow you suffered retaliation as a result of your
4    complaint. So my question is:  Was there a complaint
5    that you made that you claim resulted in the
6    retaliation against you that you've already testified
7    about?
8       A.   Maybe I'm not understanding the question.
9       Q.   Okay. So you can ask me what it is about
10   the question you don't understand or tell what it is.
11      A.   What I believe is that I already answered
12   it by saying that first of all they cut my hours --
13      Q.   No, you are telling us --
14          MR. HAESLOOP:  No, that's the
15      result.
16      Q.   You are telling us the form the
17   retaliation took.
18      A.   Right.
19      Q.   My question was why -- what did you claim
20   was the reason why they did this to you?  Does that
21   help you understand what I'm asking?
22      A.   No.
23      Q.   All right, I will keep trying. I'm very
24   patient.
25          So your employer cuts your hours.

17 (Pages 62 - 65)

Page 86

1    A.   Okay.
2    Q.   In describing yourself to others, would it
3  be fair to say to describe you as a person having a
4  strong personality?
5    A.   Yes.
6    Q.   Would you consider yourself as having a
7  personality that others sometimes find offensive?
8    A.   I'm sure occasionally.
9    Q.   Do you consider yourself someone who is
10 difficult to work with?
11   A.   Absolutely not.
12   Q.   Okay.  Have there been occasions when you
13 have had arguments or disagreements with co-workers
14 while you were at work?
15       MR. HAESLOOP:  Objection to
16   form.  If you can break it down.
17   A.   I'm sorry, can you repeat the question?
18       MR. ROSEN:  Sure.  Would you
19   repeat it, please?
20       THE COURT REPORTER:  Yes, I
21   can.
22   (The last question was read back.)
23   A.   I have had disagreements with co-workers,
24 absolutely.  Arguments, I'm sure they happened.
25   Q.   Have you used profanity when you have had

Page 87

1  disagreements with your co-workers?
2    A.   No.
3    Q.   Would you describe yourself as someone who
4  has an edge in your voice?
5        MR. HAESLOOP:  Objection.
6    You can answer.
7    A.   I'm sure at times, yes.
8    Q.   In fact, you have actually used those very
9  words, have you not, to describe your voice?
10   A.   Yes.
11   Q.   In fact, you have used those very words in
12 one of your conversations with one of your managers at
13 The Plaza, is that so?
14   A.   With Marty, correct.
15   Q.   Okay.  I'd look to show you a document
16 that has been premarked for identification as
17 Defendant's Exhibit 3.  Take a moment to review it.
18       MR. ROSEN:  Here is your
19   copy -- sorry.
20       MR. HAESLOOP:  That's okay.
21   I dropped it.
22   Q.   Are you finished reviewing it?
23   A.   Yes.
24   Q.   This is the offer of employment that you
25 received from The Plaza Hotel, am I correct?

Page 88

1    A.   Yes.
2    Q.   And the date of the letter is
3  October 21, 2014, and it mentions in the opening
4  paragraph that your employment will become effective on
5  October 27, 2014; am I correct?
6    A.   Yes.
7    Q.   And this is, to your recollection, is that
8  approximately when you started working there?
9    A.   Correct.
10   Q.   And you held a bartender position in the
11 Palm Court, correct?
12   A.   Correct.
13   Q.   When you started working in the Palm Court
14 what was your normal work schedule?
15   A.   Well, at first it varied for quite a while
16 because we were in training mode.  So on October 27, we
17 met and we started to go behind the bar, make cocktails
18 with Brain Van Flandern, who was the bar consultant.
19       MR. ROSEN:  May we go off the
20   record, please?
21       THE VIDEOGRAPHER:  We are now
22   off the record.  The time on the
23   video monitor is 12:25 p.m.
24   (Off the record.)
25       THE VIDEOGRAPHER:  We are now

Page 89

1  on the record.  The time on the
2  video monitor is 12:26 p.m.
3    A.   Can I just -- I'm sorry -- correct
4  something of what we said a moment again that was
5  bothering me because you said that I have an edge in my
6  voice and that wasn't the conversation with Marty.  It
7  was that I have an edge, period.
8    Q.   Actually, if we went back, I didn't say
9  you had an edge.  I asked you whether you had ever
10 described yourself as someone having an edge in your
11 voice.  And the answer was yes, correct?
12   A.   Correct.
13   Q.   And you are the one that testified that
14 that came up during a conversation with Marty; am I
15 right?
16   A.   Yes.
17   Q.   But you are telling us that that's not
18 where it came up?
19   A.   No, it was.  He said to me in that
20 conversation -- or I said to him in that conversation
21 that I am someone with an edge.  It wasn't about my
22 voice.  It was about a personality.
23   Q.   That was one of the conversations that you
24 recorded; isn't that right?
25   A.   Correct.

23 (Pages 86 - 89)

Page 94

1    A.   Yes.
2    Q.   And you were all hired as bartenders?
3    A.   Yes.
4    Q.   And your job duties were fundamentally the
5  same?
6    A.   Yes.
7    Q.   And neither of you was the supervisor of
8  any other in that four; am I correct?
9    A.   Correct.
10       MR. ROSEN:  I will take back
11       Defendant's 3, the one that's got
12       the label, I'm sorry.
13   Q.   I'm going to go through a list of names
14  with you.  I believe that these are all people with
15  whom you worked at some point in time at the hotel, or
16  if you did not work directly with them, came in contact
17  with at the hotel at some point in time, correct -- not
18  correct, but that's what I plan to do.  All right?
19   A.   Okay.
20   Q.   The first name I want to ask you about is
21  Martin, also known as Marty, Mariano.  Was he a person
22  who also worked in the Palm Court?
23   A.   Yes.
24   Q.   And what was his position?
25   A.   He is the head of food and beverage.

Page 95

1    Q.   Was he your direct supervisor?
2    A.   No.
3    Q.   Who was your direct supervisor?
4    A.   Johan.
5    Q.   Is that a person whose last name is
6  Widnersson?
7    A.   Correct.
8    Q.   How would you characterize your working
9  relationship with Marty Mariano?
10   A.   Good.
11   Q.   Did he ever say or do anything to you that
12  caused you to question his honesty?
13   A.   I was concerned when he promised us in a
14  meeting, the bartenders and the servers, the cocktail
15  servers, early on that he was going to get us a bar
16  back or even -- or a runner or one person to be a bar
17  back and runner to help the whole floor.  And that he
18  never came through with that.
19   Q.   Do you think he deliberately lied about
20  that?
21   A.   I don't know.
22   Q.   Is there anything else that you can recall
23  that Mr. Mariano said or did to you that caused you to
24  question his honesty?
25   A.   After we had our meeting and he said at

Page 96

1  least seven times in that meeting that he wanted to
2  have two separate meetings, one with the bartenders and
3  one with the servers and a third for all of us to
4  sit down together, that he never came through with
5  that.
6    Q.   Did you believe that he intentionally lied
7  about that?
8    A.   I don't know.
9    Q.   Same question.  Did he ever say or do
10  anything else to you that caused you to question his
11  honesty?
12   A.   I'm not sure.
13   Q.   Did he ever say or do anything to you that
14  you regarded as misogynistic?
15   A.   When he referred to me as a bitch and he
16  spelled it out in our meeting.
17   Q.   Spelling out like b-i-t-c-h?
18   A.   Correct.
19   Q.   And that was one of the meetings that you
20  had with him at what point in time?  We will get to the
21  meeting but I just want to get to the time frame.
22   A.   That's the meeting we had after my review.
23   Q.   Is that one of the meetings that was
24  recorded?
25   A.   Correct.

Page 97

1    Q.   And was the fact that he used the word, or
2  the context in which he used it that you regarded to be
3  misogynistic?
4    A.   Both.
5    Q.   Can you help me better understand what it
6  was about his use of the word that you regarded as
7  misogynistic?
8    A.   Referring to a female as a bitch, I find
9  to be misogynistic, that he also referred to Cecelia,
10  one of the servers in that interview as being
11  difficult, I believe that's the word he used, in a
12  negative way or she was a pain in his ass, I even think
13  he said that.  But he also referenced Roberto in this
14  conversation and he made it more that Roberto was very
15  precise in his bartending and passionate, but,
16  meanwhile, the females, one was a bitch and the other
17  was a pain in the ass.
18   Q.   Did you come to a conclusion then or at
19  any time that Mr. Mariano viewed men more favorably
20  than women as employees?
21   A.   It appeared to be.
22   Q.   Did you ever ask him about that or did --
23  no, better -- withdrawn.
24       Did you ever accuse him of being so biased
25  towards -- biased against female employees?

Page 98

1   A.   I don't believe so.
2   Q.   The next name I want to ask you about
3   is -- and I may be pronouncing it incorrectly so feel
4   free to correct me -- is Amin Deroui?
5   A.   Amin is his first name.  I think it's
6   Deroui is the last; I'm not sure.
7   Q.   Thank you.
8       Was he also an employee at the Palm Court?
9   A.   Yes.
10  Q.   What was his position?
11  A.   I believe it to be a floor manager.
12  Q.   Did he manage you -- withdrawn.
13      Did you report to him?
14  A.   Not directly.  Johan was our first point,
15  but if Johan was not available or if Johan was off,
16  then you would go to Amin.
17  Q.   Based on your understanding of the
18  reporting structure in the Palm Court at that time, did
19  Amin report to Johan?  Did Johan report to Amin or
20  neither?
21  A.   I believe neither.
22  Q.   But they both in turn reported to
23  Mr. Mariano?
24  A.   I believe so.
25  Q.   Did Amin ever say or do anything to you

Page 99

1   that caused you to question his honesty?
2   A.   Yes.
3   Q.   Okay.  Can you describe what it was?
4   A.   I recall once he told us at 10:45 p.m. as
5   we were winding down, it was pretty slow, that we now
6   have to stay open until midnight.
7   Q.   Was he referring to that day or just
8   generally?
9   A.   Generally, from now moving forward.  And I
10  tried to have a discussion with him why we were being
11  told at that late hour, at what time did you find out
12  and how did you find out.  We asked -- and I wasn't the
13  only one, the bar team was there that night -- we were
14  trying to find out what was happening and he wasn't
15  giving us a direct answer.
16  Q.   Okay, but help me understand how that
17  occurrence caused you to question his honesty.
18  A.   Because he wasn't giving us a direct
19  answer and I feel it's a really easy direct question.
20  Who made this call, first of all, that we were going to
21  be opened until midnight?
22  Q.   Right.
23  A.   As well as what time did he find this out
24  and why are we learning about it at 10:45 p.m. when we
25  normally closed at 11:00?

Page 100

1   Q.   Okay.  And did he give what you considered
2   to be a dishonest answer?
3   A.   Well, at first, he didn't answer at all.
4   Q.   That's right.  So what is it that he said
5   that was a dishonest answer, if anything?
6   A.   He was at first saying I don't know.
7   Q.   And you consider that to be dishonest
8   because you thought he did know?
9   A.   Correct.
10  Q.   Do you, in fact, know whether he knew?
11  A.   Yes, because we eventually got it out of
12  him.
13  Q.   Anything else that he said either then or
14  subsequently learned was dishonest?
15  A.   Yes, at one point he denied to me ever
16  hearing that Roberto was slow in his job.  Meanwhile,
17  James always said to Amin, right to Amin with me as a
18  witness, that Roberto needs to pick it up, he is very
19  slow, as well as the fact that our one and only bar
20  meeting in January, that Amin wasn't at, just Johan and
21  the four bartenders, Johan said to Roberto, you are too
22  slow to work the main bar.  I need you to work service.
23  Q.   And it's your testimony that Amin denied
24  having heard that and that denial was dishonest?
25  A.   Absolutely.

Page 101

1   Q.   Is there anything else that Amin said or
2   did that caused you to question his honesty?
3   A.   I can't recall in this moment,
4   specifically honesty.
5   Q.   Okay.  If during the course of the
6   deposition, you can recall, just let me know and I
7   would be happy to let you answer.
8       Did Amin ever say or do anything to you
9   that you regarded to be misogynistic?
10  A.   Oh, absolutely.
11  Q.   Can you give us some examples?
12  A.   He called me a bitch on at least a couple
13  of occasions.  He referred to me as a baby, as in grow
14  up and stop being such a baby.  He referred to me as a
15  bar back.
16  Q.   That's just a person who supports a
17  bartender, correct?
18  A.   Correct.
19  Q.   So you viewed that as a misogynistic
20  comment?
21  A.   It was an inappropriate comment to put me
22  down in that moment.  He made a comment about Jews
23  owning the banks and the media.
24  Q.   That didn't making him misogynistic, that
25  made him anti-Semitic, right?

26 (Pages 98 - 101)

Page 102

1    A.   True, but it was also directed at me with
2  other comments.
3    Q.   Anything else?
4    A.   I can't recall in this moment.
5    Q.   Okay. I'm going to circle back to his
6  uses of the word bitch because you testified previously
7  that Mr. Mariano had also used that word in your
8  presence.
9    A.   Correct.
10    Q.   You testified earlier this morning that at
11  least at one of your other employment engagements,
12  somebody had used that word in your presence, correct?
13    A.   Correct.
14    Q.   So you know that the literal definition of
15  bitch is a female dog?
16    A.   Correct.
17    Q.   But bitch also used in your experience to
18  describe somebody who is very difficult to work with?
19    A.   Only females.
20    Q.   What kind word in your experience do
21  people use to describe males who are difficult to work
22  with? Are they called bastards or things like that?
23    A.   Well, if you even look at The Plaza, I
24  haven't heard any about men, it was just with the
25  females.

Page 103

1    Q.   I see. Because the men thought that the
2  men were always easier to work with in your experience?
3    A.   Apparently.
4    Q.   Let me ask you about Johan Widnersson.
5  What was his position at the Palm Court?
6    A.   He was the bar manager.
7    Q.   And he was your direct superior, I think
8  you previously testified to that?
9    A.   Correct.
10    Q.   And he was the direct superior of all the
11  bartenders?
12    A.   Yes.
13    Q.   And at the time you were employed there,
14  there were four; am I correct?
15    A.   Correct.
16    Q.   Did Mr. Widnersson ever say or do anything
17  to you that caused you to question his honesty?
18    A.   Well, definitely giving me the review he
19  gave me.
20    Q.   We will talk about the review in due
21  course. But just to make a note of it for our further
22  questioning, you felt it was a dishonest review; is
23  that your testimony?
24    A.   Absolutely.
25    Q.   Meaning that he put things in the review

Page 104

1  that he knew were not true; is that what you mean by
2  dishonest?
3    A.   Yes.
4    Q.   So if he put things in a review that was
5  his assessment of you, and you just don't view yourself
6  that way and disagree with his assessment, what is it
7  about his assessment that you regarded as dishonest?
8    A.   That he couldn't explain or would not
9  explain his assessment.
10    Q.   Okay. What if he just didn't think he had
11  to explain it?
12    A.   I don't understand how someone can give
13  you an assessment and not explain it. If it's
14  negative, it seems as a bar manager that would be your
15  job to correct that behavior.
16    Q.   At least that's your perception of what a
17  manager should be doing, correct?
18    A.   Absolutely.
19    Q.   Did Johan Widnersson ever say or do
20  anything else to you that caused you to question his
21  honesty?
22    A.   I don't recall at that moment specifically
23  about his honesty.
24    Q.   Did Mr. Widnersson ever say or do anything
25  to you that caused you to view him as misogynistic?

Page 105

1    A.   His general reaction to me, yes.
2    Q.   Could you be more precise?
3    A.   Absolutely. He would pass over me and
4  look to James when he needed something. If I said
5  something specific like the sky is blue, he would argue
6  with me. If James said the sky is blue, end of story.
7    Q.   And you feel that the only reason why he
8  argued with you was because you were female and James
9  was male?
10    A.   Absolutely.
11    Q.   Any other examples of, in your experience,
12  of actions that he took towards you or statements that
13  he made to you that in your mind were misogynistic?
14    A.   Yes. The fact that he always said to me
15  that I complained. And I would challenge him on that,
16  saying what do you mean, I'm giving you, like, what I'm
17  supposed to do with my job. I am not just making a
18  statement, I'm giving solutions to what we can do here.
19    Q.   Can you explain more clearly for us why
20  you regarded that as misogynistic?
21    A.   He never said to the guys, as much as they
22  were bitching and moaning about everything, not once
23  did he say that you are complaining. If I spoke up
24  about something he always put it in a negative light.
25    Q.   And it's your testimony that as far as you

27 (Pages 102 - 105)

Page 122

```
1        MR. HAESLOOP:  Are we taking
2   a lunch break?
3        MR. ROSEN:  There are plenty
4   of places right here on the street.
5   Yes.
6        MR. HAESLOOP:  Is there a
7   cafeteria in the building?
8        MR. ROSEN:  I don't believe
9   so but when you walk out the front
10  door and turn right there is a
11  gazillion, which means there is more
12  than two.
13       MR. HAESLOOP:  I gathered
14  that, even though I've criticized
15  your math earlier today.
16       MR. ROSEN:  There is also a
17  million places in Grand Station.
18  But, anyway.
19       THE VIDEOGRAPHER: We are now
20  off the record.  The time on the
21  video monitor is 1:15 p.m.
22  (Luncheon recess.)
23       THE VIDEOGRAPHER: We now on
24  the record -- sorry.  We are now on
25  the record, the time on the video
```

Page 123

```
1   monitor is 2:03 p.m.
2   Q.   Ms. Braunstein, just prior to our meal
3   break there were a number of things that I asked you
4   about where you couldn't necessarily remember all the
5   situations and I invited you if they came to your mind
6   at any point to let us know.
7   A.   Uh-huh.
8   Q.   Have you remembered anything that you did
9   not remember before lunch that you wanted to share with
10  us?
11  A.   Yes, I would say pertaining to Roberto.
12  Q.   And what about Roberto that you wanted to
13  tell us?
14  A.   Specifically his honesty.
15  Q.   Okay.  And what is it about -- the
16  question is what did, in this instance, Roberto Rosa
17  say or do that caused you to question his honesty?
18  A.   In the paperwork from the EEOC that I
19  received, there was an e-mail that I saw or one or two
20  e-mails that I saw for the first time that I guess he
21  wrote to HR or maybe Marty, those were very dishonest
22  about me.
23  Q.   In what regard?
24  A.   Blatant lies of things I did.
25  Q.   And why do you believe he wrote such lies?
```

Page 124

```
1   A.   I don't know.
2   Q.   Anything else that you may have recalled
3   that you would like to share now?
4   A.   No.
5   Q.   If I told you that Paige's last name was
6   Rodriguez, would that refresh your memory as to what
7   her last name was?
8   A.   No.
9   Q.   How did you find out about the position at
10  The Plaza Hotel?
11  A.   Through Brian Van Flandern.
12  Q.   And can you spell Brian's last name?
13  A.   V-a-n, Flan -- F-l-a-n-d-e-r-a-n.
14  Q.   And who is Brian Van Flandern?
15  A.   He was the celebrity mixologist, the
16  consultant they brought on.
17  Q.   For those of us who don't work in the
18  industry, what is a celebrity mixologist?
19  A.   He goes and does a lot of media.
20  Q.   Is that the end of your answer?
21  A.   Yes.
22  Q.   What did he tell you about the position?
23  A.   He posted on Facebook that he was doing a
24  new project, very high-end, looking for mixologists and
25  I reached out to him.
```

Page 125

```
1   Q.   What were you doing at that point in time?
2   Were you working?
3   A.   I don't remember.
4   Q.   And after you applied for the position,
5   were you interviewed?
6   A.   Yes.
7   Q.   Do you recall by whom?
8   A.   First by Brian then by Trevor Sherman and
9   then I believe another day I met with Marty and George
10  who is I believe the president of the hotel.
11  Q.   The president of the hotel?
12  A.   I think.  I don't remember his title.
13  Q.   And who is Trevor Sherman?
14  A.   That's Mr. Chatwal's right hand in this.
15  We asked for a specific title for him and he never
16  would give it to us.  He never showed us a business
17  card and he didn't give us an official title.
18  Q.   Did you understand him to be an employee
19  of the hotel?
20  A.   I understood him to work for Mr. Chatwal,
21  the owner of the hotel.
22  Q.   George Cozonis --
23  A.   Pardon?
24  Q.   -- is that who you are talking about?
25  A.   George, yes, that's his last name.
```

32 (Pages 122 - 125)

Veritext Legal Solutions
800-227-8440                                973-410-4040

Page 166

1 withdraw it.
2     Can you tell me, please, how you were able
3 to start the recording in the each of the two instances
4 that you recorded conversations without the other
5 person to the conversation knowing that you had done
6 so?
7     A. I started it and then I put it in my
8 pocket and then I went up to them.
9     Q. So they would not have even seen your
10 iPhone. It could be in your pocketbook -- or your
11 pocket, did you say?
12    A. Pocket.
13    Q. And with respect to both of the
14 conversations. And I understand the distinction that
15 the second one was actually more than one conversation.
16 It is series of conversations, that will be the
17 conversation. But for the first one, there is one
18 person that you are speaking with, correct?
19    A. Marty.
20    Q. Marty.
21    Did you start the conversation with him
22 and end the conversation with him with the tape on at
23 all times?
24    A. Yes.
25    Q. With respect to the second series of

Page 167

1 conversations, did you start the recording and end the
2 recording when those series of conversations started
3 and ended?
4     A. Yes.
5     Q. So everything that was said to you in that
6 series of conversations and everything that you said to
7 them in that series of conversations is reflected in
8 the recording; am I correct?
9     A. Correct.
10    Q. And do you believe that those recordings
11 support your legal claims against the defendants?
12        MR. HAESLOOP: Objection to
13        the form, but you can answer.
14    A. Yes.
15    Q. In what way?
16    A. Which recordings do you want to talk about
17 first?
18    Q. Let's start with Marty.
19    A. Well, Marty was supposed to be Johan,
20 Marty and I going over my review so I could get bullet
21 points or feedback from Johan about my performance,
22 which was requested verbally a couple of times and also
23 in writing.
24    Q. And so can you explain, please, how that
25 supports your claims, your legal claims against the

Page 168

1 defendants?
2     A. First of all, where was Johan? He was
3 clocked in at work that day. He was supposed to sit
4 down with us. I did not get any feedback. Now, I have
5 also come to learn because of the EEOC that both
6 James Menite and Eddie Marini their reviews, the same
7 review I got, on the right-hand side got actual
8 feedback written in on anything marked negative on how
9 they can improve. I didn't get such feedback, and I
10 don't know what Roberto got because I wasn't given his
11 review. But we were not treated different -- we were
12 not treated the same just by them getting feedback that
13 I didn't get.
14    And even Marty in his conversation, listen
15 to what he said to me. There was nothing in my job
16 performance. People seem to have negative reactions to
17 me. Who? Amin, who there was an issue with, that
18 Marty already apologized to me for; the girls who were
19 acting inappropriately as far as Marty heard, also.
20 Absolutely.
21    Q. Does it show in your mind that Marty was
22 misogynistic?
23    A. Well, he did refer to me as a bitch and he
24 chose to spell it because he knew it was a bad word.
25    Q. Is it on that tape?

Page 169

1     A. Yes.
2     Q. So that reflects that he is misogynistic?
3     A. I believe so.
4     Q. Anything else on the tape that you feel
5 reflects that he was misogynistic?
6     A. When he was choosing to talk over me about
7 him saying that because other people told him I,
8 quote/unquote, disappearing from the bar, he goes into
9 this -- starts to go into a lecture about me telling
10 people and don't -- you know, if you are going to go to
11 the restroom, just tell people that you are going to be
12 a while.
13    And you hear me trying to speak up saying
14 that is not what is happening. I am not disappearing
15 from the bar. Both Eddie and James already spoke up to
16 Amin claiming every single time I step off this bar, as
17 silly as it sounds, if I had to go for snacks, the
18 special snacks we gave every guests that was very
19 special and made us five stars, I would say, I am going
20 for snacks. If I had to go to the restroom, I would go
21 to the restroom. If I was going for a bottle from a
22 certain cabinet, I would let them know every single
23 time so they didn't turn around and be like, whoa,
24 where is my backup and I am gone. That never happened
25 with me. That is a blatant lie.

43 (Pages 166 - 169)

Page 170

1  Q.  Would you agree with me that based on the
2  tapes, Marty never raised his voice to you during that
3  conversation?
4  A.  That's correct.
5  Q.  Would you agree with me from the tapes
6  that he listened to what you had to say?
7  A.  Yes.
8  Q.  I'm going to ask you about a series of
9  documents and I will state for the record that most of
10  them are e-mails.  And I will try to take them in a
11  certain order, which is chronological.
12  So what I'm going to show you now, what I
13  would like you to look at is what I've marked as
14  Defendant's Exhibit 6 for identification.  Take a
15  moment please.
16  For the record there are two e-mails here,
17  one is dated Sunday, November 9, and it's an e-mail
18  from you to Suzanne Paradi.  And one is dated November
19  10, which is an e-mail from Suzanne Paradi to you.
20  When you are finished reading it, I have a question to
21  ask you.
22  For the record, this e-mail
23  exchange was produced by your
24  counsel.
25  A.  I know this.

Page 171

1  Q.  When was the last time you read this
2  particular e-mail exchange?
3  A.  I believe a couple of days ago.
4  Q.  So this is one of the things you reviewed
5  to prepare for your deposition, right?
6  A.  Right.
7  Q.  Is it fair to say you reviewed all the
8  documents that your attorney produced to my firm in
9  response to our document requests?
10  A.  I believe so.
11  Q.  And they included a lot of e-mails; isn't
12  that right?
13  A.  Yes.
14  Q.  And my question to you is this, when you
15  started work on October 27, 2014, and this is dated
16  November 9, 2014, so that is a period by my
17  calculations of two calender weeks.  My question to you
18  is, is this the first time that you complained about
19  anything that anyone said to you that you considered to
20  be inappropriate or unprofessional to the best of your
21  memory?
22  A.  As an e-mail?
23  Q.  Yeah, let's start with that.
24  A.  I don't remember.
25  Q.  Do you have any recollection about

Page 172

1  complaining about anyone else's conduct prior to
2  November 9, 2014, but after you started working there?
3  A.  Not to my immediate knowledge.
4  Q.  Okay.  And so and this particular e-mail
5  that you sent describes an incident involving you and a
6  tailor who was there, I guess, to provide alterations
7  to your uniform jacket.  Is that why you had contact
8  with the tailor?
9  A.  He made the uniform jackets for us and the
10  dresses for the girls.
11  MR. HAESLOOP:  Okay.  When
12  you say girls, who do you mean?
13  THE WITNESS:  I'm sorry,
14  cocktail servers.
15  Q.  Or I might have asked you mean the women,
16  right?
17  A.  Yes.
18  Q.  At the top of the page, you got a response
19  from Ms. Paradi.  And she says, quote, Good morning,
20  Tina.  I am sorry to hear this happened to you.  We
21  will certainly follow up with the tailor and ensure he
22  understands that those remarks and comments are
23  unwelcome and inappropriate.
24  Please let me know if there is anything
25  else I can assist you, close quote.

Page 173

1  Do you consider that to be an appropriate
2  response by someone from human resources?
3  A.  Yes.
4  Q.  Based on what she wrote, does it reflect
5  that she had sensitivity to what you complained about?
6  A.  Yes.
7  Q.  Did the tailor who made these comments
8  repeat them on another occasion after this e-mail
9  exchange?
10  A.  No.
11  Q.  Okay.  Thank you.
12  I'd like to show you an e-mail exchange
13  that has been marked for identification as
14  Defendant's Exhibit 7.  Take a moment, please, to look
15  at that.
16  MR. HAESLOOP:  Thank you.
17  Q.  For the record, these e-mails also were
18  produced by your counsel.
19  Are you ready for a question on the
20  document?
21  A.  Yes.
22  Q.  Let me start by asking, were these e-mails
23  also a part of the documents that you reviewed as part
24  of your preparation for this deposition?
25  A.  Yes.

44 (Pages 170 - 173)

Page 198

1    Q.   Do you know whether Ms. Paradi agreed with
2  your statement that as another professional woman no
3  manager, especially a male saying to a female, should
4  tell her to grow up and stop being such a baby?
5           MR. HAESLOOP:  Objection.  You
6       can answer if you can.
7    A.   I don't know.
8    Q.   Did you ever ask her?
9    A.   I don't remember.
10   Q.   But in terms of the comment you felt it
11  was especially inappropriate because the person who
12  uttered the comment was male and you were a female?
13  I'm just looking at your e-mail to Ms. Paradi.
14   A.   Yes.
15   Q.   But you would acknowledge that even a male
16  saying it to man would be inappropriate, do you not?
17   A.   That didn't happen, it was just directed
18  towards me.
19   Q.   And you were asking her for her agreement,
20  that she would agree as another professional woman that
21  no manager, especially a male saying to a female should
22  tell her.
23       So am I reading this correctly that you
24  agree that if a male manager said something like this
25  to a male employee, it would also be an inappropriate

Page 199

1  statement to make?
2           MR. HAESLOOP:  Objection, but
3       you could answer.
4    A.   I don't know that I can answer that
5  question.
6    Q.   Then why did you write especially a male
7  saying it to a female?
8    A.   Because his tone and saying it in the
9  manner he did was misogynistic.
10   Q.   Correct.  And then Suzanne Paradi wrote
11  less than an hour after your e-mail:  Good afternoon,
12  Tina.  Thank you for your e-mail.  We will visit the
13  situation tomorrow once Amin back in the office -- I
14  think she meant is back in the office -- and I will
15  follow up with you.  Warm regards, Suzanne.
16       Did you think that was an appropriate
17  response?
18   A.   Yes.
19           MR. ROSEN:  Thank you.
20   Q.   Do you recall whether she circled back to
21  you -- I'm sorry, followed up with you on this matter?
22   A.   She did not, I believe.
23   Q.   When you say "not believe," are you sure
24  she didn't or are you not so sure?
25   A.   I am apologizing.  I am on zero minutes of

Page 200

1  sleep.  I don't remember.
2    Q.   I would like to show you a document that
3  has been premarked for the identification as
4  Defendant's Exhibit 12.
5       This is the -- I guess at this point this
6  would have been your thirty-day introductory review.
7  Wouldn't you agree that if you started work on
8  October 27, and then -- I'm sorry.  Try again.  It's
9  really 90 days.  Yeah, it's about 90 days.  It's a
10  review and it's a review that was completed by Johan;
11  am I correct?
12   A.   Yes.
13   Q.   And he evaluates your overall performance
14  as below, correct?
15   A.   Yes.
16   Q.   And in that column in terms of behaviors,
17  where the question reads:  Does the colleague
18  demonstrate such behavior -- and I guess it would be
19  the following behavior -- he has marked all the
20  following no.  Respect for others, professionalism,
21  quality of work, productivity, positive attitude,
22  cooperative, accepts responsibility, reliability, team
23  player, leadership.  And you did not agree with that
24  review; am I correct?
25   A.   Correct.

Page 201

1    Q.   And you said so on the form, correct?
2    A.   Yes.
3    Q.   On the day that you received the form, and
4  I note that the date of the appraisal is
5  January 9, 2014, but if we look at your signature, it
6  looks like you signed it the day before,
7  January 8, 2015, did you actually have a conversation
8  with Johan about this review or did you just get handed
9  this review?
10   A.   Had a conversation.
11   Q.   Okay.  And tell us as best as you remember
12  now what you said to him and what he said to you during
13  that conversation?
14   A.   Johan, Brian Van Flandern and I were in
15  the room, in HR.  He handed me this review and said he
16  had to go over it with me.  And he went through just as
17  you did with giving yes and no.  He added the yeses
18  where you didn't.  And I said to him -- that was all he
19  said, and I said to him afterwards, I said, Johan, and
20  I pointed to this, and I said I don't know who you are
21  talking about here, I don't recognize this person.  And
22  I asked him for feedback.  And he wasn't giving me any.
23       And I said, no, no.  You can't hand me a
24  review like this.  I have never had one in my whole
25  career anything like this before.  And if you are going

Page 202

1  to say this about me, you need to give me some
2  direction.
3      Brian sat not saying a thing, Johan was
4  holding the paper and shaking as he was reading this to
5  me. And finally he said something about me stocking
6  glassware, I wasn't fast enough at it and he was going
7  to show me how to do it better.
8      He made a second comment along those lines
9  and something I can't remember but equally as
10  ridiculous. And that was -- and, again, I kept asking
11  for feedback. He would not give me feedback. He said,
12  you know, this is the review. He is just giving it to
13  me as he was told to do.
14      I was asking -- pardon me -- over and over
15  again. Finally I signed it the way I did. I do not
16  agree with my review. Initialled it. Circled that. I
17  think I put the date and I may have the day wrong, I'm
18  not sure if it's the 8th or the 9th in this moment.
19      And then I said to him, I need a copy of
20  this before I leave. And he goes, oh, shall I bring it
21  to you at the bar, and I said, no, no, no. I want a
22  copy now before I step out of the room. He stepped out
23  of the room and he comes back and he hands me the copy.
24      Q.  Is this one of the documents that you
25  reviewed yesterday in preparation for your deposition?

Page 203

1      A.  I believe two days ago, yes.
2      Q.  Just note for the record that there is not
3  a Bates stamp number on this, which I believe, but
4  could be mistaken, indicated this is not a document
5  produced by your counsel. I just make that statement
6  on the record.
7      But you have seen it before as recently as
8  this past week?
9      A.  Correct.
10      MR. HAESLOOP:  If I may be
11      heard, I believe we did enclose
12      it with our --
13      MR. ROSEN:  Like I said --
14      MR. HAESLOOP:  January 26
15      response.
16      MR. ROSEN:  That may be the
17      case, like I said, that appeared I
18      didn't know for sure.
19      Q.  In any event, I would like you to take a
20  look at Defense Exhibit 13. And this was an e-mail
21  that was produced by your counsel.
22      MR. HAESLOOP:  Oh, I didn't
23      get one.
24      Get another one. Thanks.
25      Q.  Is it fair if I characterize this e-mail

Page 204

1  as an e-mail which you sent the day after you'd
2  received your review? As you put in detail your
3  dissatisfaction with the review and recounted portions
4  of the conversation that occurred when you received the
5  review? Is that a fair characterization of this
6  e-mail?
7      A.  Yes. But I would state because it was
8  fresh in my mind at the time when I typed this out,
9  that this really was the depth of the feedback from
10  him. Like this is what we discussed.
11      Q.  So what I was saying is the e-mail or to
12  put it in different words, the e-mail served two
13  purposes. One was to allow you to expand in writing
14  about your dissatisfaction with the review. That was
15  one purpose. And the other purpose was to highlight
16  aspects of the conversation that you participated in
17  during the review; is that correct?
18      A.  I wrote in because I needed a -- pardon
19  me -- a response for the negative review. Where I
20  ended it, I expect to have a more accurate bullet point
21  assessment from you.
22      Q.  I'm glad you read from that sentence. By
23  coincidence, I was able to read from it, too. And what
24  the actual full sentence says is, quote, I expect to
25  have a more accurate, paren, bullet points, close paren

Page 205

1  assessment from you by the end of this week, so that I
2  may assess this troubling situation and figure out how
3  we can move forward from here, close quote.
4      And just to be clear, this is an e-mail
5  you addressed to your immediate superior; am I correct?
6      A.  Correct.
7      Q.  Can you see how someone reading this
8  e-mail might find the tone inappropriate and
9  insubordinate?
10      MR. HAESLOOP:  Objection.
11      A.  I think someone should think I got a
12  squashing review and I am asking for feedback. And I
13  am asking for it in a timely manner. I think that's
14  fair.
15      Q.  That actually -- I'm not asking you what
16  you may have intended when you wrote it. I'm asking
17  you whether you could see how someone reading this
18  e-mail might view your tone towards your manager, your
19  superior as inappropriate and unprofessional and
20  insubordinate?
21      MR. HAESLOOP:  Objection, but
22      you can answer.
23      A.  No -- I don't think.
24      Q.  Can't see that?
25      A.  I can't see that.

Page 234

1  Q.  Yes.
2  A.  Then would it be harassing?
3  Q.  Condescending?
4  A.  Condescending.
5  Q.  Belittling, unprofessional, inappropriate,
6  those were the adjectives I used.
7  A.  If they could back it up that it was true
8  with facts, and if management could also sit down with
9  them and have a discussion and you all agree that that
10 is facts, then I can say yes to that.
11 Q.  Okay.  Thank you.
12     I show you a document that has been marked
13 for identification as Defendant's Exhibit 20.
14 A.  Yes.
15 Q.  Do you remember on what date you were
16 informed that you were being terminated?  Let's try it
17 this way:  Do you remember what day of the week it was?
18 A.  It was Friday, March 25, 2015.
19 Q.  And you wrote this e-mail to Mr. Mariano
20 and others the day after, correct?
21 A.  Correct.
22 Q.  So as best as you can remember, would you
23 please tell us about the meeting at which you were
24 terminated?  Tell us what you could remember being said
25 at that meeting.  This is the meeting that was

Page 235

1  recorded.
2  A.  Correct.
3     Evan told me I was going to be let go.  I
4  believe I asked him why and he quoted something from
5  the union, blah, blah, blah, we don't have to because
6  of this clause -- whatever it is -- we don't have to
7  give you a reason.
8     And then I believe I said something like,
9  well, let's talk then.  And I went into the story about
10 James being veraciously drunk March 1 and work, and his
11 behavior.  And Evan asked me what does that have to do
12 with you.  And I said, well, it has everything to do
13 with me because you treat people here differently.  And
14 he said that's not true.
15    I said, yes, it was, that this is one of
16 the most misogynistic environments I have ever worked
17 before.  And he said that's not true.  And think I said
18 just because you say it's not true doesn't make it  not
19 true.  We've discussed this before.
20    And if I remember correctly, at some point
21 Luigi spoke up, and he first said, I am not sure why I
22 am here, but I am glad to be invited.  And he asked me
23 when was your probation period.  And I believe I said
24 it was going to end in two weeks.  And he said, well, I
25 don't think there is anything we can really -- I can do

Page 236

1  for you.  Because of that, you can try calling Harry
2  and speaking with him.
3  Q.  Who did you understand Harry to be?
4  A.  Harry Riker from the union.
5     And I said I have his number and I was
6  going to be calling him.  And I think that was
7  basically it.  And then Sharon escorted me out.
8  Q.  That's the security guard?
9  A.  The security guard.
10 Q.  Let me see if I can refresh your memory
11 about the union thing that you really weren't clear on.
12    You are aware, are you not that the hotel
13 is party to what is called a collective bargaining
14 agreement, the union contract, if you will?
15 A.  Yes.
16 Q.  And that is with the hotel and motel trade
17 council, correct?
18 A.  Correct.
19 Q.  And I assume it was explained to you by
20 one of the union reps that during a certain period of
21 time after you start employment, you are subject to
22 what the contract calls a probationary period.
23    Did you know that?
24 A.  I have never seen the contract.
25 Q.  But was that what you were told?

Page 237

1  A.  Yes.
2  Q.  And it was explained to you that if an
3  employee is terminated before he or she has completed
4  the probationary period, then the union does not have
5  the right to grieve the discharge or to contest the
6  discharge, maybe the word grievance wasn't used.  Does
7  this sound right to you in terms of what you were told?
8  A.  No, I was told we were on a probation
9  period.  I didn't know really the facts.
10 Q.  So the explanation I'm giving you is not
11 an explanation that the union gave you?
12 A.  The union never gave us an explanation.  I
13 hadn't seen the contract.
14 Q.  Do you feel that the union did not
15 properly represent you at your termination meeting?
16 A.  I don't know that they did.
17 Q.  But you didn't pursue anything legally
18 against the union, did you?
19 A.  No.
20 Q.  What was it about that termination meeting
21 that you regarded to be inappropriate or
22 unprofessional?
23 A.  The termination meeting?
24 Q.  Yes.
25 A.  Well, first of all to keep me waiting for

60 (Pages 234 - 237)