# EXHIBIT 2

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    SOUTHERN DISTRICT OF NEW YORK
 4    Civil Action No. 1:16-cv-08879-VSB
 5    - - - - - - - - - - - - - - - - - - -x
 6    TINA MICHELLE BRAUNSTEIN,
 7                        Plaintiff,
 8          -against-
 9    SAHARA PLAZA, LLC, and THE PLAZA HOTEL,
      a FAIRMONT MANAGED HOTEL,
10
                          Defendants.
11
      - - - - - - - - - - - - - - - - - - -x
12
                          101 Park Avenue
13                        New York, New York
14                        September 7, 2017
                          10:41 a.m.
15
16
17        DEPOSITION of MARTIN MARIANO,
18    Non-Party Witness in the above-entitled
19    action, held at the above time and place,
20    taken before Cilia Civetta, a Shorthand
21    Reporter and Notary Public of the State of
22    New York, pursuant to Notice and the
23    Federal Rules of Civil Procedure.
24               *      *      *
25
```

Page 2

```
 1
 2  APPEARANCES:
 3
 4  RAISER & KENNIFF, ESQS.
 5     Attorneys for Plaintiff
 6  300 Old Country Road, Suite 351
 7  Mineola, New York  11501
 8  BY:  E. GORDON HAESLOOP, ESQ.
 9
10
11  SILLS CUMMIS & GROSS, P.C.
12     Attorneys for Defendants
13  One Riverfront Plaza
14  Newark, New Jersey  07102
15  BY:  DAVID I. ROSEN, ESQ.
16     SONU RAY, ESQ.
17
18
19
20
21  ALSO PRESENT:
22     TINA MICHELLE BRAUNSTEIN
23
24
25
```

Page 3

```
 1
 2         STIPULATIONS
 3
 4     IT IS HEREBY STIPULATED AND AGREED, by
 5  and among counsel for the respective
 6  parties hereto, that the filing, sealing
 7  and certification of the within deposition
 8  shall be and the same are hereby waived;
 9     IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to form of
11  the question, shall be reserved to the
12  time of the trial;
13     IT IS FURTHER STIPULATED AND AGREED
14  that the within deposition may be signed
15  before any Notary Public with the same
16  force and effect as if signed and sworn to
17  before the Court.
18          *   *   *
```

Page 4

```
 1
 2  MARTIN  MARIANO,
 3  having first been duly sworn by the
 4  Notary Public, was examined and testified
 5  as follows:
 6        MR. ROSEN:  As you know, I
 7     represent the defendant in this
 8     matter.  I believe that this deponent
 9     falls within a common control group
10     and that I have attorney-client
11     privilege.
12        But in the event that there's
13     any question about that, since we have
14     no conflict of interest, I'm also
15     appearing as counsel for the deponent.
16        I just wanted you to know what
17     my representation status is.
18        MR. HAESLOOP:  I'm glad you
19     clarified it.
20  EXAMINATION BY MR. HAESLOOP:
21     Q.  Good morning, Mr. Mariano.
22     A.  Good morning.
23     Q.  My name is Gordon Haesloop and
24  with me is my client, Tina Braunstein.
25        You've never met me before,
```

Page 5

```
            M. MARIANO
 2  correct?
 3     A.  That is correct.
 4     Q.  But you have met Tina Braunstein
 5  before?
 6     A.  Yes.
 7     Q.  You worked together, correct?
 8     A.  Yes.
 9     Q.  What is your present address?
10     A.  My home address is 31-62 29th
11  Street, in Astoria, New York 11106.
12     Q.  And how long have you lived
13  there?
14     A.  About 25 years.
15     Q.  Would you tell me, please, your
16  date of birth and place of birth?
17     A.  Sure.  February 19, 1957.  And I
18  was born in Bristol, Connecticut.
19     Q.  And did you attend high school?
20     A.  Yes.
21     Q.  And where, please?
22     A.  Bristol Eastern High School.
23     Q.  And what year did you graduate?
24     A.  1975, I think.  It's been a long
25  time.
```

Page 90

M. MARIANO

1
2  A. Sure.
3  Q. And what would their complaints
4  be?
5  A. That, you know, the servers
6  were, you know, aggressive maybe. Or
7  their complaints could be hotel related.
8  You know, focusing more on the cocktail
9  program. They wanted to be really
10 involved in it.
11       They were terrific. I did not
12 hire them. They were already employees of
13 the hotel. They had come from the
14 Edwardian Room, and they were really
15 active in creating a program for the hotel
16 and that had slipped away.
17       So they were mostly -- most of
18 their complaints were that. They wanted
19 to be more creatively involved. You know,
20 and you just have squabbles between
21 employees, which is normal.
22  Q. And what kind of squabbles
23 between employees involving the two women,
24 Laura and Heather, in the Champagne and
25 Rose bars?

Page 91

M. MARIANO

1
2  A. Impatience, waiting your turn.
3  That's pretty much it. They were a good
4  team.
5  Q. Did they ever complain about any
6  of the male bartenders?
7  A. No.
8  Q. Did the male bartenders ever
9  complain about Heather?
10 A. No.
11 Q. Did they ever complain about
12 Laura?
13 A. No.
14 Q. That is, while you were present.
15 I mean, while you were employed.
16 A. Yes. They never complained
17 about Laura.
18 Q. What about the servers in those
19 bars?
20 A. Never.
21 Q. Now, did you participate in the
22 hiring of Tina Braunstein?
23 A. Yes.
24 Q. In what manner?
25 A. We were opening a new concept

Page 92

M. MARIANO

1
2  for a bar in the Palm Court and we needed
3  bartenders.
4  Q. Were those positions offered to
5  any of the bartenders in the Champagne or
6  Rose Room?
7  A. No.
8  Q. Why not?
9  A. Part of our agreement, which was
10 known as a concessionaire agreement, or
11 what we would say in layman terms, a
12 carve-out, was that the Palm Court would
13 be staffed by new hires, but the hotel had
14 a right to hire at will without going
15 through the union hall or without allowing
16 current employees in the hotel to seek
17 those positions.
18 Q. Were those positions posted
19 within the hotel?
20 A. No.
21 Q. Why not?
22 A. Because they weren't eligible
23 for the jobs.
24 Q. And who decided eligibility?
25 A. The agreement between the hotel

Page 93

M. MARIANO

1
2  and the union.
3  Q. Now, how many seats are in the
4  Champagne Room at the bar?
5  A. Four.
6  Q. And in the Rose?
7  A. Maybe twelve.
8  Q. And are there tables?
9  A. Yes.
10 Q. With chairs?
11 A. Yes.
12 Q. How many tables and chairs in
13 each?
14 A. About 50, 60 seats in each room.
15 Q. When the Palm Court opened, it
16 had what kind of configuration?
17 A. It was a bar in the center of
18 the room surrounded by tables.
19 Q. What was the configuration of
20 the bar?
21 A. It was --
22 Q. Square, rectangle?
23 A. -- oval.
24 Q. How many seats at the bar?
25 A. I think there were 14, maybe 18

24 (Pages 90 - 93)

Page 178

```
 1            M. MARIANO
 2  points reads: Martin -- that's you,
 3  correct?
 4     A.   Correct.
 5     Q.   -- I followed up with Tina when
 6  she returned to work to explain to her the
 7  JP is the general manager. How she does
 8  not know this is confusing. She has
 9  worked with him for over six weeks now. I
10  further explained that Luigi is a union
11  delegate and he was asked by Edmund to
12  witness and arbitrate the situation. I
13  told her I was investigating the incident
14  and we needed to speak to everyone
15  involved.
16     A.   Mm-hmm.
17          MR. ROSEN: You have to answer
18  him yes or no. You can't say mm-hmm.
19     Q.   Did you write that?
20     A.   Yes.
21     Q.   But it doesn't indicate anywhere
22  in the memo identified as Plaintiff's 3
23  that you informed her of what Edmund said
24  and as to whether she had any response.
25     A.   I think it's implied that I
```

Page 179

```
 1            M. MARIANO
 2  followed up with Tina. So I'm certain I
 3  would have shared that information with
 4  her.
 5     Q.   But it's not contained in the
 6  memo?
 7     A.   Not in this memo, no.
 8     Q.   Did that memo go to HR?
 9     A.   I don't know who it went to.
10     Q.   Do you recall sending it to HR?
11     A.   No.
12     Q.   If it had been sent to HR, would
13  it be something in the HR file?
14     A.   I don't know. I'm not the
15  director of HR. I don't know.
16     Q.   The bottom page says, I spoke to
17  Edwin.
18          Now, was Edwin involved in this
19  situation?
20          (Witness reviews document.)
21     A.   I don't know.
22     Q.   Well, in Tina's e-mail, which is
23  No. 2, does she refer in any way to Edwin
24  being present?
25          (Witness reviews document.)
```

Page 180

```
 1            M. MARIANO
 2     A.   No.
 3     Q.   Do you know, as you sit here
 4  today, if Edwin was not involved in the
 5  situation, why you took it upon yourself
 6  to interview him as part of that report
 7  marked Exhibit 3?
 8     A.   Because clearly Edwin was a part
 9  of the situation. Just because she didn't
10  note that in her e-mail doesn't mean he
11  wasn't a part of it.
12          So I'm going to make an
13  assumption that in speaking with Edmund,
14  he told me that Edwin was a witness. So I
15  spoke to Edwin, because I do a thorough
16  investigation and I speak to everybody.
17     Q.   Well, did you speak to Edwin
18  about what he witnessed?
19     A.   Yes.
20     Q.   I spoke to Edwin. He confirmed
21  that Tina was aggressive, bossy, used foul
22  language. He said she made a comment
23  about getting an attorney. He was very
24  concerned and claimed she's not been
25  getting along with the other staff. He
```

Page 181

```
 1            M. MARIANO
 2  asked to confidential because he doesn't
 3  want problems with her.
 4          Did he describe to you what
 5  problems he thought he might have?
 6     A.   Yes.
 7     Q.   What problems?
 8     A.   That she was aggressive with him
 9  and Roberto and that she was a bully, and
10  that she would never help them in the
11  service bar. They felt that she would set
12  them up for failure, wasn't supportive.
13          The ladies would wait for
14  cocktails all the time and she just would
15  stay at her station in the bar, talking to
16  customers in the bar, and wouldn't help.
17     Q.   Is that recorded anywhere in the
18  memo?
19     A.   No. That's my recollection of
20  what was going on at the time.
21     Q.   And what else do you recollect
22  that she told you?
23          MR. ROSEN: Are you asking about
24  she told him --
25          MR. HAESLOOP: Tina.
```

Page 238

```
 1           M. MARIANO
 2   benefits manager.  So just for future
 3   e-mail reference, that she should be
 4   copying Evan Hunt, who was the more
 5   appropriate person to handle her
 6   situation.
 7      Q.   And that explains 9; that
 8   explained why you sent the e-mail to Evan
 9   Hunt, Exhibit 10?
10      A.   Correct.  So in Exhibit 10,
11   which is dated January 25, I remind Evan
12   that I met with Tina; that we had a very
13   candid conversation about her performance
14   review on January 15.
15           And in that meeting, I reminded
16   her that the review is a snapshot; and
17   even though she was upset with the
18   comments that she did not meet the
19   expectations, that I felt it was my
20   responsibility to have a candid
21   conversation with her and really let her
22   know what the large concerns were, as I
23   understood them.
24      Q.   Understood.  But why did you
25   send that e-mail to Mr. Hunt?
```

Page 239

```
 1           M. MARIANO
 2           (Witness reviews document.)
 3      A.   Because on January 12 I offered
 4   to meet with Tina.  And in the e-mail I
 5   sent to Evan Hunt, I'm letting him know
 6   that I met with Tina, that I followed up.
 7      Q.   Thank you.
 8           You were asked a question
 9   whether you were present when Ms.
10   Braunstein was informed that she was being
11   terminated, and I believe your answer was
12   no.  Am I correct?
13      A.   Yes.
14      Q.   Were you part of the decision to
15   terminate Ms. Braunstein's employment?
16      A.   Yes.
17      Q.   Are you familiar with the
18   reasons why Ms. Braunstein's employment
19   was terminated?
20      A.   Yes.
21      Q.   Can you tell us what those
22   reasons were?
23      A.   That since her hire date of
24   October and the opening of the Palm Court
25   in November, mid-November, she had a
```

Page 240

```
 1           M. MARIANO
 2   pattern of repeated concerns that she
 3   wasn't getting along with her coworkers,
 4   always acting professionally.
 5           After my repeated receipt of
 6   e-mails and offering to meet with Tina and
 7   having candid conversations with Tina, I
 8   didn't feel that Tina was taking ownership
 9   to do any kind of self-reflection to try
10   to change any of the issues that were a
11   concern.
12           There was never a concern with
13   the technical aspects of her job or her
14   knowledge.  That's a given.  But it just
15   began to escalate that the bartenders
16   within themselves felt that Tina was a
17   bully.  That she wasn't doing her share of
18   the work.
19           The cocktail servers felt she
20   was negligent in helping out whoever was
21   on the service bar.  They weren't getting
22   along with her as well.  I felt I did
23   everything I could to try to help.  I felt
24   Tina and I had a really good working
25   relationship, and I felt that I was always
```

Page 241

```
 1           M. MARIANO
 2   open to her and that we could discuss
 3   things candidly and professionally amongst
 4   each other.
 5           And so I was really
 6   disappointed.  I couldn't get her to move
 7   to a point where they could say, you know,
 8   she's going to make it.  And I think from
 9   October to February, that's almost five
10   months of looking at an employee during a
11   probationary period, where I'm not seeing
12   any willingness to change.
13           In fact, in one of these e-mails
14   that you presented to me, she brags to me
15   about being a tough person from New York,
16   and she seems to be very proud of the fact
17   that she's confrontational with people and
18   that's who she is and that we have to
19   accept that.  And in a luxury hotel, where
20   respect amongst employees is important,
21   she didn't have it in her nature to want
22   to change.
23           So at that point I didn't see
24   any further need to continue to coach and
25   counsel her, either on the record or
```

Page 242

M. MARIANO

through written documentation. And I felt it was in the hotel's best interest to exercise their right to end a relationship with an employee during her probationary period for failing to meet the standards and expectations of the hotel.

Q. Okay. Now, you mentioned a number of different people who were female, who expressed complaints to you about Ms. Braunstein, correct?

A. Yes.

Q. Now, you were asked whether you had reduced those to writing, and I believe that you said no.

But can you tell us, to the best of your memory, what did you understand or what do you recall the substance of Ms. Merlo's complaint about Ms. Braunstein to be? That would be Carolyn Merlo.

A. Carolyn's complaint was more vague. It's sort of like, I'm not on that shift; it's not really my oversight to worry about, but I'm glad I don't have to deal with it, because she felt Tina was a

Page 243

M. MARIANO

problem.

Q. And what was the position that Carolyn held there?

A. Carolyn was a manager.

Q. Now, I believe that you said that you also received complaints from the cocktail servers. You already recited some of the complaints.

Were there any other complaints by the servers that you can recall them making about Ms. Braunstein other than not helping out?

A. Just witnessing certain things and just her, you know, being uncooperative. They felt Tina was jealous of them or didn't understand why she would be unwilling to help.

Whenever there's a line at the bar, why with three bartenders she wouldn't jump in and assist the service bartenders. She would often, basically, let them drown, which they felt impacted their ability to service tables. Just no vested interest in their success.

Page 244

M. MARIANO

Q. Now, you said there were female cocktail servers. Do you recall the names of any of those servers?

A. I don't recall the name of -- there was one server who's the delegate. I can't remember her name. She had dark hair. We allowed her to wear flat shoes because her feet hurt her. I remember that. And her uniform itched her and we made some adjustments to it. But I can't recall her name.

Q. How many servers do you recall complaining about Ms. Braunstein?

A. About four.

Q. Were they all female?

A. Yes.

Q. Now, there was another woman after the cocktail servers and before the wife of, I think, one of the owners. And I didn't write that name down.

A. Yes.

Q. Do you know who I'm referring to?

A. Yes.

Page 245

M. MARIANO

Q. What's that person's name?

A. Angelina Policrasti.

Q. And who was she?

A. She was brought in by Geoffrey Zakarian as a wine and beverage consultant. She assisted us on all the bars with developing the wine list, and she did extensive training.

We actually kept her on as an additional support because she did all of the service training for all of the bartenders and the servers, along with Brian, who was primarily cocktail driven, but she was wine driven and service driven.

Q. And what do you recall the substance was of her complaints about Ms. Braunstein?

A. Nothing specific except a recommendation to let her go and, like, weekly. She's like, you need to let her go, you need to let her go. And I didn't think that was fair because I think everyone has an opportunity to change or

62 (Pages 242 - 245)

Page 246

M. MARIANO

```
 1  get better and I invested a lot of time.
 2       And like I said, Tina and I had
 3  a good relationship. She raised some
 4  valid issues that we were able to take
 5  care of. She raised her disappointments,
 6  and we were able to talk them through. So
 7  I thought I could make some headway.
 8    Q.  Did Angelina ever give any
 9  indication as to why she thought Ms.
10  Braunstein should be terminated?
11    A.  There were -- I think there were
12  concerns for me. I think she felt that I
13  wasn't reacting, and she was hearing from
14  the Zakarian group that I was being,
15  perhaps, ineffective.
16       And I needed them to understand
17  that this is not an independent restaurant
18  where you get to just say, you know, I
19  don't like you and you have to leave
20  today. This is a different environment.
21  This is The Plaza. We have to follow a
22  process, and everyone deserves time to
23  adjust.
24       It was a challenging time of
```

Page 247

M. MARIANO

```
 1  performance. So there were going to
 2  be challenging times that we just kind of
 3  had to work through and talk through. But
 4  at the end of the day, I think they just
 5  felt that Tina wasn't really making an
 6  effort.
 7    Q.  Okay. The wife of whom? I
 8  didn't write the name down.
 9    A.  Geoffrey Zakarian, who was the
10  culinary chef. His wife was sort of a
11  self-appointed expert. I think she's a
12  vested interest in his group. She's a
13  partner of his. And she would raise, you
14  know, concerns.
15    Q.  Such as?
16    A.  Just things that she would hear
17  from the staff or observations. I will
18  say that at the bar, there weren't
19  concerns at the bar with the customers at
20  the bar. It was how it was affecting the
21  floor.
22    Q.  Can you explain that more fully?
23    A.  Yes. So Tina would have
24  customers at the bar. She would take very
```

Page 248

M. MARIANO

```
 1  good care of them. That's, you know,
 2  money that goes directly into her pocket.
 3       She was able to make very good
 4  engagement with them, and I think she felt
 5  she did a very good job there and I would
 6  agree.
 7    Q.  But what was the wife of
 8  Zakarian's concerns?
 9    A.  Just what was happening on the
10  floor. There was another person they
11  involved. Her name is Monica Saperstein.
12  She was brought on as a restaurant
13  operational consultant. She had done some
14  work for Geoffrey before. And she
15  assisted us with everything, on how the
16  hostess stand flowed, how the reservations
17  flowed, how the bar flowed, the flow of
18  service on the floor. And she would make
19  some observations that she was concerned
20  for me, that I needed to react and end the
21  relationship.
22    Q.  With whom?
23    A.  With Tina.
24    Q.  Do you recall anything else that
```

Page 249

M. MARIANO

```
 1  she said to you about Ms. Braunstein?
 2    A.  I'm not sure I understand the
 3  question.
 4    Q.  You just said that she was
 5  concerned about you and that you needed to
 6  end the relationship with Tina.
 7       So my question to you was, do
 8  you recall anything else that she may have
 9  said concerning the reasons why she felt
10  you needed to end that relationship?
11    A.  She had told me that she felt
12  that Tina was familiar; that she may have
13  recognized her.
14    Q.  What does that mean?
15    A.  That she said, I know her from
16  somewhere or I worked with her somewhere
17  before. And then she said something
18  about, like, I know her from someplace.
19       MR. ROSEN:  Okay. I have no
20  further questions.
21  BY MR. HAESLOOP:
22    Q.  Did she ever tell you where she
23  worked with Tina before?
24    A.  No.
```