# EXHIBIT 3

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3
     Civil Action No. 1:16-cv-08879-VSB
 4   ------------------------------------x
 5   TINA MICHELLE BRAUNSTEIN,
 6                       Plaintiff,
 7        - against -
 8   SAHARA PLAZA, LLC, and THE PLAZA HOTEL,
     a FAIRMONT MANAGED HOTEL,
 9
                         Defendants.
10
     ------------------------------------x
11
                         101 Park Avenue
12                       New York, New York
13                       September 28, 2017
                         11:04 a.m.
14
15
16        DEPOSITION of EVAN HUNT, a Non-Party
17   Witness in the above-entitled action, held
18   at the aforementioned time and place, taken
19   before Ashley Shugar, a Shorthand Reporter
20   and Notary Public of the State of New York,
21   pursuant to the Federal Rules of Civil
22   Procedure, Notice and stipulations between
23   Counsel.
24              *     *     *
25
```

Page 2

```
 1
 2  APPEARANCES:
 3
 4  RAISER & KENNIFF, PC
 5  Attorneys for Plaintiff
 6      300 Old Country Road, Suite 351
 7      Mineola, New York 11501
 8  BY:  E. GORDON HAESLOOP, ESQ.
 9       gordon@raiserkenniff.com
10
11
12  SILLS CUMMINS & GROSS PC
13  Attorneys for Defendants
14  SAHARA PLAZA, LLC, and THE PLAZA HOTEL,
15  a FAIRMONT MANAGED HOTEL
16      101 Park Avenue, 28th Floor
17      New York, New York 10178
18  BY:  A. SONU RAY, ESQ.
19       sray@sillscummis.com
20
21
22            *   *   *
23
24
25
```

Page 3

```
 1
 2          STIPULATIONS
 3
 4      IT IS HEREBY STIPULATED AND AGREED,
 5  by and among counsel for the respective
 6  parties hereto, that the filing, sealing
 7  and certification of the within deposition
 8  shall be and the same are hereby waived;
 9      IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to form of
11  the question, shall be reserved to the time
12  of the trial;
13      IT IS FURTHER STIPULATED AND AGREED
14  that the within deposition may be signed
15  before any Notary Public with the same
16  force and effect as if signed and sworn to
17  before the Court.
18
19            *   *   *
20
21
22
23
24
25
```

Page 4

```
 1              E. HUNT
 2    E V A N   H U N T, the Witness herein,
 3  having first been duly sworn by the Notary
 4  Public, was examined and testified as
 5  follows:
 6  EXAMINATION BY
 7  MR. HAESLOOP:
 8      Q.  Okay.  Could I have your full
 9  name and home address, please?
10      A.  Oh, boy.  Okay.  So the full
11  name is easy.  Evan Douglas Hunt.
12          The home address just changed.
13  It's 113 West Pierson, Phoenix, Arizona
14  85013.
15      Q.  How long have you been there?
16      A.  Two weeks.
17      Q.  Well, congratulations on your
18  move.
19      A.  Thank you.
20      Q.  And by whom are you employed at
21  this time?
22      A.  I'm still employed by Fairmont.
23      Q.  Okay.  And there is an entity
24  named Sahara that's under the Fairmont
25  label?
```

Page 5

```
 1              E. HUNT
 2      A.  Sahara is the owner of The
 3  Plaza.
 4      Q.  Right.
 5      A.  Yeah.
 6      Q.  And what is their relationship
 7  to Fairmont?
 8      A.  It --
 9          They own a stake of -- of --
10          Well, so I guess The Plaza is
11  the asset -- the building is the asset.  So
12  Sahara is an owner of -- of The Plaza.
13  Although, I thought that that was -- I'm
14  not an expert on this, but I think that
15  their share of the mortgage was recently
16  sold.
17      Q.  I believe that's true.
18      A.  Yeah.
19      Q.  And is Sah- --
20          Was Sahara originally the
21  manager of the property?
22      A.  No.  Sahara is not a manager.
23      Q.  Okay.
24      A.  Yeah.
25      Q.  Who was the manager of the
```

Page 34

```
 1              E. HUNT
 2   followed as the assistant director of HR?
 3        And take your time, please.
 4        A.   (Document review.)
 5             It is.
 6        Q.   Okay. That was the procedure
 7   that was in effect at the time you were the
 8   assistant director?
 9        A.   Uh-huh.
10        Q.   And in the case of the
11   bartenders at the Palm Court, were those
12   procedures followed?
13        A.   Could you be more specific?
14   You --
15             Bartenders?
16        Q.   Yeah. There were four
17   bartenders at the Palm Court. Tina
18   Braunstein was one.
19        A.   Uh-huh.
20        Q.   And there were three male
21   bartenders.
22        A.   Uh-huh.
23        Q.   And you, I believe, received
24   complaints from the bartenders about each
25   other's conduct or behavior?
```

Page 35

```
 1              E. HUNT
 2        A.   Uh-huh.
 3        Q.   Is that correct?
 4        A.   That's correct.
 5        Q.   Okay. Do you --
 6             Did you review those complaints
 7   by either e-mail or other written form
 8   before you came here today?
 9        A.   Some, yes.
10        Q.   Okay. Do you recall making any
11   notes with respect to Tina Braunstein's
12   complaints?
13        A.   Yes, a few.
14        Q.   Okay. And you don't have those
15   handwritten notes?
16        A.   We actually went over some of
17   them yesterday.
18        Q.   The notes?
19        A.   Yeah.
20        Q.   Okay.
21        A.   You have them in the exhibits.
22             MR. HAESLOOP: I would call for
23        the production of his handwritten
24        notes as the --
25             MS. RAY: The notes he's
```

Page 36

```
 1              E. HUNT
 2        referring to have been produced. We
 3        went over Defendant's production to
 4        Plaintiff.
 5             MR. HAESLOOP: Okay.
 6             MS. RAY: So all of those
 7        documents referred to have been
 8        produced already.
 9             MR. HAESLOOP: Uh-huh. Okay.
10        I just don't recall seeing those
11        handwritten notes because I didn't
12        have them.
13             MS. RAY: They are in
14        Defendant's production. There are
15        handwritten notes as well as typed-up
16        notes.
17             MR. HAESLOOP: Okay. Do you --
18             You wouldn't happen to know
19        their Bates stamps off --
20             MS. RAY: No.
21   BY MR. HAESLOOP:
22        Q.   All right. Let me have that
23   back.
24        A.   (Complies.)
25        Q.   As you sit here today, do you
```

Page 37

```
 1              E. HUNT
 2   recall the nature of Tina Braunstein's
 3   complaints to the HR department?
 4        A.   Some of them, yeah.
 5        Q.   Well, what do you recall?
 6        A.   I remember there was a
 7   complaint about a Taylor; there was a
 8   complaint about another colleague, Edmund
 9   McSloy; there was a complaint about her
10   manager, Amin.
11             Those are the only ones I can
12   remember specifically.
13        Q.   All right. And were each of
14   those complaints reduced to writing?
15        A.   She sent e-mails about each
16   one, so they were in writing.
17        Q.   Okay. Do you recall
18   interviewing her personally prior to her
19   termination regarding any of those
20   complaints?
21        A.   I interviewed her personally
22   about the one about Amin, and I sat in on
23   the interview for her with Edmund, but I
24   did not interview -- I wasn't the
25   interviewer; I was the witness.
```

10 (Pages 34 - 37)

Page 38

```
 1              E. HUNT
 2    Q.  Who was the interviewer?
 3    A.  Kristin Stabile.
 4    Q.  And who is she?
 5    A.  She was the interim director of
 6  HR.
 7    Q.  Okay.  Did you make notes of
 8  that meeting?
 9    A.  I did not.
10    Q.  Do you know if Kristin Stabile
11  made notes of that meeting?
12    A.  She did.
13    Q.  Do you remember the nature of
14  the allegation?
15    A.  Yes.
16    Q.  What was it?
17    A.  She was complaining that
18  Edmund --
19    Q.  That's Edmund McSloy?
20    A.  Edmund McSloy.
21    Q.  He was the day bartender?
22    A.  He was the day bartender,
23  correct.
24        -- yelled at her and was very
25  aggressive in his communication with her.
```

Page 39

```
 1              E. HUNT
 2    Q.  And was Edmund at that meeting?
 3    A.  Was Edmund at the meeting --
 4    Q.  The meeting where Tina was
 5  interviewed regarding that complaint
 6  against Edmund?
 7    A.  I don't remember.
 8    Q.  Okay.  But that was a meeting
 9  that Kristin Stabile and yourself attended?
10    A.  There --
11        Yes.
12    Q.  And were there others present?
13    A.  I can't remember.
14    Q.  Was Tina present?
15    A.  Tina was present.
16    Q.  Okay.  And do you recall what
17  action was taken in response to her
18  complaint?
19    A.  It was investigated.  I
20  remember Kristin went through and
21  interviewed all the witnesses to the event
22  and, ultimately, no discipline was handed
23  down to either colleague.
24    Q.  Meaning McSloy?
25    A.  McSloy or Tina.  Because in the
```

Page 40

```
 1              E. HUNT
 2  investigation, it turned out that Tina was
 3  actually bullying Edmund beforehand.
 4    Q.  And how was that determined?
 5    A.  Based off of the witness
 6  statements of the comments that Tina made
 7  to Edmund before the interaction happened.
 8    Q.  And did Tina tell you the
 9  comments that she made or did McSloy tell
10  you what she said first?
11    A.  Actually, it was the witness,
12  Eddie Marini, that told us.
13    Q.  And who is Eddie Marini?
14    A.  He's another p.m. bartender.
15    Q.  Do you know the names of the
16  three p.m. male bartenders other than --
17        Well, two others besides Eddie
18  Marini?
19    A.  Yeah, James Menite.
20    Q.  Yes?
21    A.  And then I -- Roberto, I can't
22  remember his last name.
23    Q.  Rosa.
24    A.  Rosa?  Okay.
25    Q.  Do you recall at any time while
```

Page 41

```
 1              E. HUNT
 2  you were serving in the position we're
 3  talking about --
 4    A.  Uh-huh.
 5    Q.  -- receiving any complaint
 6  about James Menite drinking while on duty
 7  at the bar or being intoxicated while
 8  performing his duties?
 9    A.  When Tina was terminated, she
10  brought it up.
11    Q.  How about prior to that?
12    A.  I don't remember receiving
13  anything prior to that.
14    Q.  When she brought that up at the
15  time of her termination, did you take any
16  action to investigate that?
17    A.  Yes.  I didn't personally.
18  Martin Mariano looked into it, I believe.
19    Q.  And do you know what the --
20  what he reported back to you as?
21    A.  Yeah, I mean, there was no
22  conclusive proof that he had been drinking.
23    Q.  Well, do you know how that was
24  determined?
25    A.  I believe he looked at
```

Page 46

```
1                E. HUNT
2        MS. RAY:  Excuse me.
3        Could you just say "yes"
4   instead of --
5        THE WITNESS:  Oh.
6        MS. RAY:  -- "uh-huh."
7        THE WITNESS:  Yes.
8   BY MR. HAESLOOP:
9   Q.   Have you ever been deposed
10  before?
11  A.   Never.
12  Q.   Do you have plans to be deposed
13  in the near future?
14  A.   Hopefully not.
15  Q.   All right.  And it reads, "I'm
16  writing again to inform you that the
17  continued harassment by Mrs. Braunstein is
18  only getting worse.  The situation needs to
19  be resolved as soon as possible for it is
20  no longer just causing me stress and
21  anxiety.  Last night it started affecting
22  my ability to perform my job."
23       Prior to this e-mail or
24  statement by Mr. Rosa, had you had any
25  similar complaints about Tina Braunstein?
```

Page 47

```
1                E. HUNT
2   A.   Of harassment?
3   Q.   Yes.
4   A.   We had had similar bullying
5   complaints by, I believe, some of the
6   cocktail servers.
7   Q.   Do you remember which ones?
8   A.   I can't remember their names
9   offhand.
10  Q.   Do you remember Paige?
11  A.   That sounds familiar, yes.
12  Q.   Do you know if those complaints
13  were ever reduced to writing?
14  A.   I can't remember.
15  Q.   Now, this e-mail that's
16  identified as Number 17 says -- and this is
17  February 21st at 11:08 and the other one
18  that I just read is February 21st at
19  8:19 a.m.
20       And it says, "I've sent even
21  reports on our meetings."
22       Do you know which reports he's
23  referring to?  This is Martin Mariano.
24  A.   I can't remember specifically,
25  no.
```

Page 48

```
1                E. HUNT
2   Q.   Would those reports have been
3   handwritten, typed or e-mailed, if you
4   know?
5   A.   Marty would normally type them
6   and e-mail them.
7   Q.   And it says, "Please schedule a
8   meeting for Roberto, myself and Evan for
9   Monday.  In the meantime, I think we need
10  to bring these two together for a
11  discussion about acceptable behavior.  I'm
12  going to reach out to Roberto."
13       And do you know if that meeting
14  that he's referring to ever took place?
15  A.   I believe it did, yes.
16  Q.   And do you remember who was at
17  that meeting?
18  A.   I was there; Marty was there;
19  Roberto was there.  I can't remember if
20  anyone else.
21  Q.   Was Tina Braunstein there?
22  A.   No.
23  Q.   But the intent of Martin's
24  e-mail is to have everyone there to have a
25  meeting for a discussion about acceptable
```

Page 49

```
1                E. HUNT
2   behavior.
3        Was there a reason that Tina
4   wasn't included in that meeting?
5   A.   I mean, generally, if we were
6   meeting with a person for bullying, you
7   would meet with the person to discuss it
8   first and then discuss whether, you know --
9   then at that point you would take a look on
10  whether you would have the person that was
11  responsible for the alleged bullying there.
12  Q.   Okay.  And prior to
13  February 21st, 2015, you had received
14  complaints from Ms. Braunstein about
15  harassment allegations, had you not?
16  A.   Yes.
17       Wait.  What was the date you
18  said?
19  Q.   February 21st, 2015.
20  A.   Yes.
21  Q.   Okay.  And did you ever after
22  the -- after February 21st, 2015, have a
23  meeting with Tina Braunstein to discuss
24  these allegations?
25  A.   I can't remember.
```