EXIBIT #29

### Page 106

1  are concerned the only reason he did so was because you
2  were female and the others were male?
3      A.  Yes.
4      Q.  Did he ever say or do anything else
5  towards you that you regard as misogynistic?
6      A.  I'm not recalling in this moment.
7      Q.  Roberto Rosa, he was also an employee at
8  the Palm Court?
9      A.  Yes.
10     Q.  He was one of the other bartenders?
11     A.  Correct.
12     Q.  Did you consider Roberto Rosa to be
13 misogynistic?
14     A.  I don't know if I'd call him misogynistic.
15 He definitely had issues with me.
16     Q.  What did you understand those issues to
17 be?
18     A.  From James and from Eddie, they told me
19 him being Latin and his first time in New York he was
20 having a lot of trouble being bested by a female,
21 someone who is a much better bartender, mixologist,
22 knew the industry.
23     Q.  This is what was told to you by the
24 others, correct?
25     A.  Correct.

### Page 107

1      Q.  So what I'm asking you is in terms of your
2  own experience with Roberto, not what others may have
3  said to you about him, in terms of your own experiences
4  with Roberto.  Did he ever say or do anything that
5  caused you to believe he was misogynistic?
6      A.  I'm not recalling in this moment.
7      Q.  Can you recall specifically any problems
8  that you and he encountered with one another directly?
9      A.  Absolutely.  He verbally came at me one
10 night, he is 6'2", probably 250 pounds, I was in the
11 process of muddling a drink, which is a big stick and I
12 had a rocks glass in my hand.  And there was a piece of
13 fruit in there you have to push down on it, and he came
14 at me so fast and furious yelling at me that he refused
15 to work service, that I shook so violently, I wasn't
16 even moving the muddler anymore, I was physically
17 shaking and the glass shattered in my hand.
18     Q.  Okay.  What happened next when that
19 happened?
20     A.  Amin was standing right there.  And he
21 yelled at me to pull it together.  Then, since Roberto
22 refused to work service, and since he was the service
23 bartender, he just refused to do it, the station wasn't
24 even set up.  It was just him and I for the evening, I
25 was working the main bar.  Amin said the two of you

### Page 108

1  have to take one ticket each, you'll split service for
2  the evening.
3      Q.  I think we sort of morphed into a
4  discussion about what Amin said and did.  And my
5  question was focused on what Roberto said and did.
6          So I'm going to ask you if there was
7  anything else that occurred directly between you and
8  Roberto that fell within that list of his having
9  problems with you?
10     A.  He refused to work service for me that
11 evening or for us that evening on the bar.
12     Q.  Did he tell you why?
13     A.  He said that he is not going to do it
14 anymore.  Then he started yelling at me that you're a
15 terrible bartender and you think you are so great,
16 Tina.  He had just a little meltdown.
17     Q.  When somebody sort of challenges you, that
18 they don't regard you as being that great or that you
19 think you are really just maybe, you know, a better
20 bartender than they are, do you find that offensive?
21     A.  Not necessarily, no.  I don't have an ego
22 like that.
23     Q.  Okay.  Let me ask the question
24 differently.
25         Do you find yourself feeling superior to

### Page 109

1  other bartenders based upon your courses of studies or
2  experience?
3      A.  No, I consider myself a sponge and I am
4  always learning and I can learn from anyone.
5      Q.  Have you gotten the impression from what
6  people had said to you over the years who you worked
7  with that their perception of you is that you are
8  superior and condescending and just feel that you are
9  better as a bartender than they are?
10         MR. HAESLOOP:  Objection.
11         You can answer if you can.
12     A.  No, I'm very well-known for being a team
13 player.
14     Q.  Very well-known by whom?
15     A.  A lot of people in the industry who I
16 worked with, they really enjoyed working with me.
17     Q.  In the various places that we've testified
18 about this morning, specifically the six places that
19 you have been terminated from, would you say that the
20 people who worked with you in those engagements
21 regarded you as a team player?
22     A.  Yes.
23     Q.  Any other problems that you can recall
24 having with Roberto Rosa?
25     A.  I believe from approximately February 18

## RESTAURANTS
*Frank Bruni*

"HELLO, chef!" shouted Tina Braunstein, who was tending bar, as Dan Barber bounded through the cocktail lounge of Blue Hill at Stone Barns and headed toward the kitchen with a broad, deep bucket swinging from his hand. "What have you got there?"

"Peas!" Mr. Barber answered, his voice exultant, as if he were reporting the discovery of buried treasure. Mr. Barber gets even more excited about fresh vegetables than most chefs do, and what he had were some impeccably fresh vegetables. These peas — these sugar snaps — had just been plucked from the acres of sloping farmland outside and around the restaurant, a converted dairy barn.

Fewer than five minutes later, a small bowl of them, cleaned but raw, appeared as bar snacks, which I nibbled as Ms. Braunstein poured me a glass of Loire Valley rosé. And over the next three hours, they showed up as a purée beneath filaments of mortadella in a quiche-like canapé and as pleasantly poppy, slightly cooked accessories to a fillet of white salmon. The time and physical distance between their harvesting, preparation and consumption was almost as brief as imaginable. This is the point and, in large measure, the glory of Blue Hill at Stone Barns, where the sheep or the chickens that you see grazing as you drive in may well be the kin of what you find on your dinner plate.

The restaurant, which opened in Westchester County three months ago, is attempting something special — something more than its fairly thorough adherence to the ethic that a restaurant's food should, as much as possible, be seasonal, local and the result of sustainable agriculture. Blue Hill not only gets many of its vegetables and some of its meat from the surrounding land, which was part of the Rockefellers' Pocantico Hills estate. It also gets to exert control over how those vegetables are grown and how the meat is fed.

This reality, which goes beyond mere novelty, is one compelling reason for people near and far to pay attention to the restaurant, an offshoot of Blue Hill in Greenwich Village, where Mr. Barber also supervises the kitchen. But there is another, better reason: most of the food here is terrific, and some of it is flat-out wonderful. The premium that the restaurant places on immediacy has a culinary purpose, a hedonistic payoff.

On a recent visit, tomatoes were just coming into season. Mr. Barber and Michael Anthony, the chef who works by his side, had used them for a rough purée that, Mr. Barber explained later by telephone, was hung in cheesecloth, with a container beneath to catch the drip. This nearly clear liquid — the distilled essence of the fruit, closer in spirit to a potion than a juice — came to the table in tall glasses, as an amuse-bouche. If early summer could be said to have a taste, this was it.

Or maybe, upon reflection, the season was summarized by one of the appetizers, a green gazpacho with so many verdant components that our server did not even try to list them. As we savored it, we could make out cucumber, green tomatoes and certainly dill, which Mr. Barber liberally employs. He is right to: the dill from the herb gardens here has an exhilarating clarity of flavor.

Not everything comes from the Stone Barns property, so named for the Norman-style, 1930's structures upon it. Not everything comes from the vicinity. Mr. Barber likes to use citrus (the grapefruit beside halibut) and seems even more fond of nuts (the candied almonds atop a lovely wild striped bass). So he must look at times to warmer climes.

The fish, obviously, is not swimming or spawning in Pocantico Hills. The white king salmon that was offered on two of my visits was Alaskan. Mr. Barber is willing to reach that far for flesh this buttery in texture, at least the way his kitchen poaches it, using either duck fat or olive oil.

He also avails himself of a 22,000-square-foot greenhouse. It allows him to advance and prolong the window of time in which a given vegetable can be used, and it represents an important insurance policy for winter, when a poor yield of root vegetables could make what is sure to be a difficult menu impossible. The restaurant's sweet carrots, which accompanied an unusually succulent duck breast on one night and bland veal on another, are from the greenhouse.

Such flexibility ultimately spares Blue Hill at Stone Barns the kind of preciousness and monotony with which it definitely flirts. When I dined here in mid-June, choosing a chef's tasting menu, peas and asparagus came to the table so often and in so many guises that I expected dessert to be a pea sorbet with an asparagus fudge. It turned out to be a strawberry medley, using fruit from another farm; the menu also offers chocolate bread pudding with a caramel sauce.

The conceit of connecting diners to the land is remarkably consistent. Although the dining area evokes a handsome showroom for an elegant version of Pottery Barn, it has a deliberately subdued palette (beiges, whites, grays) and almost no art. This way, your eyes go to the windows and the meadows and woods on the other side. The specialty cocktails include a purple basil mojito and a wild ramp martini, both using the bounty of that land.

But you will more likely find yourself in the mood for wine — the list is long, serious and nicely balanced in geography and price — because the setting, along with the forthrightness of the food, conjures thoughts of the European countryside or Napa Valley. It felt much farther away than 35 minutes on an express train from Grand Central Terminal and 10 minutes in a taxi from the Tarrytown station.

I learned over repeated visits to arrive early, so I could chat with Ms. Braunstein, one of many extremely affable servers, and enjoy the delicious pâté, made from the livers of the farm's own chickens, which eat mostly grass. I also learned to stay late, so I could sit on a patio where dessert is served. It faces a hill that, when night fell, became the backdrop for scores of fireflies. The light show they put on, like the dinner before it, was rare and memorable.

**BY A MEADOW** Blue Hill at Stone Barns is in Pocantico Hills, N.Y.

*Phil Mansfield for The New York Times*

# Fresh and Local, But There's More

### Blue Hill at Stone Barns
★★★

630 Bedford Road, Pocantico Hills, Westchester County; (914) 366-9600.

**ATMOSPHERE** A barn has been converted into a quietly elegant dining room with a high ceiling and lovely views of the surrounding meadows and woods.

**SERVICE** Extremely friendly, although a bit slow at times.

**SOUND LEVEL** Modest.

**RECOMMENDED DISHES** Salad of 11 mixed greens and herbs with egg; green gazpacho; pea cannelloni with crab meat; white king salmon; wild striped bass; duck; roasted pig; chocolate bread pudding with caramel sauce.

**WINE LIST** Long, serious and well-organized, with ample geographic variety and plenty of reasonably priced bottles.

**PRICE RANGE** Two savory courses, $46; three savory courses, $56; four savory courses, $66; desserts, $9 to $14.

**HOURS** Wednesday and Thursday, 5 to 10 p.m.; Friday and Saturday, 5 to 11 p.m.; Sunday, 11:30 a.m. to 2 p.m. (brunch) and 5 to 10 p.m.

**RESERVATIONS** Difficult. Begin calling at 9 a.m. sharp exactly one month before desired reservation.

**CREDIT CARDS** All major cards.

**WHEELCHAIR ACCESS** Accessible.

**WHAT THE STARS MEAN:**
- (None) Poor to satisfactory
- ★ Good
- ★★ Very good
- ★★★ Excellent
- ★★★★ Extraordinary

Ratings reflect the reviewer's reaction to food, ambience and service, with price taken into consideration. Menu listings and prices are subject to change.

### ON THE WEB

**PAST REVIEWS** from The Times, with additional capsule reviews by Times critics:
nytimes.com/dining

29B

*COCKTAIL IN PHOTO = NOT MINE = HOT MESS!!

## dining issue

### where to get a great cocktail

**B4**
4 Broadway
Valhalla
(914) 328-4199

**Blue**
99 Church Street
White Plains
(914) 220-0932

**Blue Hill at Stone Barns**
630 Bedford Road
Pocantico Hills
(914) 366-9600

**bolobar lounge**
241 Main Street
Mount Kisco
(914) 241-8775

**Harrys of Hartsdale**
230 East Hartsdale Avenue
Hartsdale
(914) 472-8777

**Justin Thyme**
171 Grand Street
Croton-on-Hudson
(914) 271-0022

**MacMenamin's Grill & ChefWorks**
115 Cedar Street
New Rochelle
(914) 632-4900

**Mighty Joe Young's**
610 West Hartsdale Avenue
White Plains
(914) 428-6868

**121 Restaurant & Bar**
2-4 Dingle Ridge Road
North Salem
(914) 669-0121

**Pacifico**
316 Boston Post Road
Port Chester
(914) 937-1610

**Rye Bar & Grill**
1 Station Plaza
Rye
(914) 967-0332

**Sonora**
179 Rectory Street
Port Chester
(914) 933-0200

**Strega**
2 Broadway
Pleasantville
(914) 769-4040



### MOJITO

COURTESY OF bolobar lounge
MT. KISCO, NY

fresh mint (approximately three leaves)

1/2 fresh lime

1 1/2 tsp sugar

1 1/2 parts light rum

ice

splash of soda

mint leaves and lime wedge to garnish

Muddle the mint leaves, fresh lime and sugar. Add the light rum, then the ice. Finish off with the splash of soda. Garnish with a lime wedge and mint leaves.

**STONE BARNS** in Pocantico Hills. The freshly squeezed cucumber juice "has an amazing aroma," says Tina Braunstein, the bartender who created the drink. "It's so fresh." A hand-crafted, Scottish, cucumber-infused gin and a garnish of fennel make a pale green, refreshing cocktail. Or try the pickled ramp vodka martini with oniony wild ramps, gathered from the grounds of the Stone Barns Center for Food and Agriculture. Sip either one slowly on the spacious patio of Blue Hill, while looking out over the hills and grazing on treats from the ever-changing bar menu, such as chicken liver terrine or crisp asparagus with house-cured prosciutto. Don't rub your eyes; those really are sheep, ducks and turkeys out there. Eventually there will be vineyards too. 🅦

*Judith Hausman, food critic for* The Journal News *(Gannett Suburban Newspapers), has learned that cocktails have distinctly improved since her first Singapore sling.*

29B1



13th July, 2014

To whom it may concern,

    It is my great pleasure to recommend Tina Michelle Braunstein as an outstanding candidate for a position within your organization. She has been a highly valued member of our staff at Acker Merrall & Condit since November of 2013, and has shown time and time again her acumen for both the wine and spirits industry as well as high end, high volume luxury retail. Coming into a retail location which maintains a reputation for supplying some of the finest and most sought after wines to our exclusive client base, Tina was able to integrate seamlessly into our workplace culture. With sharpness, wit, great creativity, and a keen sense for communication, she has impressed our staff on all levels by exemplifying a quality of service. Tina has a remarkable ability to connect with each client, whether in person, in writing, or over the phone, the extraordinary commitment to the luxury industry by knowing how to sell not just the product but the lifestyle.

    Tina's tirelessness as it pertains to constantly accumulating and applying industry knowledge is seen in the positive feedback we've received from many of our clients. From learning our POS and inventory systems rather quickly, to going the extra mile to ensure the success of each project she was assigned. At Acker Merrall & Condit, we encourage our staff to be creative with visual merchandising, marketing to personal client bases, and organizing in store tastings – all things which Tina took to easily by creating custom cocktail recipes for our clients to try, creating themed window displays, in-store signage, and being an important on-hand expert in spirits and champagnes with a strong background in French, Spanish and Italian wines which allowed her to speak authoritatively and accurately on all subject matter she was presented with. Using her background as a springboard, Tina was able to assist our buyers in making selections for our clientele, which were retail successes. Tina exemplifies the highest ideals of the spirits industry through her dependable professionalism and her ability to make any client feel confident and informed with their purchases.

    After the busy holiday season, we realized we would be crazy to let Tina go; her contributions to our store led us to keep her on a part-time basis. Our clients ask for her by name, many of our vendors know her from her previous industry work, and the mark she has left on our organization has proven what a true asset she is here, and will be clearly to any other hiring manager quick enough to realize her talents. It is not often I am given the opportunity to speak so highly of any of my staff members, Tina stands out as one for whom I am thrilled to recommend whole heartedly.

Sincerely,

Michael Anton
Retail Store Manager
Acker Merrall & Condit
160 W. 72nd St
New York, NY 10023
212-787-1700



JAYSON S. MYERS
CHIEF ADMINISTRATIVE LAW JUDGE
TERESA A. DEMEO
CHRISTOPHER M. TATE
MATTHEW J. TIERNEY
PRINCIPAL ADMINISTRATIVE LAW JUDGE

STATE OF NEW YORK
**UNEMPLOYMENT INSURANCE APPEAL BOARD**
ADMINISTRATIVE LAW JUDGE SECTION
P.O. BOX 29002
BROOKLYN NY 11202-9002
(718) 613-3500
FAX:(718) 613-3566

MARGARET O'BRIEN
LAURANCE I. PAVER
BENJAMIN H. REYES
ANDREA S. ADDISON
DENNIS TORREGGIANI
NICOLE BEASON
RACHEL FREEMAN
SENIOR ADMINISTRATIVE LAW JUDGE

*DECISION AND NOTICE OF DECISION*
*DECISIÓN Y AVISO DE LA DECISIÓN TOMADA*

A.L.J. Case No. 015-20930
IN THE MATTER OF:

Mailed and Filed: December 1, 2015

TINA BRAUNSTEIN
3845 SEDGWICK AVE 14D
BRONX NY 10463

1 HOTEL CENTRAL PARK LLC
1414 6TH AVE
NEW YORK NY 10019-5803

WORKERS DEFENSE LEAGUE
JOEL LEICHTER
MADISON SQ STATION PO BOX 618
NEW YORK NY 10159-0000

Department of Labor Office: 831
**A.S.O.-NYC-ATT: J. AVALOS**

Hearing Requested: September 28, 2015

**PLEASE TAKE NOTICE** that this decision has been duly mailed on the date listed above. If you appeared at the hearing and are not satisfied with this decision, you may appeal within **TWENTY DAYS** from the date this decision was mailed. **READ IMPORTANT INFORMATION ON REVERSE SIDE REGARDING YOUR RIGHT TO APPEAL.** Any party who failed to appear at the hearing has the right to apply to reopen the case. For the application to be granted, the party must apply within a reasonable time and must establish good cause for its failure to appear.

**POR FAVOR TOME NOTA**: esta decisión ha sido debidamente enviada por correo en la fecha que aparece arriba. Si usted asistió a la audiencia y no está satisfecho con la decisión, puede apelar dentro de **VEINTE DIAS** contados a partir de la fecha en que esta decisión fue enviada por correo. **LEA LA INFORMACIÓN IMPORTANTE AL REVERSO SOBRE SUS DERECHOS DE APELACIÓN.** Cualquiera de las partes que falle en comparecer a la audiencia, tiene el derecho de solicitar que se reabra su caso. Para que dicha solicitud sea otorgada, la parte interesada debe solicitarlo dentro de un periodo de tiempo razonable y debe establecer buena causa por no haber comparecido a la audiencia.

DOCUMENTO IMPORTANTE. PUEDE OBTENER UNA TRADUCCIÓN DEL MISMO LLAMANDO
AL 1-888-209-8124 (FUERA DEL ESTADO DE NUEVA YORK 1-877-358-5306)

AB 665-0 (10/06)

29 D

ISSUES:     Voluntary leaving of employment without good cause.
            Sufficiency of employment and earnings to terminate disqualification.

**COMBINED CASE CONSISTING OF ALJ CASE NOS 015-20930 & 015-22067**

The Department of Labor issued the initial determination disqualifying the claimant from receiving benefits, effective July 22, 2015, on the basis that the claimant voluntarily separated from employment without good cause. (A.L.J. Case No. 015-22067).

The Department of Labor also issued the initial determination holding that the claimant had insufficient earnings to terminate the disqualification imposed on September 1, 2015, in that her subsequent earnings are not at least 10 times her benefit rate of $381.00 or $3,810.00. (A.L.J. Case No. 015-20930).

The claimant requested a hearing.

A hearing was held at which testimony was taken. There were appearances by the claimant and her representative, on behalf of the employer and on behalf of the Commissioner of Labor.

FINDINGS OF FACT: The claimant was employed as a bartender for the employer, a restaurant and bar, for less than two weeks. After speaking with a manger during training on July 15, 2015, about working breakfast shifts, the claimant wanted to speak with the general manager. The claimant was concerned about working back-to-back evening shifts and breakfast shifts because she would not have much time between getting home and leaving again to go back to work.

On the claimant's next day back at work, July 21, 2015, she spoke with the general manager about her concern. The general manager told the claimant that in order to continue working for the employer, she would have to work breakfast shifts. The claimant understood that her employment was terminated during this meeting. During the late evening, the claimant sent an email to the employer asking if it could provide a hotel room for her on the nights when she had to work back-to-back shifts in an attempt to try and work something out to continue her employment. The employer emailed the claimant the following morning and advised her that her employment was terminated. The claimant did not receive this email; she received no response. The claimant last worked on July 21, 2015.

OPINION: Pursuant to Labor Law §593(1)(a), a claimant is disqualified from receiving benefits after a voluntary separation from employment without good cause. Pursuant to Labor Law §593(1)(a), a disqualified claimant shall not regain eligibility for benefits until he or she has subsequently worked in employment and earned remuneration at least equal to ten times his or her weekly benefit rate.

The credible evidence establishes that the claimant did not voluntarily quit her employment. The claimant contends her employment was terminated, while the employer contends that she voluntarily quit. I am not persuaded by the employer's contention because the testimony and documentary evidence support the claimant's contention.

First, I note that there was a dispute as to whether the claimant was informed at hire that she would have to work the breakfast shift. However, I need not resolve this dispute to determine whether the claimant's separation from employment was voluntary.

Next, it is significant to note that although the general manager denies terminating the claimant's employment during the July 21, 2015, meeting, she acknowledges that she told the claimant that in order to continue working for the employer, she would have to work the breakfast shift. Given the employer's statement and the concerns the claimant expressed about working the breakfast shift, it was not unreasonable for the claimant to believe that she was being discharged. Moreover, the claimant sent an email to the employer later that day inquiring about a hotel room on the nights she would have to work back-to-back shifts. By doing so, the

| A.L.J. Case No.015-20930 | TINA BRAUNSTEIN | Page 5 |

claimant made an effort to continue her employment, and as such, I cannot conclude that she evinced an intent to quit. Additionally, the general manager acknowledges that the following morning, she emailed the claimant advising that her employment was terminated. However, even though the claimant denies receipt of the email, it corroborates the claimant's testimony that the general manager had terminated her employment a day earlier. Moreover, even accepting the claimant's credible testimony that she did not receive the email, then she received no response to her email from the employer and as such, it was not unreasonable for her to believe that her employment was terminated given the conversation she had with the general manager on July 21, 2015, and the employer's subsequent lack of response to her email.

Therefore, based on the foregoing, I accept the claimant's credible and consistent testimony that the employer terminated her employment. As such, I cannot conclude that the claimant voluntarily quit her employment. Accordingly, the claimant's employment ended under non-disqualifying circumstances and she is eligible to receive benefits. Given my ruling that the claimant is not disqualified from receiving benefits, I need not decide if she had sufficient earnings to terminate such disqualification.

DECISION: The initial determination, disqualifying the claimant from receiving benefits, effective July 22, 2015, on the basis that the claimant voluntarily separated from employment without good cause, is overruled. (A.L.J. Case No. 015-22067).

The initial determination, holding that the claimant had insufficient earnings to terminate the disqualification imposed on September 1, 2015, in that her subsequent earnings are not at least 10 times her benefit rate of $381.00 or $3,810.00, is overruled. (A.L.J. Case No. 015-20930).

The claimant is allowed benefits with respect to the issues decided herein.

/s/ Alison Ferrara

**Administrative Law Judge**

29D2



# CERTIFIED MIXOLOGIST
## THE PLAZA HOTEL

*The Creative Cocktail Consultants Corporation*

Hereby Certifies That:

## TINA MICHELLE BRAUNSTEIN

Has Completed An Advanced Course in Spirits Education

And Has Demonstrated The Ability To Consistently

Execute Well Balanced Libations

November 13th, 2014

**Brian Van Flandern**
President-
Creative Cocktail Consultants
www.MyMixologist.com

29E