UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                                       :
TINA MICHELLE BRAUNSTEIN,                              :
                                                       :
                                Plaintiff,             :
                                                       :
                - against -                            :
                                                       :
                                                       :
SAHARA PLAZA, LLC, et al.,                             :
                                                       :
                                Defendants.            :
                                                       :
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/28/2021

16-CV-8879 (VSB)

**OPINION & ORDER**

Appearances:

Tina Michelle Braunstein
Bronx, New York
*Pro se Plaintiff*

David I. Rosen
Sills Cummis & Gross, P.C.
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

        Plaintiff Tina Braunstein ("Plaintiff" or "Braunstein") brings this employment

discrimination action against Defendants Sahara Plaza, LLC and The Plaza Hotel, a Fairmont

Managed Hotel (collectively, "Defendants"), asserting claims of unlawful discrimination,

retaliation, and hostile work environment, in violation of Title VII of the Civil Rights Act of

1964, ("Title VII"), 42 U.S.C. § 2000e *et seq*., the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290e *et seq*., the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. § 8-107, and the Age Discrimination and Education Act

("ADEA"), 29 U.S.C. § 621 *et seq*.  She also asserts a common law claim of "negligent

supervision."

Before me are (1) Defendants' motion for summary judgment on all of Plaintiff's claims and (2) Plaintiff's motion to reopen discovery. For the reasons set forth below, Defendants' motion for summary judgment directed at Plaintiff's federal and state discrimination, retaliation, and hostile work environment claims, and Plaintiff's negligent supervision claim, is GRANTED. Defendants' motion for summary judgment as to Plaintiff's remaining state law claims is GRANTED without prejudice to refiling in state court. Plaintiff's motion to reopen discovery is DENIED.

## I.  **Factual Background**[1]

Plaintiff alleges that she is a Jewish woman who was forty-eight years old at the time she filed the complaint in 2017. (Compl. ¶ 6.)[2] Plaintiff was employed by Defendants at the Palm Court, a restaurant located in The Plaza Hotel in New York City, beginning October 27, 2014. (Defs.' 56.1 ¶ 1; Pl.'s 56.1 ¶ 1.)[3] Plaintiff was hired as an evening bartender for a probationary period of one hundred fifty (150) days, (Defs.' 56.1 ¶ 5), along with three other evening bartenders: James Menite ("Menite"), Edwin Marini ("Marini"), and Roberto Rosa ("Rosa"), (*id.* ¶ 10). The job requirements for the bartender position included "[e]xcellent communication .

---

[1] This section is drawn from the various submissions of both parties in order to provide background and context for Defendants' motion and is not intended as a recitation of all the material undisputed facts. Unless otherwise indicated, the facts set forth in this section are undisputed. I locate Plaintiff's allegations in her complaint, declaration, and response to Defendants' Rule 56.1 statement. The complaint has been verified by Plaintiff, and her 56.1 response concludes with the statement "I am telling the truth and hope to bring my case to a Jury," followed by a notarized signature. "[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004). Accordingly, I treat Plaintiff's complaint and 56.1 response as affidavits in addressing the instant motions.

[2] "Compl." refers to Plaintiff's Complaint. (Doc. 1.)

[3] "Defs.' 56.1" refers to Defendants' L. Civ. R. 56.1 Statement of Undisputed Material Facts. (Doc. 36.) "Pl.'s 56.1" refers to Plaintiff's Response to Defendant[s'] Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 in Opposition to Defendant[s'] Motion for Summary Judgment. (Doc. 46.)

. . skills," "[s]trong interpersonal . . . abilities," and the "[a]bility to work cohesively with fellow colleagues as part of a team." (*Id.* ¶ 2; Pl.'s 56.1 ¶ 2.)

Plaintiff was supervised or managed by several different individuals—namely, Johann Widnersson ("Widnersson"), Amin Deroui ("Deroui"), and Martin Mariano ("Mariano"). (Defs.' 56.1 ¶¶ 8–9.) The parties disagree about the extent to which certain of these individuals actually supervised Plaintiff. (Pl.'s 56.1 ¶ 8.) Defendant contends that Plaintiff's direct supervisor was Widnersson, the Beverage Manager, while Deroui, the Food and Beverage Manager, also supervised her from time to time. (Defs.' 56.1 ¶ 8.) According to Plaintiff and the testimony of Mariano, Deroui was the most senior manager on the floor at the time Plaintiff was employed. (Pl.'s 56.1 ¶ 8; Mariano Dep. Tr. 122:5-123:8).[4]

Plaintiff alleges that on November 28, 2014, a rotating schedule was created to establish assignments for each of the four bartenders. (Compl. ¶ 24.) Plaintiff alleges that she was assigned to be lead bartender on Tuesday and Saturday evenings. (*Id.*) Otherwise, she alleges, she, Rosa, and Marini rotated as "second bartender, service bartender or bar back." (*Id.*) The bar back position, she alleges, involved "cleaning glasses, food containers[,] and stocking supplies and other menial duties." (*Id.*) Soon after the schedule was created, Plaintiff alleges, Menite "refused any rotations" and eventually informed Plaintiff he was taking over the Saturday night lead bartender shift. (*Id.* ¶¶ 25, 28.)

On December 2, 2014, Plaintiff alleges, a meeting on internal tipping policies was held. (*Id.* ¶ 26.) Although other bartenders and managers attended, she alleges, she was not notified of the meeting or invited to it. (*Id.*) On December 8, 2014, Plaintiff alleges, the day bartender,

---

[4] "Mariano Dep. Tr." refers to the transcript of the September 7, 2017, deposition of Martin Mariano, excerpts of which are attached as Exhibit 2 to the Declaration of David I. Rosen, ("Rosen Declaration" or "Rosen Decl."), (Doc. 38-2), and as Exhibits 3, 6, 9, 10, 11, 12, 13, 21, 22, 23, 24, and 28 to Plaintiff's Declaration [in] Opposition to Defendants['] Motion for Summary Judgment ("Plaintiff's Declaration" or "Pl.'s Decl.," (Doc. 45)).

Edmund McSloy,[5] prevented her from setting up for her shift, including by physically blocking her way and yelling at her. (*Id.* ¶ 27; Defs.' 56.1 ¶ 13; Pl.'s 56.1 ¶ 13.) It is undisputed that Plaintiff reported the alleged incident to Mariano, the Hotel's Director of Food and Beverage, who responded with an apology. (Compl. ¶ 27; Defs.' 56.1 ¶ 13; Pl.'s 56.1 ¶ 13.) Defendants contend they conducted an investigation into this incident and that Marini reported witnessing Plaintiff "bullying" McSloy beforehand. (Defs.' 56.1 ¶ 14.) Plaintiff disagrees with this account of events and contends that Defendants did not conduct an investigation. (Pl.'s 56.1 ¶ 14.)

On December 10, 2014, Plaintiff alleges that the morning bar team broke the key to the cash box, and Deroui told her to leave it open as she was "only a glorified 'bar back—woman's work.'" (Compl. ¶ 28.) On December 22, 2014, Plaintiff requested a meeting about the rotating schedule, at which she alleges Menite "refused to work any position other than Senior/Lead bartender." (*Id.* ¶ 29.) Plaintiff alleges that Deroui subsequently told her to "stop being a baby and running to management, not ladylike." (*Id.* ¶ 30.) Plaintiff reported to Widnersson and a Human Resources staff person that Deroui had "made a couple of unprofessional and in appropriate [sic] comments to [her]," including telling her to "grow up and stop being such a baby." (Defs.' 56.1 ¶ 19; Wenger Aff. Ex. K;[6] Pl.'s 56.1 ¶ 19.)

On January 9, 2015, Plaintiff received her 60-day performance evaluation, which was poor. (Compl. ¶ 32; Pl.'s Decl. Ex. 14.). She e-mailed Mariano, Widnesseron, and a Human Resources staff member, stating her disagreement with the evaluation. (Defs.' 56.1 ¶ 22; Pl.'s

---

[5] Plaintiff refers to this individual as "Mr McSorley," (*see, e.g.,* Pl.'s 56.1 ¶ 13), but this individual was properly identified in depositions as Edmund McSloy, (*see* Hunt Dep. Tr. 38:17-25). Accordingly, I refer to him as McSloy. "Hunt Dep. Tr." refers to the September 28, 2017 deposition of Evan Hunt, excerpts of which are attached as Exhibit 3 to the Rosen Declaration, (Doc. 38-3), and as Exhibits 1, 6, and 14 to Plaintiff's Declaration, (Docs. 38-1, 38-6, 38-14).

[6] "Wenger Aff." refers to the affidavit of Karen Wenger in support of Defendants' Motion for Summary Judgment filed March 14, 2018. (Doc. 37.)

56.1 ¶ 22.)  She subsequently met with Mariano on January 15, 2015, at his suggestion, to

discuss her review.  (Defs.' 56.1 ¶¶ 29, 30, 32; Pl.'s 56.1 ¶¶ 29, 30, 32.)  At that meeting, which

Plaintiff recorded, the parties agree that Mariano made the following statement:

> We're a team, we need to work together. . . . Maybe we need to have a department meeting where we workshop with each other and really get to know each other. There's going to be days where you're going to be a B-I-T-C-H and there's going to be days where [the female servers] [are] going to be anxious and flip out and you need to be able to calm them down and get them what they need and not taking things personally so that they don't reflect of an image of you that may not be fully accurate.

(Recording 3–4.)[7]  Plaintiff replied, "Yeah and my only thing is, and this may sound a little

obnoxious, but I'm just going to own it, this image has worked my whole career for 20 years."

(*Id.*)  Plaintiff also admitted during her deposition that she told Mariano during one of their

conversations that she was "someone with an edge," and that she was referring to her

"personality."  (Defs.' 56.1 ¶ 34; Pl.'s 56.1 ¶ 34.)

On January 29, 2015, Plaintiff alleges, she overheard Deroui say, "what do you expect,

Jews own all the media and the banks."  (Compl. ¶ 33.)  She also alleges that on February 20,

2015, Mariano and Rosa spoke in Spanish about her "in derogatory terms."[8]  (*Id.* ¶ 35.)  She also

states that throughout February and March, Rosa and Marini were persistently late or no-shows

but were not reprimanded, and that Menite was chronically late and drank alcohol to excess

while at work.  None were reprimanded for this behavior, she alleges.  (*Id.* ¶ 36; Pl.'s 56.1 ¶ 19.)

It is undisputed that, prior to the end of her probationary period, on March 13, 2015,

Plaintiff's employment was terminated, while Menite, Marini, and Rosa were retained.  (Defs.'

---

[7] "Recording" refers to the transcription of the audio of Plaintiff's meeting with Martin Mariano on January 15, 2015, which both parties agree is accurate.  It is attached as Exhibit 5 to the Rosen Declaration, (Doc. 38-5), and as Exhibit 23 to Plaintiff's Declaration, (Doc. 45-23).

[8] Plaintiff does not claim that she speaks Spanish nor does she explain how she knew that Mariano and Rosa were talking about her.

56.1 ¶ 38; Pl.'s 56.1 ¶ 38.)

## II.    **Procedural History**

Plaintiff commenced this action on November 15, 2016 by filing a complaint.  (Doc. 1.)

At the time, she was represented by counsel, E. Gordon Haesloop ("Haesloop").  Defendants

filed an answer on February 8, 2017.  (Doc. 8.)  On March 10, 2017, I entered a case

management plan and scheduling order, whose deadlines were then extended on several

occasions.  (*See* Docs. 12–19.)  On October 2, 2017, Defendants filed a letter motion for leave to

file a motion for summary judgment, (Doc. 21), and Plaintiff filed a letter in opposition on

October 4, 2017, (Doc. 22).  I held a post-discovery conference on October 6, 2017, at which I

heard counsel's preliminary arguments on the proposed motion.

On November 20, 2017, Plaintiff's counsel sought leave to withdraw as counsel.  (Doc.

23.)  I granted this request on November 21, 2017, and stayed the action for thirty days to allow

Plaintiff to retain new counsel.  (Docs. 25.)  I extended this deadline several times because

Plaintiff informed me that she was unable to retain new counsel.  (*See* Docs. 29–32.)  Ultimately,

Plaintiff appeared pro se and remains unrepresented.  (Doc. 33.)

On March 14, 2018, Defendants filed a motion for summary judgment, along with a

memorandum of law, Local Civil Rule 56.1 statement, the Affidavit of Karen Wenger, with

exhibits, the Declaration of David Rosen, with exhibits, and a Local Rule 56.2 notice to pro se

litigant who opposes a motion for summary judgment.  (Docs. 34–39.)  Plaintiff then requested

and received an extension of time to respond.  (Docs. 41–42.)  On May 24, 2018, Plaintiff filed a

notice of motion to reopen discovery pursuant to Fed. R. Civ. P. 56(d)(2), (Doc. 43), which

Defendants opposed by letter on May 25, 2018, (Doc. 44).  On June 4, 2018, Plaintiff filed a

declaration in opposition to Defendants' motion, with exhibits, and a response to Defendants'

56.1 statement.  (Docs. 45–46.)  Defendants filed their reply on June 18, 2018, (Doc. 47), and a letter correcting typographical errors in their reply on June 20, 2018, (Doc. 48).

On October 28, 2019, Defendants filed a request for a conference to discuss status of their pending summary judgment motion.  (Doc. 50.)

On October 29, 2020, Plaintiff filed a second letter request to reopen discovery.  (Doc. 51.)  Defendants opposed Plaintiff's request on October 30, 2020.  (Doc. 52.)  On November 19, 2020, Plaintiff filed her reply.  (Doc. 53.)

## III.   Legal Standards

### A.   *Summary Judgment*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256 (citation omitted), and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

In addition, courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted).  Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137

(2d Cir. 2008).  The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor."  *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

### B.    *Pro Se Litigant*

Pro se litigants are afforded "special solicitude" on motions for summary judgment. *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).  Courts read the pleadings, briefs, and opposition papers of pro se litigants "liberally and interpret them to raise the strongest arguments that they suggest."  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks omitted); *see also Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (stating that the submissions of pro se litigants are "held to less stringent standards than formal pleadings drafted by lawyers" (internal quotation marks omitted)); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 577 (S.D.N.Y. 2008) ("District courts should read the pleadings of a pro se plaintiff liberally[,] and [the] same principles apply to briefs and oppositions submitted by pro se litigants." (internal quotation marks omitted)).  However, "pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks omitted); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (stating that the obligation to read pro se pleadings liberally "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment").  "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.   <u>Discussion</u>

Plaintiff brings claims under Title VII, the ADEA, the NYSHRL, and the NYCHRL for (1) discrimination on the basis of sex, religion, ethnicity, and age,[9] (2) retaliation, and (3) hostile work environment, as well as a common law claim styled as "negligent supervision." Defendants move to dismiss the ethnicity, religion, and age discrimination claims on the grounds that Plaintiff failed to exhaust her remedies. (Defs.' Mem. 16–18.)[10] Defendants also contend that the sex discrimination, retaliation, and hostile work environment claims fail on the merits, and that the negligent supervision claim is barred by New York's worker's compensation law. (*Id.* at 5–16, 18–25.) Plaintiff opposes the motion and cross-moves to reopen discovery pursuant to Federal Rule of Civil Procedure 56(d)(2). I address these various arguments in turn.

### A. *Exhaustion of Remedies as to Plaintiff's Claims of Age and Ethnicity Discrimination*

#### 1. **Applicable Law**

To pursue an employment discrimination in federal court, "a litigant must [first] exhaust available administrative remedies in a timely fashion," *Briones v. Runyon*, 101 F.3d 287, 289 (2d Cir. 1996), by presenting "the claims forming the basis of such a suit . . . in a complaint to the EEOC or the equivalent state agency," *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (citation omitted). Accordingly, courts may hear Title VII or ADEA claims only if the claims have first been raised before the EEOC or if they are reasonably related to those that

---

[9] Plaintiff did not allege religious discrimination in her Complaint but raised religious discrimination claims against Defendants for the first time in her declaration in opposition to Defendants' motion for summary judgment and her response to Defendants' Rule 56.1 statement. (*See* Docs. 45–46.) Therefore, to the extent she can be seen as alleging religious discrimination, any such claim can be dismissed based upon her untimely assertion of such a claim. In any event, even construing Plaintiff to have timely alleged religious discrimination, I find that Plaintiff has not raised sufficient evidence to overcome summary judgment on such a claim, for the reasons discussed in this section.

[10] "Defs.' Mem." refers to the Memorandum of Law in Support of Defendants' Motion for Summary Judgment Dismissing the Complaint filed March 14, 2018. (Doc. 35.)

were filed with the agency. *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)). A claim is reasonably related to the filed claim "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Littlejohn*, 795 F.3d at 322 (citation omitted).

"To determine whether claims are reasonably related, the court must examine 'the factual allegations made in the EEOC charge itself.'" *Williams v. N.Y.C. Dep't of Educ.*, No. 17-CV-1996 (AJN), 2018 WL 4735713, at *3 (S.D.N.Y. Sept. 29, 2018) (quoting *Deravin*, 335 F.3d at 201). In other words, "it is the substance of the charge and not its label that controls." *Wallace v. Seacrest Linen*, No. 04-CV-6035 (GBD), 2006 WL 2192777, at *2 (S.D.N.Y. Aug. 2, 2006) (quoting *Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998)). The "reasonably related" exception to the exhaustion requirement "is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." *Deravin*, 335 F.3d at 201 (internal quotation marks omitted). However, even under this liberal standard, "[w]here the facts in the original EEOC charge do not sufficiently apprise the EEOC that another type of discrimination claim lurks in the background, courts have held that the second claim is not reasonably related to the first." *Alonzo*, 25 F. Supp. 2d at 458.

The exhaustion requirement is merely a "precondition to suit," not a jurisdictional requirement for Title VII claims, *Francis v. City of N.Y.*, 235 F.3d 763, 768 (2d Cir. 2000), and it is "likely not jurisdictional under the . . . ADEA" either. *Perez v. N.Y.C. Dep't of Educ.*, No. 15 CIV. 7156 (PAE), 2017 WL 4129637, at *4 (S.D.N.Y. Sept. 15, 2017), *appeal dismissed*, No.

17-3111, 2018 WL 1310470 (2d Cir. Jan. 2, 2018), *cert. denied*, 138 S. Ct. 1610 (2018) (citing

*Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 352 (E.D.N.Y. 2013)). Whether a plaintiff

in a Title VII action has properly exhausted her remedies operates as an affirmative defense, and

Defendants bear the burden of pleading and proving it. *Hardaway v. Hartford Pub. Works

Dep't*, 879 F.3d 486, 491 (2d Cir. 2018).

## 2. Application

Defendants contend that Plaintiff has failed to exhaust her remedies as to her claims of

age and ethnicity because her formal EEOC charge did not raise those claims. (Defs.' Mem. 16–

17.) Rather, in the charge, which bears the charge number 520-2015-03582, Plaintiff only

checked the boxes for "sex" and "retaliation" discrimination; the boxes for age and religion are

left unchecked. (Rosen Decl. Ex. 6, at 2.) Plaintiff's accompanying statement, which is signed

and dated February 8, 2016, mentions that she was 48 years old at the time of the events

underlying the complaint, but otherwise focuses on her claims of gender-based discrimination

and retaliation and does not state she is Jewish. (*Id.* at 3–4.) The EEOC subsequently dismissed

her complaint and issued a right to sue letter stating that it had been unable to find a violation of

federal law on the basis of her allegation that she was "subjected to employment discrimination .

. . in that because of your sex (female) and in retaliation for protesting discriminatory acts, you

were involuntarily terminated from your position." (Rosen Decl. Ex. 8.)

Plaintiff responds that that she did in fact exhaust her remedies by initially asserting

claims of religious and age-based discrimination to the EEOC, but that her EEOC counselor

discouraged her from including those and ultimately drafted a formal charge for her to sign that

omitted these claims. (Pl.'s 56.1 ¶ 39.) In support of that contention, Plaintiff submits two pages

of an EEOC intake form that she alleges she filled out, which bears the same charge number as

her formal charge and an EEOC "RECEIVED" stamp dated September 11, 2015, but which is not signed. (Pl.'s Decl. Ex. 28.) On this form, the "age" category is underlined, though not checked. (*See id.*) Plaintiff states that she did so because "she was questioning if this was a factor due to the nature of the environment at the Plaza." (Pl.'s 56.1 ¶ 39.) In addition, on the intake form the "national origin" box is checked, (Pl.'s Decl. Ex. 28), with a comment underneath that states that Deroui "made an anti-Semitic comment that [she] overheard," (Pl.'s 56.1 ¶ 39). Plaintiff states she intended to check the religion box but checked national origin instead because it was right next to the religion box. (*Id.*)

While an intake form may, under certain circumstances, constitute an EEOC charge for the purposes of exhaustion of remedies,[11] I need not and do not decide whether Plaintiff's intake form constituted a charge because even if it was, her submission fails to introduce a dispute of material fact as to whether the EEOC was sufficiently apprised as to any claim of age, religious or ethnicity discrimination.

"Merely checking a box, or failing to check a box does not necessarily control the scope of the charge. The more critical analysis is whether there is any explanation or description

---

[11] "An 'Intake Questionnaire' allows an employee to provide the EEOC with basic preliminary information about herself, her employer, and the reason for her claim of discrimination, and begins the process of filing a charge of discrimination. When the Intake Questionnaire manifests intent to have the agency initiate its investigatory processes, the questionnaire can itself constitute a charge of discrimination." *Littlejohn*, 795 F.3d at 305 n.2 (citing *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 566–67 (2d Cir. 2006)). Other district courts have noted that the current version of the EEOC intake questionnaire "require[s] a claimant to clearly express his or her intent by checking one of two boxes, thereby 'forc[ing] claimants to decide whether their questionnaire is a request for the agency to take remedial action . . . or merely a request for further information.'" *Lugo–Young v. Courier Network, Inc.*, No. 10-CV-3197 RRM LB, 2012 WL 847381, at *6 (E.D.N.Y. Mar. 13, 2012) (quoting *Hawthorne v. Vatterott Educ. Ctrs., Inc.*, No. 09–CV142TCKPJC, 2010 WL 3258560, at *4 (N.D. Okla. 2010)). "[C]ourts commonly hold that 'checking Box 2 on the current form of the EEOC's Intake Questionnaire, which authorizes the EEOC 'to look into the discrimination' described in the form and describing that discrimination in detail in the Questionnaire . . . qualifies as a charge with the EEOC for timeliness purposes." *Miller v. St. Luke's Roosevelt Hosp. Ctr.*, No. 15 Civ. 7019(VEC)(GWG), 2016 WL 1275066, at *5 (S.D.N.Y. Apr. 1, 2016) (quoting *Acheampong v. N.Y.C. Health and Hosps. Corp.*, No. 11CV9205-LTS-SN, 2015 WL 1333242, at *7 (S.D.N.Y. Mar. 25, 2015).) Here, the pages of the intake questionnaire included in Plaintiff's exhibit do not contain any such checkboxes or a signature, precluding me from determining whether as a matter of law it "manifests intent to have the agency initiate its investigatory processes." *Littlejohn*, 795 F.3d at 305 n.2.

supporting a particular claim." *Trivedi v. N.Y.S. Unified Court Sys. Office of Court Admin.*, 818 F. Supp. 2d 712, 737 (S.D.N.Y. 2011), *aff'd sub nom. Seck v. Office of Court Admin.*, 582 F. App'x 47 (2d Cir. 2014) (citation omitted).  Here, Plaintiff's underlining of the "age" category, accompanied by no relevant factual allegations, was plainly insufficient to put the EEOC on notice of any claims of age discrimination.  Although Plaintiff did check the ethnicity box, she did not check the religion box and the sole substantive allegation—an observation that a coworker made an anti-Semitic comment to someone else—did not contain any indication that she was Jewish, that the comment was directed at her or that it impacted her employment in any way—falls short of alerting the EEOC of her claim.  *See id.*; *see also Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 452 (S.D.N.Y. 2012) (plaintiff's identification in EEOC charge as a "Christian of West Indian descent" and statement by defendant about Trinidad "were insufficient to 'alert' the EEOC or provide 'adequate notice' that [plaintiff] was suffering discrimination on the basis of his national origin, especially in light of [plaintiff's] failure to check the national origin box on the EEOC charge form, his explicit statement that he was discriminated against on the basis of religion, and the otherwise exclusive focus of the charge on religious discrimination") (quoting *Jiggetts v. Diaz*, 02 Civ. 8959(LTS)(JCF), 2009 WL 749575, at *6 (S.D.N.Y. Mar. 20, 2009) (holding that when plaintiff's EEOC charge alleged only religious discrimination, a reference to himself as a "black-male" in the charge, without any descriptions of "racial harassment or racial discrimination," was insufficient to put the EEOC on notice of unalleged racial discrimination claims)).  This conclusion is supported by the fact that Plaintiff's decision not to include any claim of age, ethnicity or religious discrimination in her formal charge arguably constituted abandonment of them, and that discrimination on those bases could not "reasonably be expected to grow out of" an investigation into her gender

discrimination claims. *Littlejohn*, 795 F.3d at 322.

Accordingly, Defendants' motion to dismiss Plaintiff's claims of religious, ethnicity and age discrimination under Title VII and the ADEA, respectively, is GRANTED.

## B. *Discrimination Claims Under Title VII and the NYSHRL*

### 1. Applicable Law

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA makes it an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). The NYSHRL makes it unlawful for an employer "to refuse to hire or employ or to discharge from employment" a person on the basis of the "individual's age . . . [or] sex." N.Y. Exec. Law § 296.

Discrimination claims under Title VII, the ADEA, and the NYSHRL are analyzed using the three-step, burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) ("It is well established that the burden-shifting framework set forth by the Supreme Court in *McDonnell* . . . applies to claims brought under the ADEA."); *Ferraro v. Kellwood Co*, 440 F.3d 96, 99 (2d Cir. 2006) ("In discrimination claims brought under the [NYSHRL], the burden-shifting framework established by the Supreme Court in *McDonnell* . . . applies."). Initially, the employee bears the burden of setting forth a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. To set forth a prima facie case of discrimination, a plaintiff must show (1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she

suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.  *See id*.  The Second Circuit has emphasized that the "burden of establishing a *prima facie* case is *de minimis*."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (collecting cases).

Next, if a plaintiff successfully presents a prima facie case of discrimination, the burden shifts to the defendant to proffer legitimate, non-discriminatory reasons for the adverse employment action.  *See id.* at 468–69.  The defendant's burden at this stage is "light." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).  This burden "is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  To succeed at this stage, "the defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).  "Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons."  *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).  "Thus, the reasons tendered need not be well-advised, but merely truthful."  *Id*.

The burden then shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer took the adverse employment action motivated "in whole or in part" by discrimination.  *Holcomb*, 521 F.3d at 137 (citation and emphasis omitted).  In other words, Title VII permits a mixed-motives analysis whereby a plaintiff, to prevail, need not prove "that the employer's proffered reasons were false or played no role in the employment decision, but

only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Id.* at 138 (internal quotation marks omitted); *see also* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.").

## 2. Application

I find that although Plaintiff has made out a prima facie case of discrimination, she ultimately is unable to carry her burden of pointing to facts in the record that would permit a reasonable jury to find that Defendants' reasons for terminating her employment were pretextual.

### a. Step One:  Prima Facie Case

With regard to Plaintiff's prima facie case, Defendants concede that Plaintiff is a woman and that she suffered an adverse employment action in the form of termination of her employment, but (1) dispute that Plaintiff was qualified, and (2) dispute that Plaintiff has shown that any adverse employment acts occurred under circumstances giving rise to an inference of discrimination.

#### i. *Qualification*

The burden of making a prima facie showing of qualification is "minimal." *Owens v. N.Y.C. Housing Auth.*, 934 F.2d 405, 409 (2d Cir.1991) (internal quotation marks omitted).  All a "plaintiff must show . . . [is] that he possesses the basic skills necessary for performance of the job." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001) (holding that it was error to find that plaintiff had not established a prima facie case merely because employer was dissatisfied with his performance).  "In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of

course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001), *as amended* (Apr. 20, 2001). In support of their assertion that Plaintiff cannot show she was qualified for the job, Defendants point to various e-mails, meeting notes, and deposition testimony that purportedly attest to Plaintiff's "performance deficiencies" and "unacceptable workplace conduct" and demonstrate that Plaintiff did not possess the interpersonal and communication skills required for the job. (Defs.' Mem. 7–9.)

As an initial matter, the majority of the evidence offered by Defendants constitute unauthenticated and inadmissible hearsay. The purported notes from meetings with Plaintiff and other employees that Defendants offer do not state who authored them, nor are they accompanied by an affidavit or deposition testimony attesting to their authorship and authenticity. (Wenger Aff. Exs. H, J.) Rather, they are introduced as exhibits by Karen Wenger, Director of Talent and Culture at the Hotel, who does not purport to be the author or to have personal knowledge of the notes or who prepared them. (*See id.* ¶¶ 1, 15, 17.) Similarly, Defendants offer several documents purporting to be printouts of e-mails exchanged among Widnersson, Hunt, Mariano, Deroui, and Rosa, (*id*. Exs. I, N, P, Q, S, T), but are not accompanied by testimony of the sender, recipient, or person who retrieved them from electronic storage. *See Bell v. Rochester Gas & Elec. Corp.*, 329 F. App'x 304, 306 (2d Cir. 2009) (upholding district court's ruling that e-mail offered in opposition to summary judgment in a Title VII action was inadmissible "[g]iven . . . the lack of evidence that the email was ever sent or received"). Further, even if they were authenticated, the exhibits are out of court statements offered for the truth of the matters asserted within and are hearsay. The e-mails and notes include, are offered to establish, variously, the following: (1) the author's recounting of an incident involving Plaintiff; (2) the author's

impression of Plaintiff's personality; or (3) the author's recounting of what another person said about Plaintiff's personality or an incident involving Plaintiff.

Because these documents constitute hearsay and because Defendants have not demonstrated their admissibility, they may not be relied upon to demonstrate that there is no dispute of material fact as to Plaintiff's lack of qualification.[12] *See* Local Rule 56.1(d) (requiring any statement made by a movant to be "followed by citation to evidence which would be admissible"); *see also Elghourab v. Vista JFK, LLC*, No. 17-cv-911 (ARR) (ST), 2018 WL 6182491, at *2 (E.D.N.Y. Nov. 27, 2018) (evaluating a motion for summary judgment and declining to consider an email critiquing an employee's work and a performance evaluation conducted by the employee's supervisor, on the grounds that they were hearsay and were not admissible under any exception to the hearsay rule); *Price v. Fox Entm't Grp., Inc.*, No. 05 CIV.5259 SAS, 2007 WL 241386, at *1 (S.D.N.Y. Jan. 26, 2007) (admitting e-mail from plaintiff as a statement of party opponent, but not admitting emails that were only hearsay).

Much of the deposition testimony must also be disregarded as hearsay. *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 131 n. 12 (2d Cir. 2004) (stating that a district court is free to disregard the portions of affidavits that contain hearsay that would be inadmissible at trial); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 675–76 (S.D.N.Y. 2012) ("If a deponent states that he overheard another person make a statement, and the deponent would not be allowed to testify at trial as to what the other person said because of the rule against hearsay, the deponent's statement may not be considered on a motion for summary judgment." (internal quotation marks omitted)). Here, for example, Mariano testified that Marini said Plaintiff was

---

[12] My ruling here should not be interpreted and is not meant to be a ruling concerning whether or not the notes and emails will be admissible at any future proceeding at which Defendants could attempt to lay a proper foundation their admission.

"aggressive, bossy, [and] used foul language" that she was not "getting along with the other staff." (Mariano Dep. Tr. 180:20-25.) Evan Hunt, then the Assistant Director of Human Resources, testified that Marini told him that Plaintiff had instigated the conflict with McSloy, (Hunt Dep. Tr. 39:19-40:14),[13] that Rosa wrote him an e-mail that said Plaintiff was harassing him, (*id.* at 46:15-47:6), and that some of the cocktail servers had made "bullying complaints" about Plaintiff, (*id.* at 47:4-6). These statements are inadmissible to the extent they are offered for the truth of the matters within.

Filtering out the hearsay, the admissible evidence relevant to Plaintiff's qualifications: (1) the statements by Mariano and Hunt that they received numerous complaints about Plaintiff's behavior;[14] (2) Plaintiff's statements about herself during her recorded conversation with Mariano, including that she is a "strong woman" who has "an edge," (Recording 3, 6); (2) Plaintiff's deposition testimony about herself, including that she has a strong personality that is "occasionally" offensive to others, (Pl. Dep. Tr. 86:2),[15] that she has had "disagreements with co-workers" in the past, (*id.* at 86:23-24), and that she "at times" has an edge in her voice, (*id.* at 87:3-14). These facts are insufficient to demonstrate that Plaintiff was not qualified as a matter of law. *See Figueroa v. City of N.Y.*, 198 F. Supp. 2d 555, 567 n.11 (S.D.N.Y. 2002), *aff'd*, 118 F. App'x 524 (2d Cir. 2004), and *aff'd*, 118 F. App'x 524 (2d Cir. 2004) (although defendants argued that plaintiff was not performing her duties satisfactorily and that she received many complaints, "her job performance is clearly a question of fact").

---

[13] "Hunt Dep. Tr." refers to the transcript of the September 28, 2017 deposition of Evan Hunt. (Rosen Decl. Ex. 3, Doc. 38-3.)

[14] Although Mariano's testimony is not admissible to establish that Plaintiff actually engage in the conduct described by Mariano and Hunt, his mere statement that he received complaints about Plaintiff was not hearsay.

[15] "Pl. Dep. Tr." refers to Plaintiff's May 18, 2017 deposition transcript. (Rosen Decl. Ex. 1, Doc. 38-1.)

## ii. *Inference of discrimination*

Plaintiff's allegations in support of an inference of discrimination falls into two general categories: (1) allegations that she was treated differently from her colleagues, and (2) allegations of comments by individual managers that she contends demonstrate discriminatory animus.

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Murray v. Dutchess Cty. Exec. Branch*, No. 17-CV-9121 (KMK), 2019 WL 4688602, at *9 (S.D.N.Y. Sept. 25, 2019) (quoting *Littlejohn*, 795 F.3d at 312). To raise an inference of discrimination based on disparate treatment, a plaintiff must "show that [defendant] treated [her] less favorably than a similarly situated employee outside of the protected group." *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (internal quotations omitted); *see also Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). "[W]here a plaintiff seeks to establish [her] minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001). "An employee is similarly situated to co-employees if they were [] subject to the same performance evaluation and discipline standards and [] engaged in comparable conduct." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (internal quotation marks omitted).

Plaintiff's comparators for purposes of this analysis are the three male evening bartenders

with whom she was hired: Menite, Marini, and Rosa. As Defendants themselves describe, the three were hired on approximately the same day as Plaintiff, and had similar seniority to Plaintiff based on their hire dates. (Defs.' 56.1 ¶¶ 10–11.) Although Plaintiff's allegations of disparate treatment lack some specificity, and there is not a perfect correspondence between her conduct and the conduct of her coworkers, I find that she has alleged that their situations were "sufficiently similar" to give rise to an inference of discrimination for the purposes of step one of the *McDonnell Douglas* framework. *McGuinness*, 263 F.3d at 54. Specifically, Plaintiff offers testimony and supporting exhibits asserting that (1) Widnersson treated her differently from the three male bartenders, (*see* Pl. Dep. Tr. 104:23-105:6 ("He would pass over me and look to James when he needed something. If I said something specific like the sky is blue, he would argue with me. If James said the sky is blue, end of story."); 105:14-15 ("[H]e always said to me that I complained."); 105:19-24 ("He never said to the guys, as much as they were bitching and moaning about everything, not once did he say that you are complaining. If I spoke up about something he always put it in a negative light.")); (2) Deroui forced her to switch her lucrative Saturday night lead bartender shift for a "bar back" shift to accommodate Menite's desire to serve as lead bartender, despite the fact that Plaintiff had extensive experience, (Pl.'s 56.1 ¶ 19); (3) inappropriate behavior by her male colleagues was overlooked, including persistent lateness by Rosa and Marini, a lack of skill by Rosa, and lateness and consumption of alcohol at work by Menite,[16] (Compl. ¶ 36; Pl.'s 56.1 ¶¶ 19, 26, 29; Pl.'s Decl. ¶ 3); (4) Plaintiff received a poor performance evaluation that she believes was unfair and inaccurate, and included a reprimand for

---

[16] Plaintiff does not, however, state that she or anyone else reported this alleged behavior by Rosa and Menite, or that their supervisors were otherwise on notice of it. Indeed, Hunt testified that he had not heard reports of Menite drinking on the job until Plaintiff complained about it when her employment was terminated. (Hunt Dep. Tr. 40:25-41:24.) After Plaintiff raised the issue, Hunt testified, Mariano investigated that allegation. (*Id.*)

lateness, while her coworkers received more positive evaluations,[17] (Pl.'s 56.1 ¶ 21; Pl.'s Decl. Ex. 14; Pl. Dep. Tr. 200:16-202:7); and (4) she requested but did not receive feedback on how to improve, even though her coworkers received more specific commentary on their performance reviews, (Pl.'s 56.1 ¶¶ 16, 22; Pl.'s Dep. Tr. 202:8-13). Plaintiff also identifies a second category of allegations in support of her claim that an inference of discrimination exists, i.e., comments by supervisors and coworkers. For example, Plaintiff alleges that Deroui—who she states was the most senior manager on the floor and the person who set her schedule, (Pl.'s 56.1 ¶¶ 8, 19)—made multiple comments that were plainly derogatory and related to her gender, which she describes as "misogynistic," (Pl. Dep. Tr. 101:8-10). Those comments include Deroui: (1) calling her a bitch on several occasions, (*id.* at 101:12-13); (2) saying she was a "only a glorified 'bar back—woman's work,'" though it is unclear from this phrasing what precisely Plaintiff alleges he said, and the latter, gendered part of the comment appears in the Complaint but does not appear anywhere else in the record, (Compl. ¶ 28); (3) telling her to "stop being a baby and running to management, not ladylike," (*id.* at ¶ 30), although during her deposition and in her e-mail to Deroui, Plaintiff stated only that Deroui told her to "stop being such a baby," making no mention of the "not ladylike" portion of the comment, (Pl. Dep. Tr. 101:12-14); and (4) calling her a "bar back," (*id.* at 101:14-15).[18] I find these two categories of evidence sufficient to give rise to an inference of discrimination.

Based upon the above, I find that Plaintiff has met her burden of setting forth a prima

---

[17] I note, however, that Menite's performance review contained a note that read "poor time attendance," but although the "no" box was checked next to "Attendance & Punctuality," it appears to have been crossed out. (Pl.'s Decl. Ex. 14.)

[18] Although (1) Deroui was not the ultimate decision-maker with respect to Plaintiff's review and the ultimate termination of her employment—it is undisputed that Widnersson gave her the performance evaluation, and Mariano testified that he and others made the decision to let Plaintiff go—and (2) the inconsistency of Plaintiff's statements undermines her case, for purposes of the prima facie case, I find Plaintiff's allegations sufficient to meet the "low threshold" of alleging circumstances giving rise to an inference of discrimination. *Holcomb*, 521 F.3d at 139.

facie case of discrimination. The burden now shifts to Defendants and their proffered legitimate, non-discriminatory reasons for the adverse employment action—the termination of Plaintiff's employment.

          b.   <u>Step Two: Legitimate, Non-Discriminatory Reason for Termination</u>

As discussed above, much of Defendants' evidence must be disregarded as unauthenticated, inadmissible hearsay. However, I find that not all of the evidence presented by Defendants is inadmissible, and I find that the admissible evidence, "taken as true, would permit the conclusion that there was a nondiscriminatory reason" for the termination of Plaintiff's employment. *Holcomb*, 521 F.3d at 141 (quoting *St. Mary's*, 509 U.S at 509). Specifically, Defendants aver that they received numerous complaints about Plaintiff's behavior from coworkers, resulting in a poor performance review, and that despite efforts by Mariano to meet with Plaintiff to improve her behavior, Plaintiff did not do improve or exhibit a willingness to improve.

Mariano testified that from the beginning of Plaintiff's employment, "she had a pattern of repeated concerns that she wasn't getting along with her coworkers [or] always acting professionally." (Mariano Dep. Tr. 239:23-240:4.) In particular, he stated, "there [was] a feeling out there that [Plaintiff was] difficult to work with, and it's coming from not just the managers." (Recording 1.) For example, he stated that the female cocktail servers and Rosa had complained that Plaintiff did not support them when the bar became busy, instead conversing with customers. (*Id*. at 2; *see also* Mariano Dep. Tr. 180:20-181:16 (stating that Mariano had received a complaint from "Edwin" that Plaintiff was "aggressive, bossy, used foul language," "was a bully," and did not support the other bartenders); Hunt Dep. Tr. 46:15-22 (testifying that Rosa had sent him an e-mail complaining that Plaintiff's "continued harassment" of him was "only

getting worse" and "need[ed] to be resolved as soon as possible for it is no longer just causing me stress and anxiety . . . it [has] started affecting my ability to perform my job.").) Mariano also stated that other coworkers had complained that "whenever they ruffle[d] [Plaintiff's] feathers, [she] [got] short with them," and that Widnersson had said that "things [were not] working out with Tina" and that she was "not really responding" to feedback about her behavior. (Recording 2, 5.) Mariano also testified that he received complaints from Carolyn Merlo, a manager; Angelina Policrasti, a wine and beverage consultant; and the wife of the restaurant's chef, who were concerned about Plaintiff's conduct with the other staff and encouraged Mariano to terminate her employment. (Mariano Dep. Tr. 242:16-245:23; 247:10–249:19.) According to Mariano, Plaintiff's behavior posed a particular problem in the environment of the Plaza, "a luxury hotel, where respect amongst employees is important." (*Id.* at 241:13-22.) Mariano reiterated these issues in an e-mail to Evan Hunt on January 25, 2015, (*see* Wenger Decl. Ex. Q), which he confirmed was authentic at his deposition, (Mariano Dep. Tr. 238:7–14).

Based on the complaints about her behavior, Plaintiff received a negative performance review. (*See* Pl.'s Decl. Ex. 14; Wenger Decl. Ex L; Recording 2 (informing Plaintiff that her performance review was "fueled by people thinking that you're difficult").) On January 15, 2015, Mariano met with Plaintiff to discuss the performance review. (Mariano Dep. Tr. 238:10-14.) He told Plaintiff about many of the complaints about her behavior, and expressed his hope that Plaintiff's relationship with her coworkers could change "with some tweaks." (Recording 2; *see also* Mariano Dep. Tr. 238:15-23 ("I felt it was my responsibility to have a candid conversation with her and really let her know what the large concerns were, as I understood them.").)

In response, Plaintiff denied that she was difficult and stated that her "image ha[d]

worked [her] whole career for 20 years." (Recording 4.) After the meeting, Mariano testified, he

> didn't feel that Tina was taking ownership to do any kind of self-reflection to try to change any of the issues that were a concern . . . it just began to escalate that the bartenders . . . felt that Tina was a bully [and] wasn't doing her share of the work. The cocktail servers felt she was negligent in helping out whoever was on the service bar. They weren't getting along with her as well.

(Mariano Dep. Tr. 240:7-22.) Despite Mariano's attempts to be candid with Plaintiff, he felt that he did not "see[] any willingness to change," and that she was "proud of the fact that she's confrontational with people." (*Id.* at 241:8-17.) Based on these observations, Mariano testified, he "felt it was in the hotel's best interest to exercise their right to end a relationship with [her] . . . for failing to meet the standards and expectations of the hotel." (*Id.* at 242:1-7.)

While most if not all of Mariano's testimony about the complaints he received would not be admissible to establish the truth of the matters contained in those complaints—i.e., that Plaintiff had in fact engaged in the conduct alleged—they are admissible for the purposes of demonstrating that Defendants received such complaints, and relied on them in preparing Plaintiff's evaluation and ultimately terminating her employment when the issues others had with her behavior did not change. *See Reeves*, 530 U.S. at 142 (stating that defendants' burden "is one of production, not persuasion; it can involve no credibility assessment") (internal quotation marks omitted). Accordingly, Defendants have carried their burden[19] "of articulating legitimate and nondiscriminatory reasons for termination." *Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d 269, 284 (S.D.N.Y. 2009) (defendant carried step two burden by demonstrating that plaintiff had received an unsatisfactory performance evaluation, had been reprimanded for lateness and failure to adequately perform her work duties, and had been the

---

[19] This conclusion would have been strengthened had Defendants authenticated even some portion of the documentary evidence such that those documents would be admissible at trial. *See Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 470 (S.D.N.Y. 2008).

subject of student complaints); *see also, e.g.*, *Montanile v. Nat'l Broadcast Co.*, 211 F.Supp.2d 481, 488–89 (S.D.N.Y. 2002) (finding an employee's frequent absence from her work desk and the employee's refusal to perform her duties legitimate, nondiscriminatory reasons for termination).

### c.  Step 3:  Pretext

Although Plaintiff's evidence was sufficient to establish a prima facie case of discrimination, I find that that evidence does not establish that Defendants' non-discriminatory reason for her termination was "mere pretext" for discrimination, nor even that gender discrimination "was at least one of the motivating factors." *Holcomb*, 521 F.3d at 137.

As discussed above, Mariano testified that it was his decision to terminate Plaintiff's employment.  Plaintiff has offered no evidence (1) that it was not Mariano's decision to make, (2) to suggest that any other person was involved in the decision to terminate her employment, or (3) that Mariano's decision to terminate her employment was pretextual.  Although Plaintiff "repeatedly challenges the substance of [Mariano's] performance review[]," and the feedback given to her by him, "[s]he does not present evidence to suggest that [Mariano] did not actually hold those beliefs about [her behavior] nor does [s]he offer evidence to undermine them." *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013). (citing *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 105 (2d Cir. 2001) ("Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn." (internal quotation marks omitted)); *Lu v. Chase Inv. Servs. Corp.*, 412 Fed. Appx. 413, 417 (2d Cir. 2011) (that an employer's decision "may have been erroneous does not, without evidence that it was a pretext for discrimination, satisfy . . . its burden under *McDonnell Douglas*").

Moreover, there is no evidence that discriminatory animus motivated Mariano's decision. Plaintiff contends that animus is exhibited by the fact that Mariano spelled out the word "bitch" in reference to her (Pl. Dep. Tr. 96:13-25; Recording 4), and that Mariano and Rosa spoke in Spanish about her "in derogatory terms," (Compl. ¶ 35). I do not find these allegations probative of discriminatory animus. Plaintiff's testimony that Mariano and Rosa spoke in Spanish about her "in derogatory terms" is too vague to permit an inference of impermissible bias. Mariano's usage of the spelled-out word "bitch" was perhaps inappropriate in a workplace, but the full "comment[] along with [its] context reveal[s] [its] benign nature." *Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 769 (E.D.N.Y. 2018); *see Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 118 (2d Cir. 2010) (declining to find that "use of the word 'bitch' always and in every context" has "such an intensely degrading sexual epithet that its use implies as a matter of law hostility toward women" and "reject[ing] a rule that would automatically command an inference of gender-based hostility to be drawn from [the word's] use"); *see also, e.g.*, *Simon v. Turner*, No. 94 CIV. 8446 (JSR), 1997 WL 151486, at *2 (S.D.N.Y. Apr. 1, 1997) (granting summary judgment on plaintiff's discrimination claims where plaintiff failed to plead that two incidents of her being called a "bitch" were related to "any other alleged discrimination, and plaintiff never reported either incident to her supervisors or indicated to anyone that the 'bitch' comments were motivated by discriminatory animus"); *Holleman v. Art Crating Inc.*, No. 12 CIV. 2719 VMS, 2014 WL 4907732, at *36 (E.D.N.Y. Sept. 30, 2014) (collecting cases). Prior to Mariano's comment, Plaintiff commented that the female servers were "very rude and snappish" toward her. (Recording 3.) Mariano then suggested as a remedy that they convene a meeting for the team to get to know each other better, so that even on "days where [Plaintiff] is going to be a B-I-T-C-H," her coworkers do not "tak[e] things personally so they don't reflect in

an image of [Plaintiff] that may not be fully accurate." (*Id.* at 3–4.) In Mariano's usage, the word "bitch" did not carry a negative connotation, but rather was intended to facilitate understanding of Plaintiff's personality by the servers. The comment was constructive in nature and was not accompanied by a reprimand or other negative repercussion. Indeed, Plaintiff's described herself as having a strong personality that is "occasionally" offensive to others, (Pl. Dep. Tr. 86:2-5), that she has had "disagreements with co-workers" in the past, (*id.* at 86:12-24), and that she "at times" has an edge in her voice, (*id.* 87:3-14), is consistent with information Mariano was receiving that led him to try and remedy the situation. Therefore, no reasonable jury could find this remark, in context, to have been suggestive of discriminatory animus on the part of Mariano. *See, e.g.*, *Senese*, 330 F. Supp. 3d at 769 (where assistant principal told teacher that he was "a 'big guy' and reminded him to 'be that much more careful' as a man in the context of restraining a young student," comment was benign because it was made "in the context of teaching advice" and did not come with any disciplinary action).

Thus, only individuals whose conduct might give rise to an inference of discrimination were Widnersson and Deroui. As an initial matter, Plaintiff's statements about Widnersson's treatment of her are fairly conclusory, *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 575–76 (S.D.N.Y. 2010) ("feelings and beliefs are no substitute for persuasive evidence that identifiable, valid comparators were treated in a meaningfully different manner"), and she does not provide substantial evidence to conclude that she and the other bartenders were "similarly situated in all material respects [so] as . . . to permit an inference of discrimination," *Baity v. Kralik*, 51 F. Supp. 3d 414, 446 (S.D.N.Y. 2014) (internal quotation marks omitted). For example, although she complains that she was disciplined for lateness while Rosa and Menite were not, Menite's performance review contained a note that read "poor time attendance" and

the "no" box was checked next to "Attendance & Punctuality," although it appeared to have been

crossed out. (Pl.'s Decl. Ex. 14.) Conversely, although Plaintiff complains that Menite was not

reprimanded for drinking on the job, she does not complain that she was reprimanded for similar

behavior. Finally, she does not contend that any of the other bartenders were the subjects of

complaints by other coworkers, and that these complaints were ignored by Widnersson or any

other supervisors. *Cf. Baity*, 51 F. Supp. 3d at 446 (no inference of discrimination where

plaintiff correction officer on a probationary term was terminated after being involved in an

incident with an inmate and after complaints about his behavior, where there was no evidence of

"behavioral problems" on the part of the other three officers on probationary term); *Murray*,

2019 WL 4688602, at *10 (no inference of racial discrimination based on disparate treatment,

where plaintiff failed to allege that any specific employee received lesser discipline for a similar

offense). Furthermore, while Widnersson was involved in the preparation of the performance

evaluation, Mariano testified that it was Plaintiff's "[un]willingness to change" following that

review, and the numerous complaints he received from others, including managers, that

ultimately led him to terminate Plaintiff's employment. Nothing in the records suggests that

Widnersson was involved in that decision.

With respect to Deroui, although his alleged comments were indeed offensive, I find

them to be "stray remarks" within the overall circumstances of this case. "[T]he more remote

and oblique [] remarks are in relation to the employer's adverse action, the less they prove that

the action was motivated by discrimination." *Galimore*, 641 F. Supp. 2d at 284 (quoting

*Tomassi v. Insignia Fin. Group, Inc.,* 478 F.3d 111, 115 (2d Cir. 2007)). Accordingly, when

determining the significance of "stray remarks," the court's task is to "assess the remarks'

'tendency to show that the decision-maker was motivated by assumptions or attitudes relating to

the protected class.'" *Id.* (quoting *Tomassi*, 478 F.3d at 115.) Here, nothing in the record suggests that Deroui was involved in the performance review or the ultimate termination of Plaintiff's employment, nor is there any evidence that Deroui manipulated Mariano, Widnersson, or any of the coworkers who made complaints about Plaintiff. *See Edwards v. Rochester Inst. of Tech.*, 794 F. App'x 65, 67 (2d Cir. 2019) (stating that an employer may be liable on a "cat's paw theory" where the employee was "fired by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive"); *see also Woodard v. TWC Media Solutions, Inc.*, No. 09-cv-3000 (BSJ)(AJP), 2011 WL 70386, at *7 (S.D.N.Y. Jan. 4, 2011) (noting that "[r]emarks are especially likely to be considered 'stray' when made by a decision maker unrelated to the decision-making process temporally remote from the date of decision").

Finally, Plaintiff herself states that she was replaced by a female bartender. (Pl.'s 56.1 ¶ 21.) This fact, too, undermines any suggestion of discrimination based on Plaintiff's gender. *Cf. Fleming v. MaxMara USA, Inc.,* 371 Fed. App'x. 115, 117 (2d Cir. 2010) (summary order) (affirming summary judgment in favor of defendant and finding no inference of discrimination where black female plaintiff alleged termination based on race discrimination but she was "replaced by another black female").

Accordingly, considering the record and drawing all inferences in Plaintiff's favor, I find that Plaintiff has failed to "meet her burden [of] adducing sufficient evidence to support a jury finding that [she] was terminated for discriminatory reasons." *Galimore*, 641 F. Supp. 2d at 286. Defendants' motion to dismiss Plaintiff's discrimination claim is GRANTED.

### C.  *Retaliation*

#### 1.  **Applicable Law**

Retaliation claims under Title VII and the NYSHRL are also analyzed using the

*McDonnell Douglas* burden-shifting framework.  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d

93,110 (2d Cir. 2010); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  A plaintiff

may establish a prima facie case of retaliation by showing:  "(1) that she participated in a

protected activity [known to defendants], (2) that she suffered an adverse employment action,

and (3) that there was a causal connection between her engaging in the protected activity and the

adverse employment action."  *Gorzynski*, 596 F.3d at 110.  The standard for an adverse

employment action in the context of retaliation differs from the standard for a discrimination

claim in that a plaintiff need only demonstrate that "a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."  *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

The burden then shifts to the defendant "to demonstrate that a legitimate,

nondiscriminatory reason existed for its action."  *Summa*, 708 F.3d at 125.  If the defendant

meets this burden, "then the burden shifts back to the plaintiff to establish, through either direct

or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory

retaliation."  *Id.* (internal quotation marks omitted).  Retaliation claims under Title VII require a

showing that the protected activity was a "but-for" cause of the adverse employment action.

*Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  A plaintiff need not show

that retaliation was the only cause of the employer's action; rather, a plaintiff must only show

"that the adverse action would not have occurred in the absence of the retaliatory motive."  *Kwan*

*v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). A plaintiff may establish a claim for retaliation without proving a valid discrimination complaint. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

### 2. Application

#### a. Step 1: Prima Facie Case

Plaintiff claims that Defendants retaliated against her for her complaints about McSloy and Deroui by soliciting or fabricating complaints against her to discredit her, (Pl.'s 56.1 ¶ 16), giving her a negative performance review, (*id.* ¶ 21), and ultimately, terminating her employment, (*id.* ¶ 31).[20]

While terminating a plaintiff's employment and giving a negative performance review constitute adverse employment actions, *see Ibok v. Sec. Indus. Automation Corp.*, 369 Fed. App'x. 210, 214 (2d Cir. 2010) ("Here, [plaintiff] suffered adverse actions in the form of warnings, a negative performance review, the elimination of his shift, and, ultimately, his firing."), Plaintiff's statement that Defendants' solicited complaints could not have been an adverse employment action. Nothing in the record suggests that Plaintiff knew about the specific complaints until the discovery stage of this lawsuit; therefore, assuming the complaints were solicited by Defendants—a fact unsupported by the record—they could not have dissuaded her, or a reasonable employee, from bringing a charge of discrimination. *See Burlington*, 548 U.S. at 68.

Defendants do not dispute that Plaintiff participated in a protected activity known to

---

[20] Plaintiff asserts several times that Defendants "dead-ended" her complaints. This conclusory assertion alone cannot give rise to a retaliation claim; "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010).

defendants or that she experienced an adverse employment action, but argue that Plaintiff cannot establish a causal connection between her protected activity and the adverse employment actions, because the record establishes that the termination of her employment was actually based on her on complaints from her colleagues, her negative performance review, and her unwillingness to change.  (Defs.' Mem. 14–15.)

As an initial matter, Defendants assume that the only adverse employment action in the record is Plaintiff's firing, but as stated above, the performance review, standing alone can constitute an adverse employment action.  Moreover, Defendants' argument confuses the third and first stages of the *McDonnell Douglas* framework for retaliation claims.  At the first stage, all a plaintiff must do is show causation "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Galimore*, 641 F. Supp. 2d at 288 (citation omitted).  Where "'mere temporal proximity' is offered to demonstrate causation, the protected activity and the adverse action must occur 'very close' together." *Id.* (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

Here, the record shows that the protected activity was followed closely in time by the adverse employment actions:  Plaintiff made her first complaint about McSloy on December 8, 2014, followed by additional complaints by e-mail on December 25, 2014, and December 30, 2014.  She then received her negative review on January 8, 2015.  She subsequently made several complaints about this review and implied she believed it was based on sexist biases (for example, she left a "Speaking While Female" article on Mariano's desk in mid-February, (Pl.'s 56.1 ¶ 24)), then was fired on March 25, 2015.  On the other hand, the record suggests that the

timing of Defendants' actions towards Plaintiff was not unique to Plaintiff: her performance review was a standard 60-day review, other bartenders received evaluations at the same time, and Plaintiff was terminated shortly before the end of a probationary period. Although a close call, I find the facts sufficient to give rise to an inference of retaliation at the first stage. *See Kwan*, 737 F.3d at 845 ("The three-week period from Kwan's complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."); *Gorzynski*, 596 F.3d at 111 (two-month lapse of time between complaint and firing was sufficient to establish causal connection for purposes of prima facie case).

### b. Step 2: Legitimate, Non-discriminatory Reason

As already detailed above, Defendants have proffered through admissible evidence a legitimate, non-discriminatory motive for Plaintiff's negative performance review and ultimate firing. I therefore turn next to the third step.

### c. Step 3: Pretext

At step three, a plaintiff need not show that "retaliation was the only cause of the employer's action;" rather, a plaintiff must only show "that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. "Temporal proximity alone is insufficient to defeat summary judgment at the [third] stage," but it may defeat summary judgment in conjunction with, for example, "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action," *id.*, evidence that the subject of the plaintiff's complaints "generated much of the evidence supporting the non-retaliatory justification," *Ibok*, 369 F. App'x at 213 (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 770 (2d Cir. 1998)), evaluations pre-dating the protected activity that are contradicted by activities that post-date the activity, *id.* (citing *Treglia v. Town of*

*Manlius,* 313 F.3d 713, 722 (2d Cir. 2002)), or a showing that there is "a strong temporal relationship between the protected activity and the adverse action," *id.* (citing *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 180 (2d Cir. 2005)).

Here, the temporal relationship between Plaintiff's complaints and her performance review and termination is weak, particularly given that that Defendants' actions took place on the timeline of a standard probationary period. Plaintiff does not offer any evidence beyond that temporal relationship to undermine Defendants' proffered non-retaliatory motive, any evidence that the individuals who were the subject of her complaints—McSloy and Deroui—were involved in the performance review or her firing, nor any other evidence suggesting that Defendants viewed her complaints in a negative light.

Accordingly, I find that Plaintiff has not identified evidence in the record that would allow a reasonable jury to conclude by a preponderance of the evidence that Defendants' proffered reason was pretextual, and "that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan*, 737 F.3d at 846. Defendants' motion to dismiss Plaintiff's retaliation claim is GRANTED.

### D. *Hostile Work Environment*

#### 1. **Applicable Law**

A plaintiff may establish a hostile work environment claim under Title VII, and the NYSHRL by demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Gorzynski*, 596 F.3d at 102 (citation omitted). "[A] plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient

combination of these elements, to have altered her working conditions." *Pucino*, 618 F.3d at119. This does not require a plaintiff to show that her work environment was "unendurable or intolerable." *Feingold v. N.Y.*, 366 F.3d 138, 150 (2d Cir.2008) (internal quotation marks omitted).

"This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Littlejohn*, 795 F.3d at 321 (quoting *Raspardo*, 770 F.3d at 114). Plaintiff must allege that the incidents were "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Raspardo*, 770 F.3d at 114); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) ("[T]he plaintiff must show more than a few isolated incidents of racial enmity." (citation omitted)). "Incidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (internal quotation marks omitted). However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

A plaintiff must also plausibly allege "that the hostile work environment was caused by animus towards her as a result of her membership in a protected class." *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011) (quoting *Sullivan v. Newburgh Enlarged Sch. Dist. Clarence Cooper*, 281 F. Supp. 2d 689, 704 (S.D.N.Y. 2003)). "It is 'axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable . . . only when it occurs because of an employee's protected characteristic,'

such as race or gender." *Lloyd v. Holder*, No. 11 Civ. 3154(AT), 2013 WL 6667531, at *11 (S.D.N.Y. Dec. 17, 2013) (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

Finally, a plaintiff must "show a basis for imputing the objectionable conduct to the employer." *Gorzynski*, 596 F.3d at 103. When the alleged harasser "is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer." *Id.*

## 2. Application

Plaintiff's hostile work environment claim is based on many of the same allegations that underlie her discrimination claim: the two comments made by Deroui, Deroui's use of the word "bitch" on several unspecified occasions, Mariano's spelling out of the word "bitch" in a conversation with Plaintiff, and Mariano and Rosa speaking in Spanish about her in derogatory terms. As discussed, several of these incidents are either benign, or are set forth with insufficient specificity. Even taken together, I find that these discrete incidents are not severe enough nor frequent enough to allow a reasonable jury to find that Plaintiff was the victim of a hostile work environment. *See Beale v. Mount Vernon Police Dep't*, 895 F. Supp. 2d 576, 589 (S.D.N.Y. 2012) ("[C]ourts have regularly concluded that the occasional use of [the] term ["bitch"] is not severe enough to create a hostile work environment."); *Garone v. United Parcel Serv., Inc.,* 436 F. Supp. 2d 448, 469 (E.D.N.Y.2006), *aff'd by,* 254 Fed. App'x. at 108 (2d Cir. 2007) (holding that "the occasional off-color remark," including the terms "office bitch," did not rise to the level of an objectively hostile work environment); *see also Littlejohn*, 795 F.3d at 321 (allegations that the employer made negative statements about the plaintiff, was impatient and used harsh tones with the plaintiff, distanced herself and declined to meet with the plaintiff, required the plaintiff to recreate work, wrongfully reprimanded the plaintiff, increased the plaintiff's schedule, and was sarcastic to the plaintiff, could not support a finding of a severe or pervasive hostile work

environment).

Accordingly, Defendants' motion to dismiss Plaintiff's hostile work environment claim is GRANTED.

### E. *State Law Claims*

Plaintiff also asserts failure to investigate claims under the NYSHRL and the NYCHRL, and a common law claim of negligent supervision. (Compl. ¶¶ 49–59.) Having dismissed all of Plaintiff's federal claims, as well as those of her NYSHRL discrimination claims that are governed under the same standards as their federal counterparts, my jurisdiction over Plaintiff's remaining claims would be supplemental.

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Courts in this District routinely decline to exercise supplemental jurisdiction over a plaintiff's state law claims, including NYCHRL claims and common law torts, after dismissing all federal claims. *See Espinoza v. New York City Dep't of Transportation*, 304 F. Supp. 3d 374, 391 (S.D.N.Y. 2018) (granting summary judgment dismissing plaintiff's federal claims and declining to exercise supplemental jurisdiction over NYCHRL claims), *appeal dismissed* (Oct. 4, 2018); *Harris v. NYU Langone Med. Ctr.*, No. 12 Civ. 0454(RA), 2014 WL 941821, at *1–2

(S.D.N.Y. Mar. 11, 2014) (declining to exercise jurisdiction over NYHSRL and NYCHRL claims); *Algarin v. City of N.Y.*, No. 12 Civ. 1264(LTS), 2012 WL 4814988, at *4 (S.D.N.Y. Oct. 10, 2012) (declining to exercise jurisdiction over New York State Executive Law § 296 and NYCHRL claims); *Velasquez v. City of N.Y.*, No. 08 Civ. 08478(RJH), 2012 WL 232432, at *8 (S.D.N.Y. Jan. 25, 2012) (declining to exercise supplemental jurisdiction over tort claims after granting summary judgment dismissing § 1983 claims); *Mabry v. Neighborhood Def. Serv.*, 769 F.Supp.2d 381, 402 (S.D.N.Y. 2011) (declining to exercise jurisdiction over NYSHRL and NYCHRL claims).  Furthermore, "comity counsels against exercising jurisdiction over a plaintiff's NYCHRL claims, as the NYCHRL has a lower threshold of proof than its federal counterparts and has been applied primarily at the intermediate appellate level of the state courts, with limited opportunity for the New York Court of Appeals to construe it."  *Smith v. City of N.Y.*, 385 F. Supp. 3d 323, 345 (S.D.N.Y. 2019) (internal quotation marks omitted); *cf. Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 300–01 (2d Cir. 2003) (finding that district court had abused its discretion by exercising supplemental jurisdiction over state law claim that "raise[d] complex and unsettled questions of New York law" where federal claims had been abandoned).

I have dismissed all claims over which I had original jurisdiction, as well as any state law claims governed under the same standards as their federal counterparts.  Accordingly, I decline to exercise supplemental jurisdiction over Plaintiff's failure to investigate claims under the NYSHRL and the NYCHRL, and common law claim of negligent supervision, and these claims are DISMISSED without prejudice to refiling in state court.

## F.  *Plaintiff's Motion to Reopen Discovery*

Plaintiff moves to reopen discovery pursuant to Federal Rule of Civil Procedure 56(d)(2) in order to obtain (1) certain time clocks for all four bartenders, which she alleges will

demonstrate that the male bartenders were abusing overtime, arriving late, and leaving early without reprimand, and that she was not leaving early; (2) nightly accountings for the tips and income Plaintiff was paid during her time as bartender to demonstrate that Plaintiff was a team player, to determine that she was paid correctly, and to assess how much income she lost when her shift was allegedly given away; and (3) Rosa's performance review ("First Request"). (Doc. 43, at 1–2.) Plaintiff also requests permission to serve Defendants eight additional interrogatories to inquire into (1) the termination of Menite in or around November or December of 2019 and (2) the circumstances under which other employees left the establishment after the close of discovery ("Second Request"). (Doc. 51, at 1.) Plaintiff submits that her request for further discovery regarding the circumstances of Menite's termination is timely as she was not aware of Menite's termination until May 2020, and believed the courts were closed due to COVID-19 restrictions until September 2020, at which point she promptly reached out to New York Legal Assistance Group for legal advice regarding her instant request. (Doc. 53, at 1.)

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may. . . allow time to . . . take discovery." Fed. R. Civ. P. 56(d)(2).

Plaintiff has not demonstrated any "specified reason[]" she has not been able to present the purportedly essential facts she now seeks to discover. She and her former counsel had seven months in which to conduct discovery; former counsel took at least two depositions and represented in a letter to me on August 18, 2017, that he "believe[d] document disclosure [was] complete." (Doc. 16.) That Plaintiff may now disagree with the choices made by her "freely retained" former counsel, whose decisions she is bound by, is not sufficient reason to re-open discovery. *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) (affirming district court's

denial of motion to reopen discovery filed after motion for summary judgment was fully briefed where plaintiff had seven months to complete discovery); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) ("[In] our system of representative litigation . . . each party is deemed bound by the acts of his lawyer-agent.")).  Plaintiff had "ample time" to complete discovery, and did not raise the issue of purportedly outstanding documents until after a motion for summary judgment had been filed.  "A party who both fails to use the time available and takes no steps to seek more time until after a summary judgment motion has been filed need not be allowed more time for discovery absent a strong showing of need." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 928 (2d Cir. 1985).

Plaintiff has not made a strong showing of need.  Regarding Plaintiff's First Request, even if the evidence Plaintiff seeks existed and demonstrated what she says it does, it would go to the disparate treatment between her on the one hand and the male bartenders on the other.  I have already agreed with Plaintiff that her testimony that she was treated differently by Deroui and Widnersson than the male bartenders gave rise to an inference of discrimination.  However, the record contains no evidence that either Deroui or Widnersson was involved in the ultimate termination of Plaintiff's employment, particularly given Mariano's testimony that it was his decision to fire her, and Plaintiff's failure to offer any facts rebutting that.  In the absence of any link—even a tenuous one—between the discriminatory remarks and treatment and Defendants' decision to end Plaintiff's employment, Plaintiff's claim will fail regardless of whether she obtains the documents she now seeks.  As for Plaintiff's Second Request for additional discovery into Menite's termination, as Defendants point out, such discovery would not be germane to her opposition to Defendants' summary judgment motion:  "the subject of the lawsuit pertains to the circumstances of Plaintiff's termination on March 13, 2015 and certain events that predated her

termination date," (Doc. 52, at 3); yet, Plaintiff seeks information about the alleged termination that happened in November or December of 2019, more than four years after the events forming the gravamen of her lawsuit. Plaintiff fails to establish that any facts adduced from additional discovery into Menite's termination in 2019 would be essential to justify her opposition to Defendants' summary judgment motion, and absent such an association, I see no reason that additional discovery to that end would modify my ruling today.

Accordingly, Plaintiff's motion to reopen discovery is DENIED.

## V. <u>Conclusion</u>

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. Plaintiff's claims under Title VII and the ADEA, and her claims of discrimination, retaliation, and hostile work environment under the NYSHRL, are dismissed with prejudice. Plaintiff's failure to investigate claims under the NYSHRL and the NYCHRL, and her negligent supervision claim, are dismissed without prejudice to refiling in state court.[21]

IT IS FURTHER ORDERED that Plaintiff's motion to reopen discovery is DENIED.

IT IS FURTHER ORDERED that, in light of this Opinion & Order, Defendants' request for a conference on their pending summary judgment motion is DENIED.

---

[21] Plaintiff is advised that the federal supplemental jurisdiction statute, 28 U.S.C. § 1367(d), "stops the clock" on the statute of limitations for any state law claims filed in federal court while the claim is pending in federal court and for 30 days after it is dismissed. *Artis v. D.C.*, 138 S. Ct. 594 (2018).

The Clerk of Court is respectfully directed to terminate the open motions at Documents 34 and 43, enter judgment for Defendants, and to close this case.

SO ORDERED.

Dated:  June 28, 2021
        New York, New York

Vernon S. Broderick
United States District Judge